**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EVERYTOWN FOR GUN SAFETY
SUPPORT FUND,

               Plaintiff,

      v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

             Defendant.

Case No. 18-CV-2296 (AJN)

**ORAL ARGUMENT REQUESTED**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS CROSS MOTION FOR SUMMARY JUDGMENT AND**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF PROCEDURAL AND FACTUAL HISTORY ............................... 3

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

    I.   The Tiahrt Rider is Not an Exemption 3 Statute ............................................. 9

    II.  Statistical Aggregate Data is Explicitly Exempted from the Tiahrt Rider's Prohibitions. 14

    III.  Everytown Does Not Seek the Creation of New Records. ............................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdeljabbar v. ATF*,
   74 F. Supp. 3d 158 (D.D.C. 2014) ...................................................................13, 14

*ACLU v. Dep't of Def.*,
   901 F.3d 125 (2d Cir. 2018)...........................................................................9, 16

*Amnesty Int'l USA v. CIA*,
   728 F. Supp. 2d 479 (S.D.N.Y.2010)....................................................................24

*Associated Press v. Dep't of Def.*,
   554 F.3d 274 (2d Cir. 2009)..................................................................................8

*Auburn Hous. Auth. v. Martinez*,
   277 F.3d 138 (2d Cir. 2002)................................................................................19

*Bloomberg L.P. v. Bd. of Governors of the Fed. Reserve Sys.*,
   649 F. Supp. 2d 262 (S.D.N.Y. 2009)....................................................................8

*Carcieri v. Salazar*,
   555 U.S. 379 (2009)...........................................................................................14

*Carney v. Dep't of Justice*,
   19 F.3d 807 (2d Cir. 1994)..............................................................................9, 23

*Carson v. U.S. Office of Special Counsel*,
   534 F. Supp. 2d 99 (D.D.C. 2008)......................................................................22

*Center for Investigative Reporting v. U.S. Dep't of Justice*,
   2018 WL 3368884 (N.D. Cal. July 10, 2018).....................................12, 16, 17, 21

*CIA v. Sims*,
   471 U.S. 159 (1985)...........................................................................................14

*City of Chicago v. ATF.*,
   287 F.3d 628 (7th Cir. 2002) ..........................................................................14, 17

*City of Chicago v. ATF*,
   384 F.3d 429 (7th Cir. 2004) ..........................................................................12, 13

*Fowlkes v. ATF*,
   139 F. Supp. 3d 287 (D.D.C. 2015) .....................................................................12

*Goland v. CIA*,
    607 F.2d 339 (D.C. Cir. 1978) ........................................................................................24

*Gomez-Perez v. Potter*,
    553 U.S. 474 (2008) .......................................................................................................13

*Grand Cent. P'ship, Inc. v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999) ...........................................................................................24

*Halpern v. FBI*,
    181 F.3d 279 (2d Cir. 1999) ...............................................................................9, 23, 24

*Hudgins v. IRS*,
    620 F. Supp. 19 (D.D.C. 1985) .......................................................................................18

*Kensington Research & Recovery v. U.S. Dep't of Hous. & Urban Dev.*,
    620 F. Supp. 2d 908 (N.D. Ill. 2009) .............................................................................20

*Local 3, Int'l Bhd.. of Elec. Workers, AFL-CIO v. NLRB*,
    845 F.2d 1177 (2d Cir. 1988) .........................................................................................18

*Long v. ICE*,
    2018 WL 4680278 (D.D.C. Sept. 28, 2018) ...................................................................20

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011) .........................................................................................................8

*Nat'l Day Laborer Org. Network v. ICE*,
    2017 WL 1494513 (S.D.N.Y. April 19, 2017) ................................................................24

*Nat'l Sec. Counselors v. CIA*,
    898 F. Supp. 2d 233 (D.D.C. 2012) ..........................................................................19, 22

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978) .........................................................................................................8

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) .......................................................................................................18

*Penn v. U.S. Dep't of Justice*,
    2012 WL 761741 (E.D. Cal. Mar. 7, 2012) ....................................................................12

*People for the Am. Way Found. v. U.S. Dep't of Justice*,
    451 F. Supp. 2d 6 (D.D.C.2006) .........................................................................19, 20, 24

*Posadas v. Nat'l City Bank*,
    296 U.S. 497 (1936) .......................................................................................................10

iii

*Public Citizen, Inc. v. U.S. Dep't of Educ.,*
    292 F. Supp. 2d 1 (D.D.C. 2002) ........................................................24

*Reep v. U.S. Dep't of Justice,*
    302 F. Supp. 3d 174 (D.D.C. 2018) ...................................................12

*Schladetsch v. U.S. Dep't of Hous. & Urban Dev.,*
    2000 WL 33372125 (D.D.C. April. 4, 2000) .................................19, 20

*Smith v. ATF,*
    2014 WL 3565634 (E.D. Mich. July 18, 2014) ...................................12

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
    489 U.S. 749 (1989) ...............................................................................2

*United States v. Fausto,*
    484 U.S. 439 (1988) .........................................................................13, 14

*United States v. Garcia,*
    718 F.2d 1528 (11th Cir. 1983) ...........................................................15

*United States v. Lovely,*
    319 F.2d 673 (4th Cir. 1963) .........................................................10, 11

*United States v. Pacelli,*
    491 F.2d 1108 (2d Cir. 1974) .......................................................10, 13

*Wilner v. N.S.A.,*
    592 F.3d 60 (2d Cir. 2009) ...............................................................9, 14

*Yeager v. DEA,*
    678 F.2d 315 (D.C. Cir.1982) .............................................................20

**Statutes**

5 U.S.C. 522(b)(3) .................................................................................9

5 U.S.C. § 552(3)(C) ...........................................................................20

5 U.S.C. § 552(a)(3)(C) .......................................................................23

5 U.S.C. § 552(a)(3)(D) .......................................................................19

5 U.S.C. § 552(a)(4)(B) .......................................................................23

5 U.S.C. § 552(b)(3) ..........................................................................2, 9

5 U.S.C. § 552(b)(3)(B) ......................................................................2, 9

5 U.S.C. § 552(C) ..................................................................................................23

5 U.S.C. § 552(f)(2)(A)..........................................................................................19

**Other Authorities**

*Jamie A. Grodsky, The Freedom of Information Act in the Electronic Age: the*
   *Statute Is Not User Friendly*, 31 Jurimetrics J. 17 (1990) .......................................22

*Oxford English Dictionary Online* ..............................................................................15

## PRELIMINARY STATEMENT

This case concerns a Freedom of Information Act ("FOIA") request for records pertaining to the use of firearms in attempted or completed suicides by Plaintiff Everytown for Gun Safety Support Fund ("Everytown") and submitted to Defendant the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Everytown seeks these records to provide the public with evidence-backed policy recommendations to stem a growing crisis of suicide by firearm. Available data demonstrate that the United States stands alone in its rates of gun suicide, with fatalities rising annually. Additionally, evidence shows that suicide attempts tend to be spontaneous and survivors rarely go on to die by suicide, such that access to a firearm is a central factor in determining whether people who attempt suicide survive. For this reason, numerous public health experts agree that studying the availability of firearms is critical to preventing suicide.

To better understand where and when people attempting, or dying by, suicide obtain their firearms, Everytown requested statistical, aggregate data from ATF's Firearms Tracing System database ("FTS database"). This database is a massive warehouse holding every law enforcement-requested record (or "trace") of an attempt to track a weapon from its manufacturer or importer to its first retail purchaser, and ultimately, to its recovery by law enforcement. In the FTS database, individual traces are coded by a variety of searchable fields, and Everytown's request was designed using these fields so that ATF could perform simple searches and provide the numbers of firearms meeting various combinations of criteria.

However, ATF denied Everytown's request, citing a rider that appears in the Consolidated and Further Continuing Appropriations Act of 2012, Pub. L. No. 112-55, 125 Stat. 552 (2011). This rider, first enacted in 2003 and since modified, is known as the "Tiahrt Rider" after original sponsor Congressman Todd Tiahrt. It limits ATF's use of appropriated funds to disclose trace data, makes certain trace data immune from judicial process, and limits the admissibility of trace data

in court proceedings. ATF claims the Tiahrt Rider is an Exemption 3 statute that justifies withholding under FOIA, 5 U.S.C. § 552(b)(3), and that Everytown's request would entail creation of new records, which FOIA does not require. But ATF is incorrect in every regard.

First, the 2012 Tiahrt Rider cannot justify withholding under FOIA Exemption 3 because it was enacted after passage of the Open FOIA Act of 2009 but does not, as that statute requires, "specifically cite" to FOIA's Exemption 3. 5 U.S.C. § 552(b)(3)(B). An appropriations measure that nowhere mentions Exemption 3, the Tiahrt Rider is the very antithesis of the transparency mandated by the Open FOIA Act to further FOIA's "philosophy of full agency disclosure," *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 754 (1989) (citation and quotation marks omitted).

Second, even if the Court were to recognize the Rider as an Exemption 3 statute, it does not bar disclosure of the records requested here. That is because the Tiahrt Rider contains an express exception, in Subpart (C), permitting ATF's release of "statistical, aggregate data" related to, *inter alia*, "firearms misuse," 125 Stat. at 610, which is what Everytown has requested. And while ATF asserts that Everytown's interpretation of Subpart (C) would undermine the purposes of the Tiahrt Rider, this concern is misplaced. According to its sponsors, the Rider was designed to appease concerns that public dissemination of certain trace data could endanger law enforcement officials, jeopardize investigations, and violate privacy rights. But the statistical aggregate data sought here contains no identifying information for individual persons or firearms, and so its release would in no way implicate these concerns.

Third, Everytown's request does not call for the creation of new records. In arguing otherwise, ATF ignores the Electronic Freedom of Information Act Amendments of 1996 ("E-FOIA Amendments"), Pub. L. No. 104-231, 110 Stat. 3048 (1996), which require agencies to

search electronic databases and produce requested records, even where the search process generates records not previously retained in that form. Further, ATF's claim that Everytown is nonetheless asking ATF to create new records—contained in the declaration of the Chief of the National Tracing Division, Charles Houser—is facially insufficient. The Houser Declaration fails to specifically detail, as required by law, why the ATF cannot run simple searches using its own data fields and provide Everytown with the number of corresponding entries. By detailing instead the time-consuming nature of producing reports that ATF publishes on its website, including creation of "visual depictions," ATF fails to meet its burden.

In sum, ATF has no valid basis for withholding the statistical aggregate data that Everytown has requested, and which will enable analysis and policy proposals of great value to the public. Accordingly, ATF's motion for summary judgment should be denied, Everytown's cross-motion should be granted, and this Court should order production of the records requested.

## STATEMENT OF PROCEDURAL AND FACTUAL HISTORY

Everytown for Gun Safety Support Fund is an independent, non-partisan 501(c)(3) organization devoted to the prevention of firearm-related violence. Everytown conducts original research and analysis and develops evidence-based policies, all of which it communicates to the public through reports and fact sheets on its website. As pertinent to this case, Everytown has worked extensively to analyze data and educate the public regarding suicide by firearm, which is presently an urgent and worsening public health crisis in the United States.

According to evidence collected and reported by Everytown, nearly two-thirds of all gun deaths in the United States are suicides, claiming the lives of 22,000 Americans annually, an average of 59 deaths per day. Everytown for Gun Safety, "DISRUPTING ACCESS: ADDRESSING

FIREARM SUICIDE IN THE U.S.," 4 (2018) (hereinafter, "Everytown Report"),[1] provided as Exhibit A to the Declaration of Alla Lefkowitz ("Lefkowitz Decl.") filed concurrently. The firearm suicide rate in the U.S. is eight times that of other high-income countries, *id.* at 9, and is on the rise, up 19% over the past decade, *id.* at 8. For young people, the trend is even more alarming: presently, over 950 children and teens die by firearm suicide annually, and the rate of firearm suicide in this age group has increased 61% over the past 10 years. *Id.* Veterans are also particularly at risk, with a suicide rate that is 22% higher than that of the civilian population, with approximately 13 veterans dying by gun suicide daily. Lefkowitz Decl., Exh. B (U.S. Dep't of Veterans Affairs-Office of Suicide Prevention, SUICIDE AMONG VETERANS AND OTHER AMERICANS, 2001-2014, 4 (2016)).

Attempting suicide by firearm is uniquely lethal. Across all suicide attempts not involving a firearm, less than 5% are fatal, Everytown Report at 8, but approximately 85% of gun suicide attempts end in death. *Id.* As a result, though firearms are used in less than 6% of attempts, firearm suicide accounts for over half of all suicide deaths. *Id.* at 9.

Research also reveals that many suicide attempts are relatively spontaneous. Of those who survive a suicide attempt, almost half report deliberating for less than 10 minutes beforehand, and one scholar notes that, without readily available means, the acute impulse to attempt suicide often passes. *Id.* at 15. As a result, immediate access to a firearm is an important causal factor in determining whether an individual attempts and dies by suicide. *See id.* at 20 (discussing study finding that, for individuals purchasing a first gun in the previous week, the rate of suicide was 57 times higher than for the population statewide). Relatedly, residence in a region where gun

---

[1]Underlying citations for the statistical data in this section attributed to the Everytown Report may be found in the Report at the pages cited.

ownership is prevalent is highly correlated with suicide by firearm: individuals living in States with high household gun ownership die in firearm suicides almost four times as frequently as those in other States. *Id.* at 14.

Accordingly, policies affecting the ease of obtaining a firearm can have significant effects on the number of suicide fatalities. *See generally id.* at 14 (discussing successful initiatives in particular States). And existing research suggests that further analysis of patterns related to suicide by firearm—which in turn requires more data—would enable more targeted policies for harm prevention.  Lefkowitz Decl., Exh. C (Stephanie D. Chao, *et al.*, *Impact of Licensed Federal Firearm Suppliers on Firearms-Related Mortality*, J. Trauma & Acute Care Surgery 4 (2018) (published ahead of print) (study concluding, "deeper exploration of legal firearm access and firearm-related injuries would benefit discussion of preventative measures"). For example, knowing the type of firearms most commonly used in suicides; whether they are purchased locally or in neighboring states with less stringent gun laws; or the time between purchase and use, could all inform new research and policies aimed at reducing suicide by firearm.

Against this backdrop, Everytown submitted the present FOIA request, seeking records of the numbers of firearms used in attempted or completed suicides across several variables, including: (i) the length of time between purchase and use; (ii) the type of gun used; (iii) the State of use relative to the State of purchase; and (iv) whether the user was the original buyer. Specifically, on December 14, 2016, Everytown requested the following records from ATF:

(1) Nationwide, the number of each firearm type (pistol, revolver, rifle, shotgun, other) that were used in an attempted or completed suicide and successfully traced in 2012-13.

(2) Nationwide, the number of each firearm type (pistol, revolver, rifle, shotgun, other) that were used in an attempted suicide and successfully traced in 2012-13.

5

(3)     For each state, the number of guns that were used in a completed suicide and successfully traced in 2012 and in 2013.

(4)     For each state, the number of guns that were used in a completed suicide and successfully traced in 2012-13 that were in the possession of the original buyer.

(5)     For each state, the number of guns that were used in a completed suicide and successfully traced in 2012-13 that were in the possession of someone other than the original buyer.

(6)     For each state, the number of guns that were used in a completed suicide and successfully traced in 2012-13 that that were originally purchased in the same state in which they were recovered.

(7)     For each state, the number of guns that were used in a completed suicide and successfully traced in 2012-13 that were traced less than 3 months after first purchase; that were traced between 3 and 6 months after first purchase; that were traced between 6 and 12 months after first purchase; that were traced between 1 and 2 years after first purchase; that were traced between 2 and 3 years after first purchase; and that were traced more than 3 years after first purchase.

(8)     For each state, the number of guns that were used in an attempted suicide and successfully traced in 2012 and in 2013.

(9)     For each state, the number of guns that were used in an attempted suicide and successfully traced in 2012-13 that were in the possession of the original buyer.

(10)    For each state, the number of guns that were used in an attempted suicide and successfully traced in 2012-13 that were in the possession of someone other than the original buyer.

(11)    For each state, the number of guns that were used in an attempted suicide and successfully traced in 2012-13 that that were originally purchased in the same state in which they were recovered.

(12)    For each state, the number of guns that were used in an attempted suicide and successfully traced in 2012-13 that were traced less than 3 months after first purchase; that were traced between 3 and 6 months after first purchase; that were traced between 6 and 12 months after first purchase; that were traced between 1 and 2 years after first purchase; that were traced between 2 and 3 years after first

6

> purchase; and that were traced more than 3 years after first
> purchase.[2]

*See* Houser Decl. ¶ 22.

ATF concedes that it possesses this data. That is, ATF acknowledges that it performs "traces," and that it maintains the FTS database to house all trace records. *Id.* ¶¶ 8, 9, 12; *see also id.* ¶ 29 ("All of the underlying 'raw data' associated with Plaintiff's FOIA request is housed in the Firearms Tracing System."). Further, ATF admits that to facilitate electronic searching, it codes trace data across numerous fields, including "the date and location where the traced firearm was taken into custody," "information about the purchasers . . . [and] possessors of the traced firearm," information about the point of sale of the traced firearm, and "information about the traced firearm, such as the manufacturer, importer, model, weapon type, caliber and serial number." *Id.* Accordingly, ATF's trace data is organized using the very criteria identified by Everytown, making production of the records here requested expedient. Indeed, by ATF's own estimate, "it will take each analyst one hour to query the Firearms Tracing System for the requested data[.]" *Id.* ¶ 31.

Nonetheless, on April 6, 2017, ATF denied Everytown's request, claiming that production was prohibited by the 2012 Tiahrt Rider, Houser Decl. ¶ 23, which provides in pertinent part:

> [D]uring the current fiscal year and in each fiscal year thereafter, no funds appropriated under this or any other Act may be used to disclose part of all of the contents of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives . . . ; and all such data shall be immune from legal process, shall not be subject to subpoena or other discovery, shall be inadmissible in evidence, and shall not be used, relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based on the data, in a civil action in any State (including the District of Columbia) or Federal court or in an administrative proceeding other than a proceeding commenced

---

[2] Two of the requests–specifically, Nos. 3 and 8–are available online and are not at issue in this litigation. On February 5, 2018, Everytown filed a new request seeking virtually the same data for the years 2014-2017.  That request was also denied.

> by the Bureau of Alcohol, Tobacco, Firearms and Explosives to enforce the provisions of chapter 44 of such title, or a review of such an action or proceeding; except that this proviso shall not be construed to prevent: . . . . (C) the publication of annual statistical reports on products regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, including total production, importation, and exportation by each licensed importer (as so defined) and licensed manufacturer (as so defined), or statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations[.]

125 Stat. at 609-10. Everytown appealed this determination to the Department of Justice's Office of Information Policy (OIP), but OIP upheld ATF's decision on July 6, 2017. Lefkowitz Decl,. Exh. D. As ATF's denials make clear, ATF has never searched for the requested records.

Everytown filed the Complaint in this matter (ECF No. 1) on March 15, 2018. On September 28, 2018, ATF moved for summary judgment, alleging that the Tiahrt Rider is an Exemption 3 statute that bars disclosure of the requested records, and further arguing that Everytown's request improperly calls for the creation of new records. Everytown submits this brief in opposition and in support of its own motion seeking summary judgment for Plaintiff.

## LEGAL STANDARD

Congress enacted FOIA "to insure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Accordingly, in determining agency claims of authority to withhold records, courts employ a "strong presumption in favor of disclosure." *Associated Press v. Dep't of Def.*, 554 F.3d 274, 283 (2d Cir. 2009). Exemptions to FOIA are thus afforded "a narrow compass." *Milner v. Dep't of Navy*, 562 U.S. 562, 571 (2011); *see also Bloomberg L.P. v. Bd. of Governors of the Fed. Reserve Sys*., 649 F. Supp. 2d 262, 270-71 (S.D.N.Y. 2009) ("[FOIA] exemptions are construed narrowly"). Further, "the agency resisting disclosure has the burden of proving" that "the withheld material satisfies

8

the criteria of the exemption statute." *Wilner v. N.S.A.*, 592 F.3d 60, 72-73 (2d Cir. 2009). The

withholding agency may meet its burden by virtue of "[a]ffidavits or declarations" in support of a

motion for summary judgment, but only where such declarations "supply[] facts indicating that

the agency has conducted a thorough search and giving reasonably detailed explanations why any

withheld documents fall within an exemption[.]" *Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d

Cir. 1994); *see also Halpern v. FBI*, 181 F.3d 279, 293-94 (2d Cir. 1999) (rejecting affidavit that

was insufficiently detailed to allow the plaintiff to "contest the affidavit in adversarial fashion").

Moreover, an agency declaration must fail where it is "controverted by [] contrary evidence in the

record." *ACLU v. Dep't of Def.*, 901 F.3d 125, 133 (2d Cir. 2018).

## ARGUMENT

### I.    The Tiahrt Rider is Not an Exemption 3 Statute.

In denying Plaintiff's FOIA request, ATF relies solely on FOIA Exemption 3, which

permits an agency to withhold records that are:

>    (3)    specifically exempted from disclosure by statute . . . , if that
>            statute—
>
>            (A) (i)  requires that the matters be withheld from the public in such
>            a manner as to leave no discretion on the issue; or (ii) establishes
>            particular criteria for withholding or refers to particular types of
>            matters to be withheld; and
>
>            (B)  if enacted after the date of enactment of the OPEN FOIA Act
>            of 2009 [Oct. 28, 2009], specifically cites to this paragraph.

5 U.S.C. § 552(b)(3). However, as the above text makes clear, the OPEN FOIA Act of 2009

provides that a statute enacted after October 28, 2009 justifies withholding under Exemption 3

only if the statute "specifically cites" to 5 U.S.C. § 552(b)(3)(B). And the 2012 Rider, enacted

November 18, 2011, does not "specifically cite" to 5 U.S.C. 522(b)(3). *See* 125 Stat. at 552, 610.

ATF argues in response that older versions of the Tiahrt Rider, enacted before October 28, 2009,

are still in effect, and that *those* versions did not need to comply with the Open FOIA Act.  Gov't Br. at 14-15 (citing cases). But respectfully, ATF's reasoning, and the decisions it cites in support, are mistaken.

First, because the 2012 Tiahrt Rider completely covered and was intended as a substitute for earlier versions of the rider, it repealed those earlier versions. *See United States v. Pacelli*, 491 F.2d 1108, 1113-14 (2d Cir. 1974) (explaining that repeal or amendment by implication is generally disfavored but "will be given effect [] upon a clear showing of Congressional intent, such as where . . . the later act unquestionably covers the entire subject of the earlier one and is obviously designed as a substitute for it."); *accord Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936) (holding it a "well-settled categor[y] of repeal[] by implication . . . if the later act covers the whole subject of the earlier one and is clearly intended as a substitute"). That is, as the Fourth Circuit has explained:

> It is a universally accepted rule of statutory construction that where a later act purports to cover the whole subject covered by an earlier act, embraces new provisions, and plainly shows that it was intended not only as a substitute for the earlier act but also to cover the whole subject involved and to prescribe the only rules with respect thereto, the later act operates as a repeal of the earlier act even though it makes no reference to the earlier act.

*United States v. Lovely*, 319 F.2d 673, 679-80 (4th Cir. 1963) (citing cases) (holding that older statutes were impliedly repealed when the newer statutes "completely cover[ed]" the same subject and the legislature's intent was "to substitute the former for the latter.").

Here, the 2012 Tiahrt Rider undeniably "covers the entire subject . . . and [was] obviously designed as a substitute for," *Pacelli*, 491 F.2d at 1113-14, the preceding versions of the Riders. As compared to the 2008 Rider, the 2012 version details, in almost verbatim terms, the limits on ATF's use of appropriated funds to disclose trace data and on the use of such data in court proceedings, and provides exceptions to those limitations; differences between the Riders show

that Congress simply "embrace[d] new provisions" with regard to ATF's ability to release trace data to law enforcement, while nonetheless "plainly show[ing] that [the Rider] was intended not only as a substitute for the earlier act but also to cover the whole subject involved[.]" *Lovely*, 319 F.2d at 679-80. *Compare* 125 Stat. at 609-610 (2012 Rider) *with* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, 1903-04 (2007) (2008 Rider). Congress cannot have intended for successive versions of the Tiahrt Rider to remain in effect simultaneously where retention of earlier versions would thus add nothing of substance. Indeed, ATF does not rely on textual provisions of older riders anywhere in its briefing (other than to avoid the dictates of the Open FOIA Act).

Nor should ATF be permitted to cite earlier riders to undermine the Open FOIA Act, which was meant to prevent just such backdoor exemptions from disclosure. As co-sponsor Senator Patrick Leahy stated:

> The FOIA exemption commonly known as the "(b)(3) exemption," requires that Government records that are specifically exempted from FOIA by statute be withheld from the public. In recent years, we have witnessed an alarming number of FOIA (b)(3) exemptions being offered in legislation-often in very ambiguous terms-to the detriment of the American public's right to know.

> The bedrock principles of open Government lead me to believe that (b)(3) statutory exemptions should be clear and unambiguous, and vigorously debated before they are enacted into law. Too often, legislative exemptions to FOIA are buried within a few lines of very complex and lengthy bills, and these new exemptions are never debated openly before becoming law. The consequence of this troubling practice is the erosion of the public's right to know, and the shirking of Congress' duty to fully consider these exemptions.

> The OPEN FOIA Act will help stop this practice and shine more light on the process of creating legislative exemptions to FOIA. That will be the best antidote to the "exemption creep" that we have witnessed in recent years.

155 Cong Rec S 3164, 3175 (Lefkowitz Exh. E).

Moreover, "faced with a conflict between appropriations legislation and a substantive statute, [courts] construe the appropriations legislation narrowly." *City of Chicago v. ATF,* 384 F.3d 429, 433 (7th Cir. 2004)) (*citing Calloway v. Dist. of Columbia*, 216 F.3d 1 (D.C. Cir. 2000)), *vacated on other grounds by City of Chicago v. ATF*, 423 F.3d 777 (7th Cir. 2005). But in any event, no version of the Tiahrt Rider predating the Open FOIA Act is presently in effect, with the result that no version of the rider qualifies as an Exemption 3 statute.

The cases cited by ATF to the contrary are not persuasive. Preliminarily, all but one of these decisions reflected no legal analysis of the issue whatsoever, either relying on prior decisions or conclusorily stating that versions of the Tiahrt Rider that predate the Open FOIA Act remain in effect. *See Center for Investigative Reporting v. U.S. Dep't of Justice*, 2018 WL 3368884 at *8 (N.D. Cal. July 10, 2018) ("*CIR*") (providing no independent analysis but stating, "[t]he Court . . . adopts the holding of the majority of courts that have addressed this exact argument");[3] *Reep v. U.S. Dep't of Justice*, 302 F. Supp. 3d 174, 183 (D.D.C. 2018) (noting, "courts have previously held that Exemption 3 protects ATF firearms trace data" without further analysis); *Fowlkes v. ATF*, 139 F. Supp. 3d 287, 292 (D.D.C. 2015) (concurring with previous cases, without explanation); *Smith v. ATF*, 2014 WL 3565634 at *5, n. 2 (E.D. Mich. July 18, 2014) (stating only, "the Consolidated Appropriations act of 2008 . . . provides a permanent prohibition against disclosure[.]"); *Penn v. U.S. Dep't of Justice*, 2012 WL 761741 at *6 n.3 (E.D. Cal. Mar. 7, 2012)

---

[3]Though ATF alleges that "courts have repeatedly upheld the prohibition [against disclosure in the Tiahrt Rider] against similar claims brought by FOIA requesters," Gov't Br. at 1, in fact, the *CIR* decision is the only other case in which a plaintiff requested statistical aggregate data from the FTS database.

(citing prior decisions and adding only "because the 2005 and 2008 appropriations bills also apply here, and were enacted prior to the OPEN FOIA Act of 2009, that issue need not be addressed").[4]

The sole decision to substantively analyze the issue, *Abdeljabbar v. ATF*, 74 F. Supp. 3d 158 (D.D.C. 2014), held that the 2005 and 2008 Tiahrt Riders remain in effect because "repeals by implications are not favored[.]" *Id.* at 175 (noting, "a later statute will not be held to have implicitly repealed an earlier one unless there is a clear repugnancy between the two") (citing *United States v. Fausto*, 484 U.S. 439, 453 (1988)). But this holding ignores that courts find such a repeal where, as discussed, "the later act unquestionably covers the entire subject of the earlier one and is obviously designed as a substitute for it." *Pacelli*, 491 F.2d at 1113-14. Furthermore, *Abdeljabbar* also ignored that, as also mentioned above, appropriations legislation must be construed narrowly in the face of substantive statutes like the Open FOIA Act of 2009. *See City of Chicago v. ATF,* 384 F.3d at 433. And finally, *Abdeljabbar* misapplied *Fausto*, on which it purported to rely.[5] *Fausto* held that while implied repeal of *statutory text* is disfavored, implied repeal of a *judicial interpretation of statutory text* is both permissible and common. 484 U.S. at 453 ("Repeal by implication of an express statutory text is one thing[.] . . . But repeal by implication of a legal disposition implied by a statutory text is something else. The courts frequently find Congress to have done [the latter]. . . .This classic judicial task of reconciling many laws enacted over time, and getting them to "make sense" in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.") (citation omitted); *accord Gomez-Perez v. Potter*, 553 U.S. 474, 504 (2008) (applying *Fausto*). And here,

---

[4]The absence of further analysis may reflect that plaintiffs in all but *CIR* were *pro se*.

[5]*Abdeljabbar* was also decided without briefing from the *pro se* plaintiff, who failed to respond to ATF's motion for summary judgment. 74 F. Supp. 3d at 165.

earlier versions of the Tiahrt Rider did not justify withholding under FOIA by their statutory text, but only as a matter of judicial interpretation (*i.e.* "a legal disposition implied by a statutory text," *Fausto*, 484 U.S. at 453). *See City of Chicago*, 423 F.3d at 781-82 (holding that the 2005 Tiahrt Rider permitted withholding under FOIA). Thus, contrary to *Abdeljabbar*, implied repeal of the Tiahrt Rider's status as an Exemption 3 statute is not disfavored. In sum, only the 2012 Rider is currently in effect, that statute does not comply with the Open FOIA Act of 2012, and thus the Tiahrt Rider does not justify withholding under Exemption 3.

## II.  Statistical Aggregate Data is Explicitly Exempted from the Tiahrt Rider's Prohibitions.

Even if this Court considers the Tiahrt Rider an Exemption 3 statute, whether Tiahrt "qualifies as a withholding statute under Exemption 3 is only the first step of the inquiry." *CIA v. Sims*, 471 U.S. 159, 168 (1985). Additionally, "the agency resisting disclosure has the burden of proving" that "the withheld material satisfies the criteria of the exemption statute." *Wilner v. N.S.A.*, 592 F.3d 60, 72-73 (2d Cir. 2009). Here, ATF cannot satisfy that burden because Everytown seeks "statistical aggregate data," a category of records that is specifically excepted from the Tiahrt Rider's ban on disclosure. *See* 125 Stat. at 610.

This follows from the plain text of the Rider itself. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (where "the statutory text is plain and unambiguous," courts "must apply the statute according to its terms"). Thus, while the Rider prohibits the use of funds by ATF "to disclose part or all of the contents of the Firearms Trace System database," and further provides that "all such data shall be immune from legal process," it adds "except that this proviso shall not be construed to prevent":

> (C) the publication of annual statistical reports on products regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, including total production, importation, and exportation by each licensed importer (as so defined) and licensed manufacturer (as so

> defined), or statistical aggregate data regarding firearms traffickers
> and trafficking channels, or firearms misuse, felons, and trafficking
> investigations.

125 Stat. at 610. ATF acknowledges that this language authorizes publication of two separate categories of documents: (i) annual statistical reports; and (ii) statistical aggregate data. *See* Houser Decl. ¶ 28 ("[Tiahrt] does not prevent . . . ATF itself from publishing 'annual statistical reports' or certain 'statistical aggregate data.'").[6] As a result, because the plain meaning of "publication" includes "the action of making something generally known," *Oxford English Dictionary Online*, *available at* https://en.oxforddictionaries.com/definition/publication, and because it is uncontested that Everytown seeks statistical aggregate data concerning misuse of firearms, the Tiahrt Rider specifically excepts the very records that Everytown has requested.

Nor can ATF credibly argue otherwise here, given that in previous lawsuits, it has produced statistical, aggregate data in response to litigation, citing Subpart (C) for the authority to do so. Specifically, in previous lawsuits in which gun dealers and firearms trade associations challenged an ATF reporting requirement, ATF filed an "Administrative Record" that included trace database records with certain identifying information redacted—and critically, ATF explicitly justified this practice on the ground that Subpart C of the Tiahrt Rider authorizes disclosure of such statistical aggregate data. *See* Lefkowitz Decl., Exh. F (Def.'s Br. in Opp'n to Pl.'s Mot. to Suppl. Admin. R. at 5, n. 2, *Ron Peterson, LLC. V. Jones*, Case No. 11-CV-678 (D.N.M. Mar. 30, 2012)) (arguing that ATF was permitted to disclose the total number of firearms recovered from gun dealers because that information "constitute[d] 'statistical aggregate data . . .,' the disclosure of which is

---

[6]ATF's concession is required by Congress's use of the disjunctive "or," which makes clear that Subpart (C) specifically permits two different types of "publication" of trace data: "annual statistical reports," and "statistical aggregate data." 125 Stat. at 610; *see United States v. Garcia*, 718 F.2d 1528, 1532-33 (11th Cir. 1983) (noting that "[t]he specific use of the disjunctive 'or' after the comma demonstrates that Congress intended . . . . alternatives").

permitted by statute") (quoting Tiahrt Rider, 125 Stat. at 610); Lefkowitz Decl., Exh. G (Def.'s

Br. in Opp'n to Intervenor Pl.'s Mot. to Suppl. Admin. R. at 5, n. 2, *10 Ring Precision, Inc., et al.*

*v. Jones*, No. 11-cv-00663 (W.D. Tex. Mar. 26. 2012)) (same).  Because ATF has thus conceded

that the records here requested may be disclosed under Subpart (C), this Court should not credit

the Houser Declaration to the contrary, and ATF thus cannot meet its burden. *See ACLU v. Dep't*

*of Def.*, 901 F.3d 125, 133 (2d Cir. 2018) (agency cannot prevail on summary judgment where its

declaration is "controverted by [] contrary evidence in the record.") (citation and quotation marks

omitted).

ATF asserts that it is nonetheless barred from producing the requested data in this case

because, "Subpart C permits ATF to publish the annual statistical reports on its website . . . , but it

does not contemplate or permit the broad release of trace data in response to FOIA requests." Gov't

Br. at 15. But Everytown seeks statistical aggregate data, not "the broad release of trace data," *i.e.*

unredacted records of individual traces. And directly contrary to ATF's claim, Subpart (C)

expressly "contemplate[s] and permit[s]" the release of statistical aggregate data. Nor is ATF's

claim that Subpart (C) permits only publication of statistical, aggregate data on its website—in the

form of reports that are nothing like the records that Everytown here seeks—at all credible, given

ATF's previous reliance on Subpart (C) to produce statistical aggregate data in APA litigation, as

discussed above.[7]

_____

[7]ATF cites the decision in *CIR*, 2018 WL 3368884, as "holding that Subpart C did not permit
disclosure [] under FOIA of aggregate data reflecting [the] total number of firearms" according to
criteria specified by the plaintiff in that case. Gov't Br. at 15. This is misleading. *CIR* did hold that
aggregate data, as distinct from "*statistical* aggregate data," is not excepted from the Tiahrt Rider's
general ban on disclosure. 2018 WL 3368884 at *10 (emphasis added). And the court further held
that the plaintiff's alternative request for trace records with redactions, as opposed to the numbers
of relevant traces, constituted mere aggregate data, as opposed to statistical aggregate data, and so
could not be produced under the Rider. *Id.* But whatever the merits of that holding, the court
specifically held that the numbers sought by plaintiff in the first instance were statistical aggregate

ATF further argues that "Plaintiff's reading of Subpart C would completely reverse the 'change in substantive FOIA law' effected by the 2005 Appropriations Act that was designed to 'exempt[] from disclosure data previously available to the public under FOIA.'" Gov't Br. at 15 (quoting *City of Chicago.*, 423 F.3d at 781).[8] Preliminarily, while ATF expends considerable space discussing the alleged harms resulting from disclosure of individual trace records, *id.* at 15-17, such arguments do not provide a legal basis for withholding under FOIA.[9] But regardless, Everytown's request would not result in the alleged harms that animated the Tiahrt Rider. Thus, the House Report for the 2005 Rider made clear that Congress limited access to trace data because of concerns that public dissemination held "the potential of endangering law enforcement officers and witnesses, jeopardizing on-going criminal investigations and homeland security" and "violat[ing] the privacy of innocent citizens and businesses." H.R. Rep. No. 108-576, at 30 (2004).[10] But release of the kind of statistical, aggregate data sought here—with no identifying

_____

data, *id.* at *9, specifically excepted under Subpart (C), *id.* at *8 ("[T]he Tiahrt Amendment does not prohibit the publication of existing statistical aggregate data[.]") (emphasis removed). In this sense, *CIR* supports Everytown's position on this point, not ATF's.

[8]It bears noting that Subpart (C) was not added until 2008, and as an exception to the foregoing text, it necessarily pared back the extent of the Rider's restriction on disclosure.

[9]Moreover, the Seventh Circuit previously discredited ATF's claims of alleged harms resulting from release of individual trace records, holding, "ATF's arguments that the premature release of this data might interfere with investigations, threaten the safety of law enforcement officers, result in the intimidation of witnesses, or inform a criminal that law enforcement is on his trail are based solely on speculation." *City of Chicago v. ATF*, 287 F.3d 628, 635 (7th Cir. 2002), *superseded on other grounds by statute as recognized in City of Chicago*, 423 F.3d at 780-82.

[10]There is evidence that Congress was also motivated in passing the Act to foreclose public nuisance law suits against the firearms industry. *See* Juliet Eilperin, "Firearms Measure Surprises Some in GOP," WASH. POST, at A19 (July 21, 2003) (noting of 2003 Rider, "before the vote, Tiahrt assured colleagues the NRA had reviewed the language" of the rider, and quoting Tiahrt as saying, "I wanted to make sure I was fulfilling the needs of my friends who are firearms dealers.  NRA officials were helpful in making sure I had my bases covered.") (Lefkowitz Exh. H).

17

information for individual persons or firearms—bears none of these risks.[11] In sum, the Tiahrt Rider's plain text, the broader purposes of FOIA, and ATF's own interpretation make clear that ATF is permitted—and therefore required in accordance with the present FOIA request—to disclose the statistical aggregate data here sought.

## III.  Everytown Does Not Seek the Creation of New Records.

Alternatively, ATF claims a right to withhold because "Plaintiff's FOIA Request . . . would require ATF to create new records" since "ATF has never prepared any annualized reports summarizing the specific statistical summaries sought [by Plaintiff.]" Gov't Br. at 17-18. In support, ATF cites cases holding that "FOIA does not require agencies to 'produce or create explanatory material,' or 'answer questions[.]'" *Id.* (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161-62 (1975), and *Hudgins v. IRS*, 620 F. Supp. 19, 21 (D.D.C. 1985)). However, ATF ignores ample caselaw making clear that under FOIA, the retrieval of targeted data from a larger database does not amount to such record creation. Instead, so long as the database contains the information requested, the agency must provide it unless the retrieval process would be unreasonably burdensome. Here, Everytown has requested data that is within the FTS database, and ATF has failed to establish that the requisite search would pose an unreasonable burden. Accordingly, ATF must produce the requested records.

This issue is controlled by the "E-FOIA Amendments," 110 Stat. 3048, through which Congress updated FOIA to reflect the realities of information storage in the digital age. Specifically, Congress defined "record" to include information stored "in any format, including an

---

[11]Further, though the plain text of Subpart (C) is clear, any ambiguity should, again, be resolved in Everytown's favor because "each [FOIA Exemption] is to be narrowly construed with all doubts resolved in favor of disclosure." *Local 3, Int'l Bhd.. of Elec. Workers, AFL-CIO v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988).

electronic format," and expanded the definition of "search" to mean "review, manually or by automated means." 5 U.S.C. §§ 552(a)(3)(D), (f)(2)(A). The E-FOIA Amendments thus make clear that "[s]orting a database by a particular data field (*e.g.,* date, category, title) . . . [*i.e.*] the application of codes or some form of programming . . . does not involve creating new records or conducting research—it is just another form of searching that is within the scope of an agency's duties in responding to FOIA requests." *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 270 (D.D.C. 2012) (citations and quotation marks omitted); *accord People for the Am. Way Found. v. U.S. Dep't of Justice*, 451 F. Supp. 2d 6, 14 (D.D.C.2006) (examining E-FOIA Amendments and concluding "[e]lectronic database searches are thus not regarded as involving the creation of new records") (citations and quotation marks omitted); *Schladetsch v. U.S. Dep't of Hous. & Urban Dev.,* 2000 WL 33372125 at *3 (D.D.C. April. 4, 2000) (same).

Even if the plain text of the E-FOIA Amendments were ambiguous, however, the legislative history resolves all doubt. *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143-44 (2d Cir. 2002) (in cases of ambiguity, "[t]he court may [] look at legislative history to determine the intent of Congress").  As a contemporaneous House Report states:

> Computer records found in a database rather than a file cabinet may require the application of codes or some form of programming to retrieve the information.  Under the definition of "search" in the bill, the review of computerized records would not amount to the creation of records. Otherwise, it would be virtually impossible to get records maintained completely in an electronic format, like computer database information, because some manipulation of the information likely would be necessary to search the records.

H.R. Rep. 104-795, at 22 (1996). Thus, as information storage has transitioned from paper records to databases with entries coded across multiple fields, Congress has required agencies to target and collate specific electronic data in response to FOIA requests, even if the agency had not previously grouped the data in the form of the FOIA request. Otherwise, Congress clarified, technological

advances would lead to *less* disclosure and so undermine the purpose of FOIA. *See* § 2(a)(6), 110 Stat. 3048 (noting of purpose of E-FOIA Amendments, "[g]overnment agencies should use new technology to enhance public access to agency records and information"); *see also Yeager v. DEA*, 678 F.2d 315, 321 (D.C. Cir.1982) ("Although accessing information from computers may involve a somewhat different process than locating and retrieving manually-stored records, these differences may not be used to circumvent the full disclosure policies of the FOIA. The type of storage system in which the agency has chosen to maintain its records cannot diminish the duties imposed by the FOIA.").

Accordingly, the few courts that have so far addressed the issue have held that requiring an agency to produce a subset of information within a database—though the search process may entail reconfiguration of the underlying data—is not tantamount to record creation, but is simply an extension of FOIA's "reasonable . . .  search" requirement, 5 U.S.C. § 552(3)(C). *See Kensington Research & Recovery v. U.S. Dep't of Hous. & Urban Dev.*, 620 F. Supp. 2d 908, 910 (N.D. Ill. 2009) (defendant was required to search for and produce requested records where "the component parts [of the record requested] continue to exist, likely stored in various electronic databases maintained by [defendant agency] and its affiliates"); *Long v. ICE*, 2018 WL 4680278, at *8 (D.D.C. Sept. 28, 2018) ("[N]either sorting a pre-existing database of information to make information intelligible, nor extracting and compiling data . . . as to any discrete pieces of information that [an] agency does possess in its databases, amounts to the creation of a new agency record.") (quotation marks omitted) (second and third alterations in original); *People for the Am. Way Found.*, 451 F.Supp.2d at 15 (holding agency was required to conduct a PACER search of 44,000 electronically-stored files to identify data targeted in FOIA request in accordance with its duty to conduct a "reasonable search"); *Schladetsch*, 2000 WL 33372125, at *3 ("Because

[defendant agency] has conceded that it possesses in its databases the discrete pieces of information which [plaintiff] seeks, extracting and compiling that data does not amount to the creation of a new record," even though "the net result of complying with the request will be a document the agency did not previously possess[.]").

ATF is accordingly required to search for the records here requested. That is, Everytown here seeks aggregate numbers—specifically, the numbers of firearms recovered after attempted or completed suicides meeting various combinations of other criteria—and the data within the FTS database is coded according to these criteria, such that a simple search will yield both the responsive database entries and the requested numbers thereof. *See* Houser Decl. ¶ 31 (estimating that "it will take each analyst one hour to query the Firearms Tracing System for the requested data"). Certainly, ATF has not established that the Trace Data System cannot generate the requested numbers.[12] In fact, ATF encourages law enforcement officials  to access the FTS database through a platform called "eTrace" to, among other things, "generate statistical reports (*i.e.*, number of traces, top firearms traced, time-to-crime rates, age of possessors, etc.)." ATF Publication 3312.9, "ETRACE INTERNET-BASED FIREARMS TRACING AND ANALYSIS" 2 (2009) (Lefkowitz Exh. I).

And while the district court in *CIR* reached the opposite conclusion on the basis of analogous facts, that decision was, respectfully, wrong. In *CIR*, the court held that a FOIA request seeking the numbers of firearms meeting various criteria in FTS database was a request for "a statistical summary or listing of a particular subset of data points" because the relevant numbers were "information that does not currently exist." 2018 WL 3368884, at *9-10. But this conclusion

---

[12]To the contrary, insofar as the Houser Declaration lists the total number of traces in the FTS database as "over 7 million" it would appear that the database is capable of numbering the results. *See* Houser Decl. ¶ 15.

was incorrect because ATF did not demonstrate that its database was incapable of generating the requested numbers by means of an electronic search, as it was required to do. *See Nat'l Sec. Counselors*, 898 F. Supp. 2d at 270 ("[R]ecords found in a database . . . may require the application of codes or some form of programming to retrieve the information."); *see also Jamie A. Grodsky, The Freedom of Information Act in the Electronic Age: the Statute Is Not User Friendly*, 31 Jurimetrics J. 17, 26 (1990) (former analyst for the Congressional Office of Technology Assessment notes, "[a] fundamental difference between hard copy records and computerized records, however, is that the former may reside within computer systems until they are demanded, sometimes requiring the application of codes or additional programming to be retrieved from host systems in systematic or comprehensible form."). And *CIR* cited no agency declaration asserting that the relevant numbers would not be generated by the search process (just as ATF has not so certified in this case).

Nor do the decisions cited by ATF on this point support its contention. These cases stand for the uncontested proposition that an agency cannot be compelled to create new records to satisfy its obligations under FOIA. *See* Gov't Br. at 17 (citing cases). But none concerned an electronic database, and the only case decided after enactment of the E-FOIA Amendments concerned paper records which the plaintiff conceded did not exist. *See Carson v. U.S. Office of Special Counsel*, 534 F. Supp. 2d 99, 101-02 (D.D.C. 2008). In short, ATF has simply not engaged with the relevant law, which holds that Everytown's request for aggregate numbers from the FTS database entails "just another form of searching that is within the scope of an agency's duties in responding to FOIA requests." *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d at 270.

Thus, ATF's obligation to "make reasonable efforts to search" the FTS database is subject only to limitation where "such efforts would significantly interfere with the operations of the

agency's automated information system," 5 U.S.C. § 552(a)(3)(C), and "the defending agency has the burden of showing that its search was adequate" by means of "declarations supplying facts . . . and giving reasonably detailed explanations[.]" *Carney*, 19 F. 3d at 812 (footnote omitted); *see* 5 U.S.C. § 552(a)(4)(B) (noting the "burden is on the agency to sustain its action" with regard to any withholding). ATF has not met that burden.

Specifically, ATF entirely fails to explain why it cannot simply search its database by the applicable categories and provide Everytown with the resulting numbers. For example, Everytown's first requested record is for "[n]ationwide, the number of each firearm (pistol, revolver, rifle, shotgun, other), that were used in a completed suicide and successfully traced in 2012 and 2013." Houser Decl. ¶ 22. ATF does not explain why it cannot simply set the parameters for that search using its data fields and give Everytown the resulting number, as virtually any modern database is capable of doing. *See Halpern*, 181 F.3d at 293 (rejecting declaration that did not "permit [the requester] to contest the affidavit in adversarial fashion"). Indeed, to the contrary, the Houser Declaration concedes that, "ATF . . . estimates that it will take each [of two] analyst[s] *one hour* to query the Firearms Tracing System for the requested data . . . ." *Id.* ¶ 31 (emphasis added). Obviously, this is neither unduly burdensome nor a search that will "significantly interfere with the operations of the agency's automated information system." 5 U.S.C. § 552(C).

Nonetheless, ATF attempts to demonstrate that the production Everytown seeks would entail an unreasonable burden by detailing the many intensive steps involved in creation of the annual statistical reports published on its website. *See* Houser Decl. at ¶¶ 18-21. Thus, ATF states that "experienced specialists" must perform "time-consuming and specialized queries," which are subsequently "analyzed using statistical software," after which an ATF specialist must "evaluate the data and fill in gaps by making educated assumptions or perform[ing] research on missing

fields," before "the resulting statistics are inserted into the applicable software and the visual depiction of the data is created," which is then "subjected to a multi-level review process[.]" *Id.* But ATF fails to show why Everytown's request requires any of these steps beyond the initial search. *See Halpern*, 181 F.3d at 285  (declaration failed to carry the agency's burden to justify withholding because, "although the author . . . wrote much, she said little; and she said nothing in particular that would justify withholding the documents the requester sought"); *Amnesty Int'l USA v. CIA,* 728 F. Supp. 2d 479, 497 (S.D.N.Y.2010) (court may rely on agency declarations only if they are "relatively detailed and nonconclusory") (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978); *see also Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) ("A district court in a FOIA case may grant summary judgment in favor of an agency on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record . . . .") (citation and quotation marks omitted). Thus, in claiming that Everytown's request will pose an unreasonable burden, ATF attacks a strawman request that has not actually been made.[13]

---

[13]Even with the multiple, unnecessary steps that ATF would insert into the search process, the total number of hours that ATF estimates it would take to fulfill Plaintiff's request—160, *see* Houser Decl. ¶ 33—is not unreasonably burdensome.  *See e.g. Public Citizen, Inc.*, 292 F. Supp. 2d at 6 (refusing to find manual search of 25,000 paper files unduly burdensome); *e.g. People for the Am. Way Found.*, 451 F. Supp. 2d at 15 (holding that PACER search of 44,000 files, requiring approximately 120 hours of work, was "not unduly burdensome"). Cases in which courts have permitted withholding on the basis of undue burden, by contrast, have entailed a markedly greater commitment of agency resources than that here claimed by ATF.  *See*, *e.g.*, *Nat'l Day Laborer Org. Network v. ICE*, 2017 WL 1494513, at *15 (S.D.N.Y. April 19, 2017) (search requiring review of between 436,000 and 1.3 million pages, over an estimated 436 to 1,300 weeks, was unduly burdensome.

**CONCLUSION**

For the foregoing reasons, ATF's motion for summary judgment should be denied, Everytown's cross-motion for summary judgment should be granted, and ATF should be ordered to produce the requested records.

Respectfully Submitted,

/s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Avram Frey
GIBBONS P.C.
(973) 596-4500
One Gateway Center
Newark, NJ 07102-5310

Eric Tirschwell
Alla Lefkowitz
James Miller
Everytown for Gun Safety Support Fund
(646) 324-8222
132 E. 43rd Street, # 657
New York, NY 10017
(mailing address)

Dated: November 2, 2018