# EXHIBIT A

# DISRUPTING

# ACCESS

## ADDRESSING
## FIREARM SUICIDE
## IN THE U.S.



*Everytown for Gun Safety would like to acknowledge the American Association of Suicidology and our academic research partners for reviewing this report.*

If you or someone you know is in crisis, please contact the National Suicide Prevention Lifeline, a national network of local crisis centers that provides free and confidential emotional support to people in suicidal crisis or emotional distress 24/7. **1-800-273-TALK (8255)** **suicidepreventionlifeline.org**

You may also contact the Crisis Text Line, which provides trained crisis counseling services over text 24/7. Text **HOME** to **741741** for free from anywhere in the U.S. **crisistextline.org**

# TABLE OF CONTENTS

EXECUTIVE SUMMARY                              4

FIREARM SUICIDE IN THE U.S.                    8

THE RELATIONSHIP BETWEEN                       14
FIREARM ACCESS AND SUICIDE

POLICY SOLUTIONS                               18

CONCLUSION                                     23





*pictured, from top: Khary;*
*his mother Joyce*

*photography, top: Joe Quint*

Disrupting Access: Addressing Firearm Suicide in the U.S.

# JOYCE AND KHARY

Joyce was 27 years old, with a new baby son.[1] She was living back home after separating from her husband and struggling with alcoholism and depression.

At some point, her father bought her a handgun for self-defense. He took her to a shooting range so she could practice using it. According to her now-grown son, Khary, nobody considered the risk of giving Joyce access to firearms — despite the fact that Joyce had a history of suicide attempts.

A few months after acquiring the handgun, Joyce wrote a note to her parents asking them to take care of Khary, who was just 20 months old at the time. She climbed into her car, drove onto the freeway, pulled over to the side, and took out the handgun her father had given her. "Then she listened to the lies depression told her and killed herself," says Khary.

For his entire childhood, Khary was told that his mother had died of an illness. His family "didn't want to face it," Khary says. It wasn't until he was 18, looking through his father's things, that he found copies of Joyce's death certificate and learned the truth. "It really messed me up," he recalls. "I know where my mom is: she's in a grave in Cincinnati. I have no way of getting to know her, or of finding out what her voice is like, or what her touch was like. No way of remembering what it was like for her to say, 'I love you' — stuff that other people take for granted."

For Khary, who has struggled with anger and pain and his own suicidal impulses over the years, his mother's story should not have ended this way. "I don't know how she would have responded, because from what I'm told my mom was very headstrong, but removing access would have saved her life," he says. "I really think that if someone would have put a barrier in between my mom and that gun, my mom would still be here."

> HIS MOTHER'S STORY SHOULD NOT HAVE ENDED THIS WAY. "I DON'T KNOW HOW SHE WOULD HAVE RESPONDED, BECAUSE FROM WHAT I'M TOLD MY MOM WAS VERY HEADSTRONG, BUT REMOVING ACCESS WOULD HAVE SAVED HER LIFE."

## EXECUTIVE SUMMARY

**Claiming the lives of nearly 22,000 Americans every year, firearm suicide is a significant public health crisis in the U.S.**[2] The conversation around gun violence in the U.S. tends to focus on homicides, especially in the context of mass shootings and school shootings. But nearly two-thirds of all gun deaths in the U.S. are suicides: an average of 59 deaths a day.[3] And the problem is only getting worse: over the past decade, the U.S. firearm suicide rate has increased by 19 percent.[4] Addressing firearm suicide is an essential element of any strategy to reduce suicide and gun violence in this country.

**Amongst commonly used methods of self-harm, firearms are by far the most lethal, with a fatality rate of approximately 85 percent.**[5,6] Conversely, less than 5 percent of people who attempt suicide using other methods will die,[7,8] and the vast majority of all those who survive do not go on to die by suicide.[9] While firearms are used in less than 6 percent of suicide attempts, over half of suicide deaths are with firearms.[10] Research suggests that a reduction in suicide attempts by firearm would result in an overall decline in the suicide rate by an estimated 20 to 38 percent.[11,12]

FIREARM SUICIDE MAKES UP THE MAJORITY OF BOTH GUN DEATHS AND SUICIDES IN THE U.S.



2/3 OF ALL GUN DEATHS

1/2 OF ALL SUICIDES

**Access to firearms — meaning personal or household gun ownership — increases the risk of suicide by three times.**[13] Researchers overwhelmingly agree that household firearm ownership rates are strongly associated with rates of firearm and overall suicide, even when controlling for other factors associated with suicide like poverty, unemployment, serious mental illness, and substance abuse.[14] This is why states with high rates of household gun ownership also have high rates of firearm and overall suicide.[15]

**Policies and practices that focus on disrupting access to firearms can reduce firearm suicides. These include**:

— Building public awareness about the suicide risk posed by firearm access.

— Limiting the easy and immediate acquisition of firearms.

— Encouraging the responsible storage of firearms in the home to prevent access by children and other unauthorized users.

— Creating mechanisms to temporarily remove firearms from individuals in moments of crisis.



ACCESS TO A GUN INCREASES THE RISK OF DEATH BY SUICIDE BY THREE TIMES

3x



*pictured, from top: Debbie; her father Don*

# DON AND DEBBIE

Don was a veteran — he'd served during the Vietnam War — and he lived with his wife on a farm in Virginia that had been in the family for five generations.[16] People could count on Don — if somebody got sick, he would be the one to take them to the doctor. "He was a very hands-on caregiver," recalls his daughter, Debbie.

At 72, Don got cancer, and the treatment took a tremendous toll on him. "He never really recovered to the point where he was totally independent and could do all the things he wanted to do on the farm," Debbie says. The sudden reversal of dependence left him at a loss. "I think the thought of someone having to care for him … I don't think he could tolerate it."

Don owned shotguns which he used to shoot groundhogs that were getting into the crops. The shotgun he used to take his own life had belonged to his great-grandfather. He did it in a way that nobody would be home when the suicide happened, and so none of his family members would be the one to find him.

Debbie noted, "I think my dad looked at himself like, 'I'm in pain, and I don't want to be a burden, and I've lived a good life.' What he didn't think about, though, was the immense pain that he would leave behind for everybody."

## FIREARM SUICIDE IN THE U.S.

### A growing problem

Nearly 43,000 Americans die by suicide every year,[17] and the rate of suicide has increased by 19 percent over the past decade.[18] The dynamics of suicide are complex, involving factors like poverty, unemployment, substance abuse, and mental illness.[19] But one thing is clear: means matter and, amongst commonly used methods of self-harm, firearms are the most lethal means.[20,21] Across all suicide attempts not involving a firearm, less than 5 percent will result in death,[22,23] and the vast majority of those who survive do not go on to die by suicide.[24] For example, 98 percent of people who try to kill themselves through poisoning/overdose — the most common method of attempted suicide — will survive the attempt.[25,26] For gun suicide, those statistics are flipped: approximately 85 percent of gun suicide attempts end in death.[27,28] While firearms are used in less than 6 percent of suicide attempts, over half of suicide deaths are with firearms.[29]



SUICIDES
ATTEMPTS
BY GUN

**85%**

RESULT
IN DEATH

SUICIDE
ATTEMPTS
BY ALL
OTHER MEANS
LESS THAN

**5%**

RESULT
IN DEATH

**OVER THE PAST DECADE, THE RATE OF FIREARM SUICIDE FOR CHILDREN AND TEENS INCREASED BY** **61%**

Nearly 22,000 Americans die by firearm suicide every year — including over 950 children and teens.[30] The U.S. firearm suicide rate is eight times that of other high-income countries.[31] Like the overall suicide rate, the firearm suicide rate has increased by 19 percent over the past decade.[32] This trend has been of particular concern for children and teens, with the rate of firearm suicide up by 61 percent over the past decade.[33]



**LESS THAN 6 PERCENT OF SUICIDE ATTEMPTS ARE WITH FIREARMS** **6%**

**OVER** **50%** **OF SUICIDE DEATHS ARE WITH FIREARMS**

### The demographics of firearm suicide

A demographic analysis of firearm suicide victims reveals several key patterns:

Men represent 86 percent of firearm suicide victims, and are over six times more likely than women to die by firearm suicide.[34]

Rates of firearm suicide are much higher for adults than for children and teens.[35] For women, firearm suicide rates are highest in the 45 to 60 age range.[36] For men, firearm suicide rates largely increase with age,[37] and are especially high for male senior citizens (65 and older).

White Americans represent 87 percent of all firearm suicide victims, and have the highest rate of firearm suicide by race.[38] American Indians and Alaska Natives also have a disproportionately high rate of firearm suicide.[39]

**MEN REPRESENT 86% OF FIREARM SUICIDE VICTIMS**



**WOMEN 14%**

**WHITE AMERICANS REPRESENT** **87%** **OF ALL FIREARM SUICIDE VICTIMS**

**FIREARM SUICIDE RATE BY RACE**



*Firearm suicide rate per 100,000*

White   American Indian/AK Native   Black   Hispanic   Asian/ Pacific Islander

Finally, Americans living in rural areas experience higher rates of firearm suicide than those living in urban areas.[40] The CDC classifies all U.S. counties according to their level of urbanization,[41] and the average firearm suicide rate increases as counties become more rural.[42] The rate of firearm suicide in the most rural counties is over two times higher than in the most urban.[43]

**THE AVERAGE FIREARM SUICIDE RATE INCREASES AS COUNTIES BECOME MORE RURAL**



Firearm suicide rate per 100,000

MOST URBAN ⟵⟶ MOST RURAL



*pictured, from top: Jennifer;
her husband Scott*

*photography, top: Joe Quint*

THINKING BACK, JENNIFER THINKS IT COULD
HAVE BEEN DIFFERENT IF RED FLAG LAWS
AND EXTREME RISK PROTECTION ORDERS
HAD EXISTED AS A RESOURCE.

# SCOTT AND JENNIFER

Scott had one handgun, which he told his wife he wanted for protection.[44] They argued about it — Jennifer didn't want to live in a home with a firearm, but he managed to convince her by offering a compromise. The gun would be kept locked in a safe, and he would only take it out when they went to the woods in North Carolina, where he liked to set up targets and practice his aim.

Scott was a great father to his two daughters. He worked for a medical device company and he liked to go hiking in the mountains of Utah and Nevada. He also struggled with depression.

At the age of 42 Scott made a suicide attempt using alcohol and pills. He was taken to the emergency room, treated in an intensive care unit, and then held for supervision. "Then they send you away with a bunch of worksheets encouraging you to seek help," Jennifer says. "It's all very overwhelming and you don't really know what to do." One of the worksheets directed family members to remove all firearms. Jennifer bought a different safe for the gun, and hid it inside the house. When Scott arrived home, he was furious at her. "He said he was fine now, and why didn't I trust him? It became a thing."

Three weeks later, Scott made another suicide attempt with pills. This time, when Scott woke up in the hospital, he was "his old self" again, Jennifer recalls. "He asked me to go to the bookstore and get him all of these books on depression. He felt sure that if he could just learn enough about what was going on, he could solve it."

Scott soon convinced Jennifer to return his firearm. They were planning a trip to the woods in North Carolina, and he told her that shooting would make him "feel normal" again. "He hated feeling like the patient all the time," she recalls. But Scott's depression returned, and he used his gun to kill himself.

Thinking back, Jennifer thinks it could have been different if Red Flag Laws and extreme risk protection orders had existed as a resource. "The gun was a thing between us," she says. "When he was feeling paranoid, and when he was not at his best and was suspicious of me, he would not consider me an ally." For Jennifer, removing the gun herself was a difficult proposition; it might have caused an "event" with Scott if she'd tried. But if there had been a legal option to have police remove the gun? "He definitely had a complicated mental illness," Jennifer says. "I'm not saying it would have helped him forever. But it could have helped him through one more crisis, and maybe then he would have gotten the help that finally started to work better."

## THE RELATIONSHIP BETWEEN FIREARM ACCESS AND SUICIDE

Access to firearms is strongly associated with an increased risk of suicide.[45] This reflects a broad consensus among academic researchers, medical professionals, and other public health experts. When it comes to suicide, a meta-analysis of 14 different scientific studies concluded that having access to a firearm triples one's risk of death by suicide.[46] This elevated risk applies not only to the gun owner, but everyone in the household.[47]

People who live in states with high rates of household gun ownership are almost four times more likely to die by gun suicide than in states where fewer households own guns.[48] Again, this relationship remains strong even when controlling for other factors associated with suicide, like poverty, unemployment, serious mental illness, and substance abuse.[49] In fact, the relationship between firearm ownership and firearm suicide is so strong that researchers use the prevalence of firearm suicide in a given state as a proxy for the rate of firearm ownership in that state.[50]

This is why populations most at risk for firearm suicide are also those with high rates of firearm ownership and access. A nationally representative survey of U.S. gun owners found that gun owners overall are disproportionately male, white, older, and non-urban.[51] And as noted previously in this report, this demographic makes up the vast majority of firearm suicides in the U.S.

Informed by this overwhelming body of research, eight national organizations of health professionals and the American Bar Association jointly released a 2015 report stating: "Although some persons suggest that firearms provide protection, substantial evidence indicates that firearms increase the likelihood of homicide or, even more commonly, suicide. Access in the home and general access to firearms have also been shown to increase risk for suicide among adolescents and adults."[52] As the report notes, "reducing availability [of firearms] to persons who may pose a threat to themselves or others" is necessary to properly address "firearm-related violence."[53]

**"ALTHOUGH SOME PERSONS SUGGEST THAT FIREARMS PROVIDE PROTECTION, SUBSTANTIAL EVIDENCE INDICATES THAT FIREARMS INCREASE THE LIKELIHOOD OF HOMICIDE OR, EVEN MORE COMMONLY, SUICIDE."**

The relationship between firearm access and suicide makes sense given what we know about the nature and dynamics of suicide. While there may be warning signs leading up to suicide attempts, almost half of all survivors report less than 10 minutes of deliberation between the thought of suicide and the actual attempt.[54,55] Therefore, the method used in this moment of crisis can mean the difference between life and death, and firearms are an especially lethal means of self-harm.

Based on this data, researchers believe that reducing the number of suicide attempts involving firearms should reduce suicide rates overall. According to an analysis by the *Washington Post*, if the percentage of suicides in the U.S. involving firearms were similar to that of other high-income countries, researchers estimate that suicides overall could decrease by 20 to 38 percent.[56] Dr. E. Michael Lewiecki, a professor at the University of New Mexico School of Medicine, told the *Washington Post*: "If you have an impulse for suicide and you have easy access to a gun, you're very likely to [die by suicide]. But if access to that means is not there, then the impulse may pass."[57] Similarly, Dr. Daniel Webster, a professor at the Johns Hopkins Bloomberg School of Public Health and a leading researcher on gun violence has said, "If we had a shift in the number of people who attempt to end their life with a firearm — who chose other means — we would very greatly reduce our suicide rate."[58]

"IF WE HAD A SHIFT IN THE NUMBER OF PEOPLE WHO ATTEMPT TO END THEIR LIFE WITH A FIREARM – WHO CHOSE OTHER MEANS – WE WOULD VERY GREATLY REDUCE OUR SUICIDE RATE."



*pictured, from top: Alexandria;
her brother Mikey*

*photography, top: Joe Quint*

Disrupting Access: Addressing Firearm Suicide in the U.S.

# MIKEY AND ALEXANDRIA

At 13 years old, Mikey was a friendly and engaged boy.[59] He was an expert bowler, a quarterback for the football team, and he loved to play video games. His older sister, Alexandria described him as the type of child "who would befriend the new kid and introduce them to his friends."

Mikey's father kept three guns at his home in upstate New York. For years, Mikey's mother had asked him to get rid of the guns, or at least lock them up so Mikey wouldn't be able to access them. After the shooting at Sandy Hook in December 2012, she renewed her pleas — "but he would not listen," recalls Alexandria.

On January 13, 2013, Mikey shot and killed himself with one of his father's unsecured guns. He seemed happy, says Alexandria, so his suicide came as a shock. "He must have gotten angry for some reason," she says, and "at that age you're not thinking how final a gun is."

Mikey's community was devastated by the sudden loss. His mother was inconsolable. Exactly nine months to the day after Mikey's death, she died by suicide. "She was so grief stricken over the death of her son," Alexandria says, "and the guilt of not being able to protect him was something she could no longer live with."

"HE MUST HAVE GOTTEN ANGRY FOR SOME REASON," SHE SAYS, AND "AT THAT AGE YOU'RE NOT THINKING HOW FINAL A GUN IS."

## POLICY SOLUTIONS

The evidence points to a clear conclusion: America's outsized rate of firearm suicide is directly related to its high rate of firearm ownership and access. It is not surprising, therefore, that policies and practices focused on disrupting access to firearms have been shown to reduce firearm suicide rates. A comprehensive approach to disrupt access should have several key elements:

— Building public awareness about the inherent risks of firearm access

— Limiting the easy and immediate acquisition of firearms

— Responsibly storing firearms to prevent access by children and other unauthorized users

— Temporarily removing firearms from at-risk individuals

### Building public awareness

Most Americans do not think that having a gun in the home increases the risk of suicide.[60] In fact, most gun-owning Americans simply think their firearms make them safer — 67 percent of gun owners report owning a gun for protection[61] — and may not factor in the reality that access to a firearm increases the risk of suicide for people in the household.[62] While 61 percent of American gun owners report having some formal firearms training, suicide prevention is not frequently covered in those training programs.[63] Among respondents who had received training, only 15 percent reported being trained on suicide prevention.[64]

Although firearm suicide is addressed in a 2012 U.S. Surgeon General report on a national strategy for suicide prevention,[65] the federal government should do more to build awareness about this public health risk. In its reporting on suicide in the U.S., the Centers for Disease Control and Prevention (CDC) barely mentions firearms, and does not directly address how they elevate the risk for suicide.[66,67] And the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) does not disclose key pieces of data on firearm suicides, including: the types of guns primarily used; the length of time between the purchase of a gun and a suicide attempt; and whether guns used in suicides are typically in the possession of their original buyers.[68]

In the absence of public health campaigns led by the federal government, local leaders have taken the initiative to educate people on the connection between firearms and suicide. Trusted experts like law enforcement, gun dealers, and medical professionals have all launched campaigns that help inform Americans about the risks of firearms in the home and how to mitigate those risks.

Several law enforcement agencies run campaigns that provide new or prospective gun owners (or permit holders) with information about the risks of firearm access — particularly as it pertains to suicide. The Multnomah

**ONLY**

**15%**

**OF GUN OWNERS WHO RECEIVED FIREARMS TRAINING REPORTED BEING TRAINED ON SUICIDE PREVENTION**

County Sheriff's Office in Oregon is one such agency. As a part of the process for obtaining a concealed carry permit, applicants in Multnomah County are provided materials and given training on the relationship between suicide and firearms. "Firearms are the leading method for suicide," the literature notes. "They're also the deadliest … Access to guns raises the risk of suicide for people in crisis."[69]

A similar campaign exists in New York City, where the New York Police Department presents permit applicants with a warning about the risks posed by firearms in the home: "The presence of a firearm in the home has been associated with an increased risk of death to self and others, including an increased risk of suicide, death during domestic violence incidents, and unintentional deaths to children and others."[70]

Some gun dealers have taken proactive steps to educate their customers on the suicide risk posed by firearms. In New Hampshire, in 2009, firearms used in three separate suicides within one week were traced back to a single store: Riley's Sports Shop in Hooksett. Then-owner Ralph Demicco was troubled by the pattern, and he set up a series of meetings with various interest groups, from suicide prevention advocates to pro-gun organizations, to determine what could be done to minimize the risk for future customers.[71]

In 2011, this group launched the Gun Shop Project, which encourages gun stores and gun ranges to display and distribute materials about firearms and suicide. A recent evaluation found that nearly half of the gun shops in New Hampshire were displaying these materials, which include information like: "Suicides far outnumber homicides in New Hampshire … Firearms are the leading suicide method in our state."[72,73] The Gun Shop Project has since expanded nationwide, with similar initiatives underway in 21 states.[74]

Physicians and other medical professionals are also crucial sources of information about the risk of firearm access. Research shows that a majority of Americans (64 percent) who attempted suicide made a visit to a healthcare professional in the month before the attempt.[75] But, physicians do not routinely talk to patients about firearm access and the risk of suicide.[76] One issue is a lack of training: a study of emergency physicians found that over 95 percent report never having been formally trained on firearm safety counseling.[77]

**64%** OF AMERICANS WHO ATTEMPTED SUICIDE MADE A VISIT TO A HEALTHCARE PROFESSIONAL IN THE MONTH BEFORE THE ATTEMPT. BUT, PHYSICIANS DO NOT ROUTINELY TALK TO PATIENTS ABOUT FIREARM ACCESS AND THE RISK OF SUICIDE

Of particular concern, the gun lobby has backed legislation specifically aimed at restricting doctors' ability to discuss firearms with their patients. In 2011, Florida passed a law to prohibit doctors from discussing firearms with their patients, and Montana and Missouri followed with their own laws that interfere with the doctor-patient relationship. While the Florida prohibition has since been struck down, the clear intent of these laws is to discourage doctor counseling on gun safety.

By asking their patients about firearm access and counseling about firearm suicide risk, medical professionals may help prevent these deaths. Elaine Frank, with the Harvard Injury Control Research Center and the New Hampshire Firearm Safety Coalition, leads a program called Counseling on Access to Lethal Means, or C.A.L.M.[78] This program trains medical professionals on how to explain the differing lethality of various suicide methods, and to "help clients at risk for suicide and their families reduce access to lethal means, particularly firearms."[79] Medical providers who have received this training are more likely to counsel clients on the importance of restricting access to lethal means.[80,81] There are several other organizations engaged in this type of work, including the Zero Suicide Initiative,[82] and the Veterans Health Administration.[83]

### Limiting the easy and immediate acquisition of firearms

A study in California found that the rate of suicide among new gun owners in the first week after buying a gun was 57 times higher than the state's population as a whole.[84] Policies and practices that disrupt the easy and immediate acquisition of firearms may save lives. This begins at the point of sale, with strong background check and permitting laws.

Research has shown that, in states requiring an individual to obtain a permit in addition to a background check during the process of buying a handgun, the laws are associated with a reduction in firearm suicide.[85,86] This type of enhanced background check law, which is often referred to as permit-to-purchase (PTP), mandates that an applicant must pass a background check before obtaining their permit and often requires an in-person application at a law enforcement agency. As of 1994 and 1995, Connecticut required both a PTP and a comprehensive point-of-sale background check — laws that were associated with a 15 percent decline in the firearm suicide rate over the following decade.[87] By contrast, when Missouri repealed its PTP law in 2007, this repeal was associated with a 16 percent increase in the firearm suicide rate over the following five years.[88]

Beyond PTP laws, a mandatory waiting period may also help prevent firearm suicides by delaying firearm acquisition. A waiting period law requires a certain number of days to elapse between the purchase of a firearm and when the purchaser can actually take possession of that firearm. In delaying immediate access to a firearm, waiting periods insert a buffer between impulse and action. Policies that create this buffer are associated with reduced rates of firearm suicide.[89,90]

While legal mechanisms to limit or delay firearm acquisition may have an impact, gun dealers also have a critical role to play. The Gun Shop Project educates staff members at firearm dealers and firing ranges about the warning signs of suicidal individuals.[91] Demicco, co-founder of The Gun Shop Project, said: "If they manifest [signs of distress] outwardly, that's where we come in. If they don't make eye contact, if they're in distress, shut the sale down." Which is exactly what he did when he sensed something wrong after a woman came into his shop. After Demicco asked her if buying a gun was a good idea, the woman broke down into tears and admitted she was considering taking her own life. Demicco halted the sale and connected her with medical help. "We can put a little stumbling block in the way of their intentions," Demicco said, "and possibly give 'em just a little bit of time to realize that a long-term solution to a short-term problem is not the way to go."[92]

## Responsibly storing firearms

Access to a firearm increases the risk of death by suicide for everyone in the household, regardless of how that firearm is stored.[93] However, research shows that responsible firearm storage can help mitigate the risks of firearm suicide, especially for children.[94]

4.6 million American children live in households with at least one loaded, unlocked firearm.[95] And 17 percent of American high school students report seriously considering a suicide attempt.[96] This combination of suicidal ideation and easy firearm access can be lethal. When American children die by gun suicide, they overwhelmingly use guns they find at home. In fact, one study revealed that over 80 percent of child firearm suicides involved a gun belonging to a family member.[97]

OVER **80%** OF CHILD FIREARM SUICIDES INVOLVED A GUN BELONGING TO A FAMILY MEMBER

The American Academy of Pediatrics (AAP) concludes: "the most effective measure to prevent suicide, homicide, and unintentional firearm-related injuries to children and adolescents is the absence of guns from homes and communities." But if there are guns in the home, AAP notes that responsible storage practices — storing guns locked and unloaded, with ammunition kept in a separate place — can mitigate the risk of child firearm suicide.[98] Indeed, research indicates that responsible gun storage practices are associated with reduced rates of child firearm suicide. One study evaluated individual-level household storage practices, including storing household guns locked, unloaded, or separate from the ammunition. Each one of these storage practices was associated with reductions in the risk of self-inflicted and unintentional firearm injuries among children and teenagers — up to 85 percent depending on the type of storage practice.[99]

Drawing on this data, Everytown for Gun Safety and Moms Demand Action for Gun Sense in America launched Be SMART,[100] a public health campaign that educates 25,000 Americans every year on how to prevent child firearm suicides and unintentional deaths. The Be SMART presentation — delivered by volunteers in communities across the country — shares research on how guns in the home pose a risk to children, and how to mitigate this risk through practices like firearm storage and temporary firearm removal.

Recognizing the public safety benefits of responsible firearm storage, many cities and states have laws that require or encourage responsible storage. Four states and the District of Columbia have passed laws mandating that owners responsibly store their firearms.[101] And 14 states have passed Child Access Prevention (CAP) laws, which impose criminal penalties on adults when a child gains unsupervised access to their firearms.[102] States with safe storage or CAP laws have seen reductions in firearm suicide rates for children.[103,104,105]

Despite evidence that these laws save lives, the NRA — which claims to support safe storage — has sued to block responsible storage and CAP laws.[106] In 2009, the NRA sued the City and County of San Francisco for enacting legislation that required responsible storage in the home. A federal court of appeals upheld the law, rejecting the NRA's arguments that San Francisco's law violated the Second Amendment. The NRA sued the City of Seattle in July and the City of Edmonds, Washington in August 2018, seeking to block enforcement of their newly enacted CAP and responsible storage laws. As of publication, the lawsuits are still pending.

### Temporarily removing firearms from at-risk individuals

In February 2018, a man in Portland, Oregon dialed 911 and threatened suicide with a gun. A Portland Police Bureau officer responded to the call, and when he arrived at the residence, he found 10 firearms — including a loaded handgun lying on the floor that was easily accessible to both the man and his three-year-old son. Using Oregon's recently enacted Red Flag Law, the officer immediately petitioned a court to temporarily remove the firearms from the home and to temporarily prohibit the man from acquiring any new ones. The petition was granted by a judge; the officer then collected all the weapons for safekeeping.[107] By intervening at a clear moment of crisis, this officer may have prevented the man from taking his own life.

To protect individuals in crisis, several states have passed Red Flag Laws as a way to temporarily remove firearm access. These laws — which establish extreme risk protection orders (ERPOs), or gun violence restraining orders (GVROs) — allow immediate family members and/or law enforcement officers to petition a court to temporarily block gun possession by individuals who have exhibited behavior suggesting they are a risk to themselves or others. In states without Red Flag Laws, friends or family members must pursue other options if they wish to have firearms removed from an at-risk individual. According to a survey in several U.S. states, a majority of local law enforcement agencies are willing to temporarily store guns during a crisis; many gun dealers offer this service too.[108] If this is not an option, friends or family may be willing to temporarily store the firearms, though this kind of transfer comes with its own potential risks. In these instances, to prevent the at-risk individual from regaining access, the firearms should be securely locked and any key or code to the lock withheld. This is why Everytown has made passing Red Flag Laws a legislative priority.

At the time of publication, 13 states had Red Flag Laws in place.[109] "We've actually had three people, specifically, that when they came in for their [ERPO] court hearing … actually thank us in court for securing their firearms from them," Seattle Police Sergeant Eric Piconski recently said in an interview. "They acknowledged and recognized that it was probably not a good idea that they had access to firearms."[110]

**RED FLAG LAWS REDUCE FIREARM SUICIDES**

↓ **INDIANA SAW A 7.5% REDUCTION IN THE FIREARM SUICIDE RATE**

↓ **CONNECTICUT SAW A 14% REDUCTION IN THE FIREARM SUICIDE RATE**

The impact of Red Flag Laws have been studied in two states: Indiana and Connecticut, and the evidence shows that these laws work to reduce firearm suicides.[111] In the 10 years after Indiana passed its Red Flag Law, the state's firearm suicide rate decreased by 7.5 percent.[112] In Connecticut, the Red Flag Law was associated with a 14 percent reduction in firearm suicide rate in the period after the 2007 shooting at Virginia Tech, when enforcement of the law increased significantly.[113] Another study in Connecticut found that one suicide was averted for approximately every 11 gun removals carried out under the law.[114] Researchers have noted implementation gaps in Connecticut may have blunted the initial impact of the state's Red Flag Law, underscoring the importance of awareness campaigns aimed at educating the public and law enforcement agencies about the availability of ERPO as a tool to temporarily remove firearm access from a person at risk.

## CONCLUSION

Claiming the lives of nearly 22,000 Americans every year, firearm suicides have a devastating impact on our communities — from the victims themselves, to their surviving loved ones, to the public at large. Access to firearms is strongly associated with increased risk for suicide.[115] This is why states with high rates of household gun ownership also have high rates of firearm and overall suicide.[116]

Americans should be educated on the prevalence of firearm suicide, how having access to a gun increases the risk of suicide, and steps they can take to mitigate risk. Given the unique lethality of firearms as a means of suicide, policies and practices that limit or disrupt access to firearms have been shown to save lives. This includes disrupting the easy and immediate acquisition of firearms, encouraging the responsible storage of firearms in the home, and temporarily removing firearms from individuals in moments of crisis.

1  This narrative is derived from an interview with Khary, a member of the Everytown Survivor Network.

2  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). A yearly average was developed using five years of most recent available data: 2012-2016.

3  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). Firearm suicide to total suicide ratio and daily average developed using five years of most recent available data: 2012-2016.

4  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). A percent change was developed using 2007-2016 age-adjusted rates for all ages.

5  Miller M, Azrael D, Hemenway D. The epidemiology of case fatality rates for suicide in the northeast. *Annals of Emergency Medicine.* 2004; 43(6): 723-30.

6  Miller M, Azrael D, Barber C. Suicide mortality in the United States: The importance of attending to method in understanding population-level disparities in the burden of suicide. *Annual Review of Public Health.* 2012; 33: 393-408.

7  Vyrostek SB, Annest JL, Ryan GW. Surveillance for fatal and nonfatal injuries - United States, 2001. *Morbidity and Mortality Weekly Report. Surveillance Summaries.* 2004; 53(7): 1-57.

8  Miller M, Azrael D, Barber C. Suicide mortality in the United States: The importance of attending to method in understanding population-level disparities in the burden of suicide. *Annual Review of Public Health.* 2012; 33: 393-408.

9  Owens D, Horrocks J, House A. Fatal and non-fatal repetition of self-harm: Systematic review. *British Journal of Psychiatry.* 2002; 181: 193-199.

10  Miller M, Azrael D, Barber C. Suicide mortality in the United States: The importance of attending to method in understanding population-level disparities in the burden of suicide. *Annual Review of Public Health.* 2012; 33: 393-408.

11  Soffen K. To reduce suicides, look at guns. *The Washington Post.* July 13, 2016. https://wapo.st/2I7MCUx.

12  Yip PS, Caine E, Yousuf S, Chang SS, Wu KC, Chen YY. Means restriction for suicide prevention. *The Lancet.* 2012; 379(9834): 2393-2399.

13  Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: A systematic review and meta-analysis. *Annals of Internal Medicine.* 2014; 160: 101–110.

14  Miller M, Lippman SJ, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. *The Journal of Trauma Injury, Infection, and Critical Care.* 2007; 62(4): 1029-35.

15  Ibid.

16  This narrative is derived from an interview with Debbie, a staff member at Everytown and a member of the Everytown Survivor Network.

17  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). A yearly average was developed using five years of most recent available data: 2012-2016.

18  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). A percent change was developed using 2007-2016 age-adjusted rates for all ages.

19  Risk Factors and Warning Signs. American Foundation for Suicide Prevention Website. https://bit.ly/2bmWnQx.

20  Vyrostek SB, Annest JL, Ryan GW. Surveillance for fatal and nonfatal injuries - United States, 2001. *Morbidity and Mortality Weekly Report. Surveillance Summaries.* 2004; 53(7): 1-57.

21  Miller M, Azrael D, Barber C. Suicide mortality in the United States: The importance of attending to method in understanding population-level disparities in the burden of suicide. *Annual Review of Public Health.* 2012; 33: 393-408.

22  Vyrostek SB, Annest JL, Ryan GW. Surveillance for fatal and nonfatal injuries - United States, 2001. *Morbidity and Mortality Weekly Report. Surveillance Summaries.* 2004; 53(7): 1-57.

23  Miller M, Azrael D, Barber C. Suicide mortality in the United States: The importance of attending to method in understanding population-level disparities in the burden of suicide. *Annual Review of Public Health.* 2012; 33: 393-408.

24  Owens D, Horrocks J, House A. Fatal and non-fatal repetition of self-harm: Systematic review. *British Journal of Psychiatry.* 2002; 181: 193-199.

25  Vyrostek SB, Annest JL, Ryan GW. Surveillance for fatal and nonfatal injuries - United States, 2001. *Morbidity and Mortality Weekly Report. Surveillance Summaries.* 2004; 53(7): 1-57.

26  Miller M, Azrael D, Barber C. Suicide mortality in the United States: The importance of attending to method in understanding population-level disparities in the burden of suicide. *Annual Review of Public Health.* 2012; 33: 393-408.

27  Vyrostek SB, Annest JL, Ryan GW. Surveillance for fatal and nonfatal injuries - United States, 2001. *Morbidity and Mortality Weekly Report. Surveillance Summaries.* 2004; 53(7): 1-57.

28  Miller M, Azrael D, Barber C. Suicide mortality in the United States: The importance of attending to method in understanding population-level disparities in the burden of suicide. *Annual Review of Public Health.* 2012; 33: 393-408.

29  Ibid.

30  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). A yearly average was developed using five years of most recent available data: 2012-2016. Children and teens defined as 0-19.

31  Grinshteyn E, Hemenway D. Violent death rates: The US Compared with other High-Income OECD Countries, 2010. *The American Journal of Medicine.* 2016; 129(3): 266-273.

32  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). A percent change was developed using 2007-2016 age-adjusted rates for all ages.

33  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). A percent change was developed using 2007-2016 crude rates for children and teens (0-19).

34  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). Developed using five years of most recent available data (2012-2016) and age-adjusted rates.

35  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). A yearly average was developed using five years of most recent available data: 2012-2016. Children and teens (0-19) die of firearm suicide at a rate of 1.16 per 100,000 compared to 8.75 per 100,000 among adults age 20 and over.

36  Ibid.

37  Ibid.

38  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). Race and ethnicity breakdowns developed using five years of most recent available data (2012-2016) and age-adjusted rates. White defined as non-hispanic white.

39  Centers for Disease Control and Prevention. National Centers for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS). Racial and ethnic breakdowns developed using five years of most recent available data: 2012-2016.

40  Centers for Disease Control and Prevention. National Center for Health Statistics, Wide-ranging Online Data for Epidemiologic Research Tool (WONDER). A yearly average of each CDC classified urbanization level was developed using five years of most recent available data: 2012-2016.

41  Centers for Disease Control and Prevention. 2013 NCHS Urban-Rural Classification Scheme for Counties. Published April 2014.

42  Centers for Disease Control and Prevention. National Center for Health Statistics, Wide-ranging Online Data for Epidemiologic Research Tool (WONDER). A yearly average was developed using five years of most recent available data: 2012-2016. County urbanization levels given by CDC.

43  Centers for Disease Control and Prevention. National Center for Health Statistics, Wide-ranging Online Data for Epidemiologic Research Tool (WONDER). A yearly average was developed using five years of most recent available data: 2012-2016.

44  This narrative is derived from an interview with Jennifer, a member of the Everytown Survivor Network.

45  Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: A systematic review and meta-analysis. *Annals of Internal Medicine.* 2014; 160: 101–110.

46  Ibid.

47  Ibid.

48  Miller M, Lippman SJ, Azrael D, and Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. *The Journal of Trauma Injury, Infection, and Critical Care.* 2007; 62(4): 1029-35.

49  Ibid.

50  Siegel M, Ross CS, King C 3rd. A new proxy measure for state-level gun ownership in studies of firearm injury prevention. *Injury Prevention.* 2014; 20(3): 204-7.

51  Azrael D, Hepburn L, Hemenway D, Miller M. The stock and flow of U.S. firearms: Results from the 2015 national firearms survey. *The Russell Sage Foundation Journal of the Social Sciences.* 2017; 3(5): 38-57.

52  Weinberger SE, Hoyt DB, Lawrence HC, et al. Firearm-related injury and death in the United States: A call to action from 8 health professional organizations and the American Bar Association. *Annals of Internal Medicine.* 2015; 162: 513-516.

53  Ibid.

54  Deisenhammer EA, Ing CM, Strauss R, Kemmler G, Hinterhuber H, Weiss EM. The duration of the suicidal process: How much time is left for intervention between consideration and accomplishment of a suicide attempt? *The Journal of Clinical Psychology.* 2007; 70(1): 19-24.

55  Simon TR, Swann AC, Powell KE, Potter LB, Kresnow M, O'Carroll PW. Characteristics of impulsive suicide attempts and attempters. *Suicide and Life-Threatening Behavior.* 2001; 32(supp): 49-59.

56  Soffen K. To reduce suicides, look at guns. *The Washington Post.* July 13, 2016. https://wapo.st/2I7MCUx.

57  Ibid.

58  Ibid.

59  This narrative is derived from an interview with Alexandria, a member of the Everytown Survivor Network.

60  Connor A, Azrael D, Miller M. Public opinion about the relationship between firearm availability and suicide: Results from a national survey. *Annals of Internal Medicine.* 2018; 168: 153-155.

61  Igielnik R, Brown A. Key takeaways on Americans' views of guns and gun ownership. *Pew Research Center.* June 22, 2017. https://pewrsr.ch/2sZzPjv.

62  Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: A systematic review and meta-analysis. *Annals of Internal Medicine.* 2014; 160: 101–110.

63  Rowhani-Rahbar A, Lyons VH, Simonetti JA, Azrael D, Miller M. Formal firearm training among adults in the USA: Results of a national firearm survey. *Injury Prevention.* 2018; 24: 161-165.

64  Ibid.

65  US Department of Health and Human Services (HHS) Office of the Surgeon General and National Action Alliance for Suicide Prevention. *2012 National Strategy for Suicide Prevention: Goals and Objectives for Action.* US Department of Health and Human Services; 2012.

66  Stone D, Simon TR, Fowler KA, et al. Vital Signs: Trends in state suicide rates - United States, 1999-2016 and circumstances contributing to suicide - 27 states, 2015. Centers for Disease Control and Prevention. 2018; 67(22): 617-624.

67  Ibid.

68  *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms, and Explosives.* [2018]. (United States District Court, Southern District of New York).

69  Is your safety on? Firearms and suicide. Multnomah County Health Department. https://bit.ly/2Iwa7h4.

70  New York City firearm permit application "warning". Email correspondence with New York Police Department.

71  Van Brocklin E. Can Gun Stores Play a Role in Suicide Prevention? *The Trace.* January 4, 2016. https://bit.ly/2t6FWBD.

72  Vriniotis M, Barber C, Frank E, Demicco R, New Hampshire Firearm Safety Coalition. A suicide prevention campaign for firearm dealers in New Hampshire. *Suicide and Life-Threatening Behavior.* 2015; 45(2): 157-163. This program has not otherwise been evaluated for impact.

73  Harvard T.H. Chan School of Public Health. Gun Shop Project. https://bit.ly/2c4QKah.

74  Ibid.

75  Ahmedani BK, Stewart C, Simon GE, et al. Racial/ethnic differences in health care visits made before suicide attempt across the United States. *Medical Care.* 2015; 53(5): 430-435.

76  Price JH, Thompson A, Khubchandani J, Wiblishauser M, Dowling J, Teeple K. Perceived roles of Emergency Department physicians regarding anticipatory guidance on firearm safety. *Journal of Emergency Medicine.* 2013; 44(5): 1007-1016.

77  Ibid.

78  CALM: Counseling on Access to Lethal Means. Suicide Prevention Resource Center Website. https://bit.ly/2OvUN1B.

79  Ibid.

80  Sale E, Hendricks M, Weil V, Miller C, Perkins S, McCudden S. Counseling on Access to Lethal Means (CALM): An evaluation of a suicide prevention means restriction training program for mental health providers. *Community Mental Health Journal.* 2018; 54(3): 293-301.

81  Johnson RM, Frank EM, Ciocca M, Barber CW. Training mental healthcare providers to reduce at-risk patients' access to lethal means of suicide: Evaluation of the CALM Project. *Archives of Suicide Research: Official Journal of the International Academy for Suicide Research.* 2011; 15(3): 259-264.

82  Zero Suicide Toolkit. Zero Suicide Initiative. https://bit.ly/2vtVRks.

83  Department of Veterans Affairs & Department of Defense. Clinical Practice Guideline for Assessment and Management of Patients at Risk for Suicide. 2013.

84  Wintemute GJ, Parham CA, Beaumont JJ, Wright MA, Drake C. Mortality among recent purchasers of handguns. *The New England Journal of Medicine.* 1999; 341(21): 1583- 1589.

85  Federal law requires criminal background checks for all guns purchased from a licensed firearms dealer, and does not cover any sales by unlicensed sellers. A total of 20 states (and Washington D.C.) have closed that critical gap for handguns, passing laws that require some form of a background check before a handgun purchase. Seven of those states require the check only pursuant to a purchase permitting process, nine require a background check only at the point of purchase, and four require background checks both in order to obtain a permit and also at the point of sale.

86  Crifasi CK, Meyers JS, Vernick JS, Webster DW. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. *Preventive Medicine.* 2015; 79: 43-49.

87  Ibid.

88  Ibid.

89  Luca M, Malhotra D, Poliquin C. Handgun waiting periods reduce gun deaths. *Proceedings of the National Academy of Sciences of the United States of America.* 2017; 114(46): 12162-12165.

90  Anestis MD, Anestis JC, Butterworth SE. Handgun legislation and changes in statewide overall suicide rates. *American Journal of Public Health.* 2017; 107(4): 579-581.

91  Van Brocklin E. Can Gun Stores Play a Role in Suicide Prevention? *The Trace.* January 4, 2016. https://bit.ly/2t6FWBD.

92  Ibid.

93  Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: A systematic review and meta-analysis. *Annals of Internal Medicine.* 2014; 160: 101–110.

94  Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional firearm injuries. *JAMA: The Journal of the American Medical Association.* 2015; 293(6): 707-714.

95  Azrael D, Cohen J, Salhi C, Miller M. Firearm storage in gun-owning households with children: Results of a 2015 national survey. *Journal of Urban Health.* 2018; 95(3): 295-304. Study defined children as under the age of 18.

96  Centers for Disease Control and Prevention. High School Youth Risk Behavior Surveillance System. 2017 data.

97  Johnson RM, Barber C, Azrael D, Clark DE, Hemenway D. Who are the owners of firearms used in adolescent suicides? *Suicide and Life-Threatening Behavior.* 2010; 40(6): 609-611. Study defined children as under the age of 18.

98  Council on Injury, Violence, and Poison Prevention Executive Committee. Firearm-related injuries affecting the pediatric population. *American Academy of Pediatrics.* 2012; 130(5): e1416-e1423.

99  Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional injuries. *JAMA: The Journal of the American Medical Association.* 2005; 293(6): 707-714. Study found households that locked both firearms and ammunition had an 85 percent lower risk of unintentional firearm deaths than those that locked neither.

100  Be SMART Website. https://bit.ly/1PUZX1H.

101  California (Cal. Pen. Code §§ 25000-25110); Massachusetts (ALM Gl. ch. 140, § 131L); Minnesota (Minn. Stat. § 609.666); Virginia (Va. Code Ann. § 18.2-56.2); District of Columbia (D.C. Code § 7-2507.02)

102  Connecticut (Conn. Gen. Stat. §§ 29-37i, 53a-217a); Delaware (11 Del. C. § 1456; 11 Del. C. § 603); Florida (Fla. Stat. §§ 790.174; 790.175; 784.05); Illinois (720 ILCS § 5/24-9); Iowa (Iowa Code § 724.22(7)); Hawaii (HRS §§ 134-10.5; 707-714.5); Maryland (Md. Crim. Law Code Ann. § 4-104); Nevada (Nev. Rev. Stat. § 202.300); New Hampshire (RSA § 650-C:1); New Jersey (N.J. Stat. § 2C:58-15); North Carolina (N.C. Gen. Stat. § 14-315.1); Rhode Island (RI Gen. Laws § 11-47-60.1); Texas (Tex. Pen. Code § 46.13); Wisconsin (Wis. Stat. § 948.55)

103  Gius M. The impact of minimum age and child access prevention laws on firearm-related youth suicides and unintentional deaths. *The Social Science Journal.* 2015; 52(2): 168-175.

104  Webster DW, Vernick JS, Zeoli AM, Manganello JA. Association between youth-focused firearm laws and youth suicides. *JAMA: The Journal of the American Medical Association.* 2004; 292(5): 594-601.

105  Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional injuries. *JAMA: The Journal of the American Medical Association.* 2005; 293(6): 707-714.

106  According to their website, the "NRA's longstanding rule of gun storage is to store your guns so that they are inaccessible to any unauthorized users, especially your children and the children that visit your home." Frequently asked questions about Eddie Eagle. NRA Eddie Eagle Gunsafe Program Website. https://bit.ly/2wmZZx9.

107  Multnomah County ERPO case file, on file with Everytown. Received from Oregon State Court Administrator.

108  Runya CW, Brooks-Russell A, Brandspigel S, et al. Law enforcement and gun retailers as partners for safely storing guns to prevent suicide: A study in 8 Mountain West states. *American Journal of Public Health.* 2017; 107(11): 1789-1794.

109  California (Cal. Pen. Code § 18100, et. seq.); Connecticut (Conn. Gen. Stat. § 29-38c); Delaware (10 Del. C. § 7701, et. seq.); Florida (Fla. Stat. § 790.401); Illinois (2017 IL House Bill 2354); Indiana (Ind. Code § 35-47-14-1, et seq); Maryland (Md. Public Safety Code Ann. § 5-601, et seq); Massachusetts (Mass. Gen. Laws ch. 140, §§ 121, 129B(C), 131(C), 131R-Z); New Jersey (2018 NJ Assembly Bill 1217); Oregon (O.R.S. § 166.525, et seq.); Rhode Island (RI Gen. Laws § 8-8.3-1, et seq.); Vermont (13 VSA § 4051, et seq.); Washington (Rev. Code Wash. § 7.94.010, et seq.)

110  MyNorthwest.com. How Seattle is using ERPO laws to remove guns from at-risk people. *KIRO Radio.* March 6, 2018. https://bit.ly/2HYWlad.

111  Kivisto AJ, Phalen PL. Effects of risk-based firearm seizure laws in Connecticut and Indiana on Suicide Rates, 1981-2015. *Psychiatric Services.* 2018; 69(8): 855-862.

112  Ibid.

113  Ibid.

114  Swanson JW, Norko M, Lin H, et al. Implementation and effectiveness of Connecticut's risk-based gun removal law: Does it prevent suicides? *Law and Contemporary Problems.* 2017; 80: 179-208.

115  Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: A systematic review and meta-analysis. *Annals of Internal Medicine.* 2014; 160: 101–110.

116  Miller M, Lippman SJ, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. *The Journal of Trauma Injury, Infection, and Critical Care.* 2007; 62(4): 1029-35.

EVERYTOWNRESEARCH.ORG/
DISRUPTING-ACCESS



# EXHIBIT B

# *Suicide Among Veterans and Other Americans*

# *2001–2014*

Office of Suicide Prevention

**3 August 2016**

**(Updated August 2017 by the Office of Mental Health and Suicide Prevention)**



**U.S. Department
of Veterans Affairs**

# Contents

I.    Introduction ...................................................................................................................3

II.   Executive Summary .......................................................................................................4

III.  Background ....................................................................................................................5

IV.   Methodology...................................................................................................................5

V.    Results – Part 1: Suicide Among VHA Patients With Comparison to the U.S. General Population, 2001–2014 ........................................................................................................................6

    A.   VHA Patient Population ...........................................................................................6

    B.   Mental Health and Substance Use Disorders Among VHA Patients .......................8

    C.   History of Non-Fatal Suicide Attempt ....................................................................12

    D.   Total and Sex-Specific VHA Patient Suicide Rates ...............................................15

    E.   Differences in VHA Patient Suicide Rates by Age and Sex...................................17

    F.   Comparison of Suicide Rates Among VHA Users and the General U.S. Population ...................18

    G.   Suicide Among OEF/OIF/OND VHA Users ............................................................19

VI.   Results – Part 2: Suicide Among All U.S. Veterans, 2001–2014 .................................20

    A.   Magnitude of Veteran Suicide Mortality.................................................................21

    B.   Comparison of Suicide Rates Among Veterans Who Do and Do Not Use VHA Services, 2001–2014 ..................................................................................................................24

    C.   Comparison of Veteran and Adult Civilian Suicide Risk, 2001–2014 .............................25

    D.   Method of Veteran and Civilian Suicide, 2001–2014 ........................................39

    E.   Understanding the Burden of Veteran Suicide: Magnitude vs. Risk ................................43

VII.  Summary and Discussion of Findings..........................................................................47

VIII. Ongoing Suicide Data Analysis ..................................................................................48

# I.  Introduction

The top priority of the U.S. Department of Veterans Affairs (VA) is the health and well-being of all of our Nation's Veterans, including Veterans who have chosen not to enroll in, or are not eligible for, VA health care. As the largest integrated health care system in the country, VA is committed to providing timely access to high-quality, recovery-oriented mental health care that anticipates and responds to Veterans' needs, such as treatment for PTSD, substance use disorders, depression, and suicidal ideation.

In 2014, suicide was the 10th-leading cause of death in the United States, and rates of suicide in the U.S. general population are increasing. Centers for Disease Control and Prevention (CDC) data released in an April 2016 report indicated that between 1999 and 2014, suicide rates increased among the general population, for both men and women and for all ages. Regardless of suicide rates or the number of cases, one life lost to suicide is too many.

VA has worked tirelessly to develop suicide prevention resources for every Veteran who is experiencing a mental health crisis, whether or not that Veteran is enrolled in the VA Health Care System. In fact, of about 21.6 million[*] Veterans across the country — including almost 2 million women — just over 8.5 million[**] are enrolled for care from a VA provider. VA is committed to identifying and reaching all Veterans who may be at risk for suicide and continues to enhance programs designed to reduce risk among those who receive services from the Veterans Health Administration (VHA). As highlighted in a recent VA-led Call to Action to Prevent Veteran Suicide, eliminating the burden of suicide among Veterans will require participation from a broad group of federal government and community partners. In recognition of this need, VA and its partners are developing innovative strategies to find and help Veterans at risk for suicide through community-based collaborations and expanded supportive services.

As part of the Call to Action, VA has undertaken the most comprehensive analysis of Veteran suicide in our nation's history, examining more than 55 million records from 1979 to 2014 from all 50 states, Puerto Rico, and Washington, D.C. This report describes the results of this effort. It builds on data from previous VA Suicide Data Reports, which were primarily limited to information on Veterans who used VHA health services and to mortality records obtained directly from a small number of states, which included approximately 3 million records. This report on Veteran suicide is unprecedented in its breadth and depth of information about the characteristics of suicide among Veterans. It contains the first comprehensive assessment of differences in rates of suicide among Veterans with and without use of VHA services and comparisons between Veterans and other Americans. This report serves as a foundation for informing and evaluating suicide prevention efforts inside the VHA health care system and for developing lifesaving collaborations with community health care partners.

***Data on Veteran deaths by suicide included in the "Suicide Among All U.S. Veterans, 2001–2014" report have been updated to align with the final 2016 version of the Suicide Data Repository. We note that in the initial report, released in August 2016, some data points regarding overall Veteran suicide mortality in Part 2 included U.S. territories while others excluded them, making the data points inconsistent and therefore not comparable. This updated report excludes U.S. territories from these analyses, due to variations in the availability of National Death Index (NDI) data for the territories. This is consistent with the CDC's published aggregate suicide counts and rates for the general U.S. population. These revisions have a minimal impact on the overall report.***

[*]*Source: VA Benefits & Health Care Utilization Pocket Card, Updated 5/13/16; Veteran Population as of 09/30/15 (http://www.va.gov/vetdata/docs/pocketcards/fy2016q3.pdf)*
[**]*Source: VA Benefits & Health Care Utilization Pocket Card, Updated 5/13/16; Produced by the National Center for Veterans Analysis and Statistics. (http://www.va.gov/vetdata/docs/pocketcards/fy2016q3.pdf)*

## II.   Executive Summary

This report provides information regarding suicide mortality for the years 2001–2014. It incorporates the most recent mortality data from the VA/Department of Defense (DoD) Joint Suicide Data Repository and includes information for deaths from suicide among all known Veterans of U.S. military service. Data for the Joint VA/DoD Suicide Data Repository were obtained from the CDC National Center for Health Statistics' NDI through collaboration with the DoD and the VA/DoD Joint Suicide Data Repository initiative. Data available from the NDI include reports of mortality submitted from vital statistics systems in all 50 U.S. states, Washington, D.C., Puerto Rico, and the U.S. Virgin Islands. However, in Section 2, data reported by Puerto Rico and the U.S. Virgin Islands were excluded due to variations in the availability of data for the U.S. territories.

This report is unprecedented in its comprehensive analysis of suicide rates among all U.S. Veterans. Unlike previous VA reports, this report provides information on all recorded suicides among all known Veterans living in the United States. Additional enhancements include direct comparisons of Veterans' suicide rates with those of analogous civilian populations, calculation of suicide rates among populations with known elevations in suicide risk (e.g., with mental health diagnoses) and groups with emerging risk (e.g., patients who are prescribed opioids), and comparisons between Veterans who do and do not use VHA services. In contrast to previous VA reports, rates of suicide have been calculated by calendar year to facilitate comparison with national statistics and reports from other agencies.

Findings on suicide counts and rates are based on analyses conducted at the VHA Office for Suicide Prevention with support from the VISN 2 Center of Excellence for Suicide Prevention; VISN 19 Mental Illness Research, Education and Clinical Care Center; and the Post-Deployment Health Service. Results from analyses included in this report were obtained using all available information to identify Veterans who died by suicide. This report includes the years 2001–2014. Subsequent analyses will include data from earlier years. Key findings from this year's report include:

- In 2014, an average of 20 Veterans died by suicide each day. Six of the 20 were recent users of VHA services in 2013 or 2014.
- In 2014, Veterans accounted for 18 percent of all deaths by suicide among U.S. adults and constituted 8.5 percent of the U.S. adult population (ages 18 and older). In 2010, Veterans accounted for 20.1 percent of all deaths by suicide and represented 9.6 percent of the U.S. adult population.
- The burden of suicide resulting from firearm injuries remains high. In 2014, about 67 percent of all Veteran deaths by suicide were the result of firearm injuries.
- There is continued evidence of a high burden of suicide among middle-aged and older Veterans. In 2014, about 65 percent of all Veterans who died by suicide were ages 50 and older.
- After adjusting for differences in age and sex, risk for suicide was 22 percent higher among Veterans compared with U.S. civilian adults. (2014)
- After adjusting for differences in age, risk for suicide was 19 percent higher among male Veterans compared with U.S. civilian adult men. (2014)
- After adjusting for differences in age, risk for suicide was 2.5 times higher among female Veterans compared with U.S. civilian adult women. (2014)
- In 2014, rates of suicide were highest among younger Veterans (ages 18–29) and lowest among older Veterans (ages 60 and older).

4

## III.   Background

Rates of suicide have been increasing for both men and women and across all age groups in the United States. According to a recent CDC report, the age-adjusted rate of suicide increased by 24 percent between 1999 and 2014.[1] Findings from this same report show that increases in rates of suicide were higher between 2006 and 2014 than they were during earlier time periods. Although women have lower rates of suicide compared to men in the general population, rates of suicide increased more among women than among men during the study period. While overall rates of suicide have increased in the United States, suicides resulting from a firearm injury have decreased since 1999. According to the CDC, the proportion of suicides resulting from a firearm injury decreased by more than 10 percent among men and 16 percent among women in the U.S. general population. Finally, different patterns were seen in the distribution of suicide rates across age groups for men and women. With some slight variability, rates of suicide increased with age among men in the U.S. general population, with the highest rates of suicide among men ages 75 and older. In contrast, rates of suicide among women in the U.S. general population peaked during middle age, with the highest rates among women ages 45–64.

VA has released two previous Suicide Data Reports (2012, 2014). While these previous reports did not include information on the characteristics of suicide among all Veterans, the available information did provide valuable insight into potential differences between suicide among those with history of U.S. military service and other Americans. Of particular importance were findings of increases in rates of suicide among younger Veterans (ages 18–29), sex-based differences in changes in rates among female Veterans who used VHA services, and a comparatively high prevalence (approximately 66 percent) of suicides resulting from a firearm injury. Results included in this report provide the first systematic assessment of characteristics of suicide among Veterans with and without use of VHA services and comparison to rates of suicide among other Americans (i.e., civilians).

## IV.   Methodology

Data for this report were obtained by linking information from VA and DoD administrative records with cause of death information included in the CDC's NDI. Information from multiple program offices and record systems was combined to create a comprehensive population record of Veterans for the years of interest. From VA, information was obtained from population rosters maintained by the Office of Policy and Planning, deployment and service rosters maintained by the Post-Deployment Health Service, and VHA clinical and administrative records. Information on all Veterans who separated from active duty service or who had been activated during service in a Reserve component or the National Guard was obtained from the DoD Defense Manpower Data Center. In total, more than 50 million records were submitted to the NDI for retrieval of information on fact and cause of death.

This report is divided into two sections, parts 1 and 2. Part 1 includes information on rates of suicide among all VHA patients and compares these rates to suicide rates among the general U.S. population. Consistent with past practice, rates of suicide and estimates of relative risk presented in the first section include information on all users of VHA services (Veterans and other users) with comparison to rates of suicide among members of the U.S. general population. Part 2 includes information on rates of suicide among only Veterans, including both those who used VHA clinical services and those who did not. The report compares these with suicide rates among non-Veteran adult civilians. In both sections of this report, Veteran suicide decedents were considered users of VHA services if there was at least one record of inpatient or outpatient care in the calendar year of or before death.

# V.    Results – Part 1: Suicide Among VHA Patients With Comparison to the U.S. General Population, 2001–2014

This section provides information regarding suicide mortality among all VHA patients, including those who were not Veterans. Findings on suicide counts, rates, and risk factors in this section are based on analyses conducted at the VHA's Office of Mental Health Operations' Serious Mental Illness Treatment Resource and Evaluation Center. For the years 2001–2014, the rates of suicide among patients who used VHA health care services in the year of death or in the previous calendar year have been evaluated overall and by sex and age group.

## A.    VHA Patient Population

VHA provides health care to a large and diverse patient population and, as is true with many health systems, provides care for patients with complex health problems, some of which are associated with increased risk for suicide. It is also important to note that not all Veterans are equally eligible to receive VHA services. One way of understanding the characteristics of VHA's patient population is to examine the type of eligibility assigned to each Veteran who received VHA care. Veterans are assigned priority groups that determine their eligibility status for VHA services. Eligibility is largely, but not solely, based on service-connected disability level and income. Since 2001, some notable changes in the VHA patient population have occurred. Specifically, the proportion of VHA Veterans with a 50 percent or higher service-connected disability has more than doubled, increasing from 11.7 percent in 2001 to 25.9 percent of all VHA patients in 2014. At the same time, the proportion of non-Veteran VHA patients has decreased significantly, dropping from 8.8 percent in 2001 to 4.4 percent of all VHA patients in 2014.[2] Additional changes in the patient population distribution by priority enrollment group can be seen in Figure 1.

---

1.    Curtin SC, Warner M, Geedegaard H. Increase in suicide in the United States, 1999–2014. NCHS data brief, no, 241. Hyattsville, MD: National Center for Health Statistics. 2016.

2.    Details on priority group enrollment criteria can be found at: http://www.va.gov/HEALTHBENEFITS/resources/priority_groups.asp

Figure 1. VHA Patient Distribution by Enrollment Priority Group (percent), 2001 and 2014





Priority Group Descriptions: **Group1** = ≥ 50 percent service-connected disability; **Group 2** = 30–40 percent service-connected disability; **Group 3** = 20 percent service-connected disability, prisoners of war, other special categories; **Group 4** = Veterans who are receiving aid and attendance or housebound benefits from VA, or Veterans who have been determined to be catastrophically disabled; **Group 5** = nonservice-connected Veterans and noncompensable service-connected Veterans rated 0 percent disabled by VA with annual income below the VA and geographically (based on resident ZIP code) adjusted income limits, Veterans receiving VA pension benefits, Veterans eligible for Medicaid programs; **Group 6** = all other Veterans not required to make a copay; **Group 7** = Veterans with gross household income below the geographically adjusted income limits for their resident location and who agree to pay copays; **Group 8** = Veterans with gross household income above the VA and the geographically adjusted income limits for their resident location and who agree to pay copays.

## B.    Mental Health and Substance Use Disorders Among VHA Patients

Mental health disorders, including major depression and other mood disorders, have been associated with increased risk for suicide.[3] Since 2001, the proportion of VHA users with mental health conditions or substance use disorders (SUD) has increased from 27 percent in 2001 to 41 percent in 2014. The increased prevalence of mental health disorders among VHA patients compared to the U.S. adult population should not be taken as an indicator of the overall mental health of the larger Veteran population. Rather, this information may explain differences in suicide rates among VHA patients compared to rates of suicide in the general population.

Figure 2. Percentage of VHA Users With Diagnoses of Mental Health (MH) Condition/Substance Use Disorder (SUD) by Calendar Year



**Main Finding: The percentage of VHA users diagnosed with a mental health condition or a SUD has increased substantially since 2001.**

3.    Harris, E.C. & Barraclough, B. (1997) Suicide as an outcome for mental health disorders. A meta-analysis. Br J Psychiatry, 170, 205-228.

Figure 3. Suicide Rate (per 100,000 Person-Years) Among VHA Users With Mental Health (MH) Conditions/Substance Use Disorders (SUD), by Condition and Calendar Year



**Main Finding: Compared to 2001, rates of suicide have decreased among VHA patients diagnosed with a mental health condition or a SUD.**

Figure 4 provides information on rates of suicide among those patients diagnosed with opioid use disorder (OUD), a condition with emerging evidence of suicide risk. As shown in Figure 4, rates of suicide have increased among VHA patients with an OUD and are comparable to rates of suicide among VHA patients diagnosed with severe depression (BPD).

Figure 4. Suicide Rate per 100,000 Person-Years Among VHA Users by Receipt of Opioid Use Disorder Diagnosis by Calendar Year



**Main Finding: Rates of suicide were elevated among VHA patients diagnosed with an OUD and have increased since 2001.**

Overall, suicide rates are highest among patients with mental health condition and SUD diagnoses who are in treatment and lower among those who received a mental health condition diagnosis but were not sick enough to require enhanced care from a mental health care provider (Table 1).

## Table 1. Suicide Rates by Receipt of Mental Health (MH)/Substance Use Disorder (SUD) Diagnosis or Treatment and Calendar Year

| Characteristics | Calendar Year | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| Total | 39.9 | 39.0 | 34.9 | 35.9 | 34.9 | 35.9 | 35.1 | 38.4 | 37.0 | 36.4 | 38.9 | 37.9 | 38.8 | 39.2 |
| With MH treatment | 84.0 | 81.4 | 68.9 | 69.8 | 65.0 | 68.1 | 64.3 | 70.7 | 65.1 | 62.4 | 66.3 | 63.4 | 62.3 | 65.6 |
| Without MH treatment | 27.7 | 27.6 | 25.8 | 26.6 | 26.3 | 26.3 | 25.9 | 27.2 | 26.5 | 26.1 | 27.4 | 26.8 | 28.1 | 26.7 |
| With MH/SUD diagnosis | 77.6 | 74.1 | 63.5 | 62.1 | 59.4 | 59.0 | 57.7 | 60.4 | 57.7 | 55.3 | 58.2 | 56.2 | 55.8 | 57.0 |
| Without MH/SUD diagnosis | 24.7 | 24.5 | 22.3 | 23.3 | 22.5 | 23.6 | 22.5 | 25.4 | 24.2 | 24.2 | 25.9 | 25.3 | 26.7 | 26.3 |
| With MH/SUD diagnosis and MH treatment | 89.8 | 88.2 | 74.6 | 75.2 | 70.6 | 72.4 | 69.1 | 75.3 | 68.4 | 65.5 | 69.3 | 65.6 | 65.5 | 68.2 |
| With MH/SUD diagnosis, without MH treatment | 52.9 | 49.0 | 46.0 | 43.1 | 43.2 | 39.4 | 40.4 | 36.2 | 38.9 | 36.6 | 37.3 | 38.3 | 36.9 | 34.4 |
| Without MH/SUD diagnosis, with MH treatment | 38.7 | 27.9 | 23.1 | 24.6 | 18.3 | 30.7 | 21.7 | 32.0 | 36.9 | 36.0 | 42.8 | 46.9 | 39.8 | 47.6 |
| Without MH/SUD diagnosis, without MH treatment | 24.2 | 24.3 | 22.3 | 23.3 | 22.7 | 23.3 | 22.5 | 25.1 | 23.6 | 23.5 | 24.9 | 23.9 | 25.8 | 24.8 |

**Main Finding: VHA patients with mental health condition or SUD diagnoses who accessed mental health treatment services have higher rates of suicide than other VHA patients.**

## C.    History of Non-Fatal Suicide Attempt

A history of non-fatal suicide attempts is recognized to be among the most robust risk factors for suicide. Among VHA patients, reports of suicide attempt can be identified through review of external injury codes associated with health services (obtained from medical records) or from the Suicide Prevention Applications Network (SPAN), VHA's internal suicide event case management and tracking system. As shown in Figure 5, based on SPAN data, monthly reports of non-fatal suicide attempts increased between 2012 and 2014, ranging from just over 600 reported attempts in May 2012 to almost 900 in August 2014. VHA's health care system includes an increasing number of patients with factors associated with risk for suicide, such as a history of suicide attempts (see Figure 5). Limitations in the standardized reporting of suicide attempts within health care systems have been noted in electronic medical records and SPAN. Figure 5 should be viewed for changes over time and not the total number of reported SPAN suicide attempts.

Figure 5: Number of Suicide Attempts Reported Through VA's Suicide Prevention Applications Network per Month, 2012–2014



Several steps were taken to assess suicide among VHA users with a history of non-fatal suicide attempt. VHA users with a suicide attempt indication were identified in calendar years 2002–2013 based on indications in inpatient or outpatient encounter records (ICD-9 code E95, excluding E95.9). For each year, the first attempt indication was used as the index date. Non-fatal attempts were identified by survival seven days post-indication date. Among those with non-fatal attempts, suicide and all-cause mortality were assessed from eight to 365 days following the index date of the suicide attempt. As mortality data are currently available only through 2014, analyses are not presented for the 2014 cohort, given limited observable follow-up time. Although both all-cause and suicide-specific 12-month mortality was high among this patient subpopulation, all-cause mortality decreased from 2001 to 2014, and suicide rates in the 12 months following attempt remained relatively stable over the period of observation (Figures 6 and 7).

4.    Anderson H.D., Et. Al. (2015) Monitoring Suicidal Patients in Primary Care Using Electronic Health Records. J Amer Board Fam Med, Vol. 28, No. 1 (pg 66).

5.    Hoffmire C., Et. Al. (2016) VA Suicide Prevention Applications Network: A National Health Care System – Based Suicide Event Tracking System. Public Health Reports, Vol. 131 (6) (pg 816)

Figure 6. 12-Month All-Cause Mortality Following Suicide Attempt Indication, 2002–2013



**Main Finding: All-cause mortality in the 12 months following a suicide attempt has decreased since 2002.**

Figure 7. 12-Month Suicide Mortality Following Suicide Attempt Indication, by Calendar Year



**Main Finding: Rates of suicide in the 12 months following a suicide attempt have remained stable since 2002.**

## D.    Total and Sex-Specific VHA Patient Suicide Rates

For 2001–2014, the suicide rate among all VHA patients who used VHA services in the year of death or in the previous calendar year were evaluated. These are listed in Table 2 and depicted in Figure 8, below. Overall, rates of suicide among all VHA patients decreased between 2001 and 2003, remained relatively stable between 2004 and 2007, and increased between 2008 and 2011. However, while the suicide rate among male patients remained relatively stable between 2001 and 2014, the rate increased among female VHA patients during that same time period. Overall, the observed increase in the suicide rate among female VHA patients between 2001 and 2014 is consistent with a comparatively greater increase in the suicide rate among women in the U.S. general population, as reported by the CDC in 2017.

Table 2. Suicide Rates by Sex and Calendar Year

| Calendar Year | Suicide Rate (per 100,000 person-years) | | |
|---|---|---|---|
| | Total | Male | Female |
| 2001 | 39.9 | 42.6 | 14.4 |
| 2002 | 39.0 | 41.7 | 11.7 |
| 2003 | 34.9 | 37.2 | 10.7 |
| 2004 | 35.9 | 38.1 | 13.0 |
| 2005 | 34.9 | 36.9 | 14.7 |
| 2006 | 35.9 | 38.5 | 9.0 |
| 2007 | 35.1 | 37.3 | 12.5 |
| 2008 | 38.4 | 40.9 | 14.4 |
| 2009 | 37.0 | 39.3 | 14.8 |
| 2010 | 36.4 | 38.6 | 15.4 |
| 2011 | 38.9 | 41.3 | 16.3 |
| 2012 | 38.0 | 40.4 | 16.2 |
| 2013 | 38.8 | 41.5 | 14.4 |
| 2014 | 39.2 | 41.8 | 17.3 |

**Main Finding: Rates of suicide among users of VHA services have remained relatively stable in recent years.**

15

Figure 8. Suicide Rates Among VHA Users by Sex and Calendar Year



**Main Finding: Rates of suicide among male and female users of VHA services have remained relatively stable in recent years.**

## E.     Differences in VHA Patient Suicide Rates by Age and Sex

Table 3 provides information on suicide rates among VHA patients by age group and sex. In contrast to age-based differences in suicide rates in the U.S. general population, among VHA patients the suicide rate for those ages 18–29 was lower than or comparable to that of older Veterans in 2001. VHA patients ages 18–29 had the highest suicide rate in 2014, while those ages 60–79 had the lowest rate that year. It is likely that this finding is strongly influenced by patterns of suicide among men. Among female VHA patients, the highest suicide rate (in 2014) was observed for women ages 40–59, a pattern that generally held for each year 2001–2014.

### Table 3. Overall Suicide Rates by Calendar Year, Age, and Sex

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | 39.9 | 39.0 | 34.9 | 35.9 | 34.9 | 35.9 | 35.1 | 38.4 | 37.0 | 36.4 | 38.9 | 38.0 | 38.8 | 39.2 |
| 18–29 | 24.8 | 30.4 | 27.0 | 28.8 | 21.2 | 35.5 | 29.7 | 36.8 | 37.7 | 44.5 | 50.6 | 54.4 | 60.7 | 58.4 |
| 30–39 | 43.8 | 41.1 | 39.5 | 35.0 | 36.9 | 35.8 | 36.0 | 33.7 | 37.2 | 39.4 | 44.0 | 40.5 | 43.0 | 46.2 |
| 40–49 | 49.0 | 47.6 | 42.5 | 46.3 | 44.4 | 34.2 | 42.1 | 42.6 | 40.1 | 39.2 | 45.0 | 41.2 | 41.1 | 41.0 |
| 50–59 | 41.8 | 42.9 | 37.9 | 38.4 | 36.5 | 41.1 | 38.7 | 43.5 | 42.1 | 42.0 | 45.5 | 41.1 | 35.0 | 39.7 |
| 60–69 | 32.6 | 29.3 | 31.1 | 29.9 | 29.9 | 31.7 | 31.4 | 36.7 | 31.5 | 32.3 | 30.5 | 29.2 | 31.0 | 32.2 |
| 70–79 | 37.2 | 35.6 | 30.4 | 32.2 | 31.4 | 34.2 | 30.3 | 32.6 | 33.5 | 32.0 | 32.8 | 36.3 | 41.1 | 34.1 |
| 80+ | 47.5 | 47.7 | 36.6 | 40.0 | 40.4 | 36.9 | 37.8 | 40.9 | 41.8 | 35.4 | 43.6 | 44.7 | 44.1 | 45.8 |
| **Male** | 42.6 | 41.7 | 37.2 | 38.1 | 36.9 | 38.5 | 37.3 | 40.9 | 39.3 | 38.6 | 41.3 | 40.4 | 41.5 | 41.8 |
| 18–29 | 33.9 | 39.5 | 37.3 | 38.4 | 27.8 | 48.2 | 37.4 | 48.4 | 45.5 | 55.4 | 60.4 | 67.0 | 74.6 | 73.3 |
| 30–39 | 54.3 | 51.2 | 45.6 | 42.5 | 44.7 | 44.3 | 43.1 | 40.0 | 45.1 | 47.7 | 54.3 | 49.2 | 51.5 | 55.5 |
| 40–49 | 55.7 | 54.7 | 49.1 | 52.7 | 48.6 | 40.8 | 49.1 | 50.6 | 46.4 | 44.8 | 51.8 | 46.6 | 46.3 | 45.6 |
| 50–59 | 44.2 | 45.8 | 40.7 | 40.8 | 39.3 | 44.0 | 41.5 | 45.9 | 45.6 | 45.8 | 50.2 | 45.4 | 39.4 | 43.6 |
| 60–69 | 33.4 | 30.5 | 32.1 | 30.9 | 31.1 | 32.9 | 32.4 | 38.1 | 32.4 | 32.8 | 31.1 | 30.0 | 32.0 | 33.1 |
| 70–79 | 38.0 | 36.2 | 30.9 | 32.8 | 31.5 | 34.7 | 30.9 | 33.2 | 34.0 | 32.7 | 33.3 | 36.4 | 42.0 | 34.5 |
| 80+ | 49.0 | 49.5 | 38.1 | 41.0 | 41.5 | 38.0 | 38.9 | 41.5 | 43.0 | 36.4 | 44.6 | 45.7 | 44.9 | 46.7 |
| **Female** | 14.4 | 11.7 | 10.7 | 13.0 | 14.7 | 9.0 | 12.5 | 14.4 | 14.8 | 15.4 | 16.3 | 16.2 | 14.4 | 17.3 |
| 18–29 | 5.7 | 11.9 | 5.9 | 9.0 | 6.7 | 4.7 | 10.2 | 5.4 | 15.2 | 11.1 | 19.3 | 12.9 | 15.7 | 11.0 |
| 30–39 | 13.1 | 10.9 | 21.1 | 12.6 | 13.8 | 10.9 | 15.7 | 15.9 | 14.9 | 15.3 | 13.5 | 14.4 | 17.4 | 17.6 |
| 40–49 | 18.1 | 15.9 | 13.9 | 19.7 | 27.4 | 7.8 | 14.8 | 12.8 | 16.7 | 17.4 | 18.1 | 20.3 | 20.6 | 22.7 |
| 50–59 | 14.5 | 9.7 | 5.6 | 11.2 | 7.5 | 12.9 | 13.8 | 25.3 | 18.1 | 18.8 | 18.1 | 18.1 | 11.8 | 20.0 |
| 60–69 | 17.1 | 4.8 | 9.5 | 9.6 | 4.8 | 6.8 | 8.6 | 4.0 | 9.0 | 19.4 | 14.7 | 11.9 | 9.7 | 14.5 |
| 70–79 | 14.6 | 15.9 | 7.0 | 0.0 | 25.9 | 5.3 | 0.0 | 0.0 | 10.8 | 0.0 | 10.6 | 31.4 | 0.0 | 14.7 |
| 80+ | 14.6 | 5.9 | 0.0 | 16.9 | 15.3 | 7.8 | 8.2 | 17.7 | 0.0 | 0.0 | 5.2 | 0.0 | 5.7 | 0.0 |

**Main Finding: Rates of suicide among younger male users of VHA services, ages 18–29, have been rising in more recent years while the suicide rates for other male age groups have remained relatively stable. Rates of suicide among younger female users of VHA services have increased in recent years.**

## F.   Comparison of Suicide Rates Among VHA Users and the General U.S. Population

Table 4 and Figure 9 provide information on changes in relative risk for suicide among VHA patients compared to members of the U.S. general population. It is important to note that data for the general U.S. population include all suicides among U.S. residents, regardless of age or Veteran status. As shown in Table 4, compared to suicide rates in the U.S. general population, risk for suicide among all VHA patients, as well as for men and women separately, has decreased since 2001.

Table 4. Standardized Mortality Ratios Among VHA Users Compared to the General U.S. Population by Sex and Calendar Year

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1.65 | 1.54 | 1.41 | 1.46 | 1.39 | 1.45 | 1.39 | 1.47 | 1.43 | 1.38 | 1.47 | 1.42 | 1.42 | 1.41 |
| Male | 1.63 | 1.53 | 1.40 | 1.44 | 1.37 | 1.45 | 1.38 | 1.46 | 1.41 | 1.36 | 1.45 | 1.40 | 1.41 | 1.39 |
| Female | 2.57 | 2.01 | 1.83 | 2.06 | 2.40 | 1.41 | 1.87 | 2.13 | 2.14 | 2.18 | 2.23 | 2.15 | 1.88 | 2.15 |

Figure 9. Standardized Mortality Ratio (SMR) for Suicide Among VHA Users by Sex and Calendar Year



**Main Finding: Compared with the U.S. general population, risk for suicide among users of VHA services has decreased since 2001 among both men and women.**

18

## G.  Suicide Among OEF/OIF/OND VHA Users

Risk for suicide following separation from active duty service remains a concern among Veterans of Operation Enduring Freedom, Operation Iraqi Freedom, and Operation New Dawn (OEF/OIF/OND). Rates of suicide among OEF/OIF/OND Veterans who used VHA services are listed by age group and sex in Table 5. Rates of suicide were highest among male OEF/OIF/OND Veterans ages 18–29 and decreased with age. However, the small number of OEF/OIF/OND Veterans who are ages 60 and older or who are female limits consideration of age and sex-based differences in risk for suicide among members of this group. Table 6 provides information on suicide rates among Veterans coming from active duty service and members of Reserve or National Guard components who were activated in support of operations in Afghanistan and Iraq. Suicide rates were lower among members of the Reserve and National Guard over the observation period.

### Table 5. Suicide Rates Among OEF/OIF/OND VHA Users by Sex, Age Group, and Calendar Year

| Sex and Age Group | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | 0.0 | 0.0 | 26.8 | 26.8 | 20.6 | 24.5 | 30.1 | 34.6 | 32.9 | 30.4 | 45.2 | 45.1 | 50.4 | 47.8 |
| 18–24 | 0.0 | 0.0 | 21.5 | 54.6 | 12.5 | 22.8 | 35.1 | 60.5 | 47.2 | 46.9 | 73.0 | 66.3 | 85.0 | 110.3 |
| 25–29 | 0.0 | 0.0 | 32.1 | 37.3 | 24.6 | 44.5 | 33.7 | 37.7 | 35.7 | 38.4 | 46.9 | 55.9 | 67.1 | 56.3 |
| 30–39 | 0.0 | 0.0 | 38.0 | 7.2 | 30.6 | 20.0 | 35.2 | 31.7 | 28.3 | 28.2 | 50.0 | 50.8 | 52.3 | 51.2 |
| 40–49 | 0.0 | 0.0 | 23.4 | 8.6 | 22.3 | 14.6 | 21.3 | 16.5 | 23.8 | 17.6 | 32.5 | 23.5 | 31.2 | 28.0 |
| 50–59 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.2 | 16.7 | 35.0 | 10.3 | 16.3 | 21.8 | 12.4 | 22.9 |
| 60–69 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 14.7 | 0.0 | 0.0 | 0.0 |
| 70–79 | . | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 80+ | . | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Male** | 0.0 | 0.0 | 31.5 | 31.4 | 21.8 | 28.2 | 34.0 | 38.8 | 34.7 | 33.1 | 49.2 | 49.1 | 55.0 | 52.5 |
| 18–24 | 0.0 | 0.0 | 27.0 | 67.2 | 15.0 | 27.0 | 38.6 | 69.8 | 49.7 | 53.2 | 75.4 | 75.3 | 92.9 | 124.0 |
| 25–29 | 0.0 | 0.0 | 39.5 | 45.2 | 29.3 | 52.4 | 39.5 | 42.7 | 39.5 | 43.6 | 52.0 | 60.9 | 73.8 | 62.7 |
| 30–39 | 0.0 | 0.0 | 43.8 | 8.3 | 35.0 | 22.8 | 40.2 | 36.4 | 29.9 | 29.5 | 57.1 | 54.6 | 57.8 | 57.6 |
| 40–49 | 0.0 | 0.0 | 26.5 | 9.5 | 14.9 | 16.3 | 23.7 | 16.6 | 23.6 | 18.4 | 33.3 | 26.4 | 32.7 | 28.8 |
| 50–59 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.9 | 18.4 | 34.0 | 7.7 | 18.3 | 22.1 | 14.0 | 22.6 |
| 60–69 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 15.5 | 0.0 | 0.0 | 0.0 |
| 70–79 | . | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 80+ | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Female** | 0.0 | 0.0 | 0.0 | 0.0 | 13.0 | 0.0 | 3.4 | 5.4 | 20.0 | 11.1 | 17.1 | 17.5 | 18.8 | 15.7 |
| 18–24 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 13.8 | 0.0 | 29.0 | 0.0 | 55.5 | 0.0 | 29.1 | 16.7 |
| 25–29 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.7 | 12.2 | 5.2 | 13.9 | 22.2 | 21.5 | 12.9 |
| 30–39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 17.2 | 19.8 | 5.1 | 27.8 | 18.9 | 12.8 |
| 40–49 | 0.0 | 0.0 | 0.0 | 0.0 | 88.6 | 0.0 | 0.0 | 16.3 | 25.9 | 10.6 | 26.0 | 0.0 | 19.0 | 22.3 |
| 50–59 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 44.6 | 32.9 | 0.0 | 19.3 | 0.0 | 24.8 |
| 60–69 | . | . | . | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 70–79 | . | . | 0.0 | . | . | . | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 80+ | . | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

**Main Finding: Rates of suicide were highest among younger male OEF/OIF/OND Veterans.**

Table 6. Suicide Rates per 100,000 Person-Years Among OEF/OIF/OND VHA Users (Active Duty or Reserve/National Guard) by Calendar Year

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Active Duty | 35.0 | 43.0 | 36.2 | 35.4 | 48.6 | 49.2 | 54.9 | 54.9 |
| Reserve | 25.6 | 25.8 | 29.1 | 24.3 | 40.9 | 39.4 | 43.2 | 35.6 |

**Main Finding: Compared with rates of suicide among Veterans of the National Guard or Reserve components, rates of suicide were higher among OEF/OIF/OND active duty Veterans.**

# VI.   Results – Part 2: Suicide Among All U.S. Veterans, 2001–2014

An important enhancement to this year's report is the availability of information on rates and characteristics of suicide among all Veterans, regardless of VHA use, during the period of observation (2001–2014). Data on suicide among all Veterans were obtained from the VA/DoD Joint Suicide Data Repository. Rates of suicide among the Veteran population were calculated using the Vet Pop 2001 population projection estimates. In general, use of the U.S. Census Bureau American Community Survey estimates is suggested, but these are not available for all years included here. Counts of death for the entire U.S. adult population (ages 18 and older) were obtained from the CDC's WONDER system.[4] Rates of suicide for the civilian population were calculated using estimates of the total U.S. population obtained from WONDER and removing counts for known Veteran suicides for each year within each age and sex subgroup of interest. Crude rates of suicide per 100,000 were calculated for each year and by age and sex for Veterans overall, by use of VHA services, and among civilians. Age adjustment, using the 2000 U.S. standard population, was used to assess differences in rates within groups over time.[5]

Estimates of relative risk for suicide were calculated using standardized mortality ratios (SMRs). SMRs can be interpreted as the difference in suicide risk between two populations. SMRs with a value of 1 indicate no difference in risk. SMRs were used to compare rates across groups for any given year, accounting for differences in age and sex composition between the groups.

6.   Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999–2014 on CDC WONDER Online Database, released 2015. Data are from the Multiple Cause of Death Files, 1999–2014, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program.

7.   Klein RJ, Schoenbaum CA. Age adjustment using the 2000 projected U.S. population. Healthy People Statistical Notes, no. 20. Hyattsville, Maryland. National Center for Health Statistics. January 2001.

## A.    Magnitude of Veteran Suicide Mortality

In 2001, Veterans accounted for 12.1 percent of the U.S. adult population and 23 percent of all suicides among U.S. adults. Between 2001 and 2014, there were decreases in both the proportion of U.S. adults who were Veterans (8.5 percent in 2014) and the proportion of adult suicide decedents who were Veterans (17.8 percent in 2014). However, changes in the proportion of U.S. adults who were Veterans or the proportion of adults who died by suicide and were Veterans leave gaps in our understanding of changes in rates of suicide among Veterans over time. Therefore, steps were taken to test for changes in rates of suicide among Veterans and control for shifts in the demographic composition of populations over time. Age-adjusted suicide rates were calculated for each year during the study period using the 2000 U.S. standard population weights. As shown in Figure 10, age-adjusted suicide rates were greater for Veterans than civilians between 2001 and 2014, with substantial increases observed for female Veterans between years. Further differences within Veteran subpopulations were observed when changes in the age-adjusted rates of suicide were calculated separately for Veterans who did and did not use VHA services. Overall, non-VHA Veterans had greater increases in rates of suicide when compared to changes in rates of suicide among VHA Veterans.

Figure 10. Percent Changes in Age-Adjusted Rates of Suicide Among Veterans and Civilians, 2001–2014



**Average Number of Veteran and Civilian Suicides per Day**

We calculated the average number of suicides among Veterans and civilians per day by taking the total number of suicides in each group for each year and dividing by 365, the number of days in a year. In 2001, an average of 19 Veterans died by suicide per day (Figure 11). This number increased slightly from 2001 to a high of 21 per day in 2010, with a subsequent decrease to 20 per day in 2011, and has remained stable since that time. In contrast, the average number of civilian adults who died by suicide each day has increased steadily from 62 per day in 2001 to 93 per day in 2014. Among Veterans who used VHA services, the average number who died by suicide per day increased from 4 in 2001 to 6 in 2014 (Figure 12). It should be noted that decreases in the size of the Veteran population and contrasting increases in the size of the U.S. population limit the comparability of these statistics. Rates of suicide stratified by group are more appropriate for understanding changes in risk among Veterans and civilians and are provided throughout this report.

Figure 11. Average Number of Suicides per Day Among Veterans and Civilians by Year, 2001–2014



**Main Finding: On average, the number of civilians who died by suicide per day has increased each year since 2001.**

Figure 12. Average Number of Suicides per Day Among Veterans With and Without Use of VHA Services, 2001–2014



**Main Finding: On average, the number of Veterans who died by suicide per day has remained stable since 2011.**

## B.    Comparison of Suicide Rates Among Veterans Who Do and Do Not Use VHA Services, 2001–2014

In 2014, male Veterans who used VHA services were 22 percent more likely to die by suicide than male Veterans who did not use VHA. Excess suicide risk among female Veterans who used VHA services decreased from 89 percent to 4 percent between 2001 and 2014. Since 2013, there has been no statistically significant difference in risk for suicide among female Veterans who do and do not use VHA services.

Figure 13. Standardized Mortality Ratios (SMRs) Comparing Risk for Suicide Among Veterans With and Without Use of VHA Services by Calendar Year and Sex, 2001–2014



**Main Finding: The difference in suicide risk between Veterans who did and did not use VHA services has diminished since 2001.**

24

## C.    Comparison of Veteran and Adult Civilian Suicide Risk, 2001–2014

Prior to 2006, Veteran suicide rates were lower than adult civilian suicide rates after accounting for age and sex differences between the populations. Risk for suicide among Veterans relative to civilians has increased relatively steadily since 2001. In 2014, Veterans were 22 percent more likely to die by suicide compared to their adult civilian peers, adjusting for age and sex. Differences in estimates of relative risk were observed for Veterans who did and did not use VHA services: Veterans who used VHA care had higher suicide rates than adult civilians across the observed time period (Figure 14). A greater increase in the relative risk for suicide among Veterans compared to civilians was observed for those who did not use VHA services over this time period.

Figure 14. Standardized Mortality Ratios for Veterans With and Without Use of VHA Services Compared to Civilians, 2001–2014



**Main Finding: Compared with suicide mortality among the civilian population, a greater increase in the relative risk for suicide among Veterans was observed among those who did not use VHA services.**

**Comparison of Veteran and Civilian Suicide Risk Among Various Age Groups**

Figures 15 through 21 provide age-specific suicide rates for all Veterans and civilians, by year. Figures 22 through 24 present this information for men, and Figures 25 through 27 present this information for women. Overall, rates of suicide have increased more among Veterans than among their civilian peers. However, there are important differences across age groups and between male and female Veterans. For example, rates of suicide have remained relatively stable for Veterans ages 40–49, and little difference was observed in rates of suicide among older female Veterans compared to civilian women in the same age group. However, the comparatively small number of suicides among older female Veterans limits consideration of observed differences.

Figure 15. Crude Rates of Suicide by Calendar Year Among Veterans (V) and Civilians (C) Ages 18–29, 2001–2014



**Main Finding: Rates of suicide have increased substantially among younger Veterans while remaining relatively stable among civilians ages 18–29.**

26

Figure 16. Crude Rates of Suicide by Calendar Year Among Veterans (V) and Civilians (C) Ages 30–39, 2001–2014



**Main Finding: Rates of suicide have increased among Veterans ages 30–39 while remaining relatively stable among civilians in this age group.**

Figure 17. Crude Rates of Suicide by Calendar Year Among Veterans (V) and Civilians (C) Ages 40–49, 2001–2014



**Main Finding: Despite an increase in suicide rates among the civilian population ages 40–49, rates of suicide have remained stable among Veterans in the same age group.**

28

Figure 18. Crude Rates of Suicide by Calendar Year Among Veterans (V) and Civilians (C) Ages 50–59, 2001–2014



**Main Finding: Rates of suicide increased substantially among Veterans ages 50–59. Increases in civilian suicide rates are also evident in this age group.**

Figure 19. Crude Rates of Suicide by Calendar Year Among Veterans (V) and Civilians (C) Ages 60–69, 2001–2014



**Main Finding: Rates of suicide increased substantially among Veterans ages 60–69. Increases in civilian suicide rates are also evident in this age group.**

Figure 20. Crude Rates of Suicide by Calendar Year Among Veterans (V) and Civilians (C) Age 70–79 Years, 2001–2014



**Main Finding: Despite increases in suicide rates among the civilian population ages 70–79, rates of suicide remained stable among Veterans in the same age group.**

Figure 21. Crude Rates of Suicide by Calendar Year Among Veterans (V) and Civilians (C) Ages 80 and Older, 2001–2014



**Main Finding: Rates of suicide increased among Veterans ages 80 and older while remaining stable among civilians in this age group.**

32

Figure 22. Crude Rates of Suicide by Calendar Year Among Male Veterans (V) and Civilians (C) Ages 18–39, 2001–2014



**Main Finding: Compared with male civilians, younger male Veterans had higher suicide rates with greater increases over time.**

33

Figure 23. Crude Rates of Suicide by Calendar Year Among Male Veterans (V) and Civilians (C) Ages 40–69, 2001–2014



**Main Finding: Increases in rates of suicide among male Veterans ages 50–69 were larger than those observed among male civilians in the same age groups.**

Figure 24. Crude Rates of Suicide by Calendar Year Among Male Veterans (V) and Civilians (C) Ages 70 and Older, 2001–2014



**Main Finding: Rates of suicide among older adult male Veterans were lower than rates of suicide among older adult male civilians across the time period.**

35

Figure 25. Crude Rates of Suicide by Calendar Year Among Female Veterans (V) and Civilians (C) Ages 18–39, 2001–2014



**Main Finding: Greater increases in rates of suicide were observed among younger female Veterans than among younger female civilians.**

Figure 26. Crude Rates of Suicide by Calendar Year Among Female Veterans (V) and Civilians (C) Ages 40–69, 2001–2014



**Main Finding: Rates of suicide were higher among female Veterans ages 40–69 compared with suicide rates among female civilians in the same age groups.**

Figure 27. Crude Rates of Suicide by Calendar Year Among Female Veterans (V) and Civilians (C) Ages 70 and Older, 2001–2014



**Main Finding: Despite instability associated with a relatively small number of older female Veterans, rates of suicide among older female Veterans were similar to rates of suicide among older adult female civilians.**

## D.    Method of Veteran and Civilian Suicide, 2001–2014

Use of firearms is associated with the highest rate of suicide mortality in the United States compared with mortality rates for other prevalent suicide methods. Figures 28 and 29 demonstrate that the proportion of suicide decedents using firearms is higher among both male and female Veterans than among the adult civilian population. In addition, while the proportion of civilian decedents who used firearms has decreased, it has remained relatively stable or increased slightly for both male and female Veterans.

### Figure 28. Civilian Suicide Deaths by Method and Sex, 2001–2014



**Main Finding: From 2001 to 2014, the percentage of suicides resulting from a firearm injury decreased among both male and female U.S. adult civilians.**

39

Figure 29. All Veteran Suicide Deaths by Method and Sex in 2001 and 2014



**Main Finding: The percentage of all suicides resulting from a firearm injury remained high among Veterans from 2001 to 2014.**

40

Figures 30 and 31 show the proportion of all deaths by method among all Veterans and among Veterans who did and did not use VHA services in 2001 and 2014. In contrast to trends in the U.S. civilian population, the proportion of suicides resulting from a firearm injury has increased among female Veterans and has remained relatively constant among male Veterans. Among female Veterans, the proportion of suicides resulting from poisoning decreased, and the proportion of suicides resulting from suffocation and firearms increased. The observed increase in suicides resulting from suffocation was greater among female Veterans who used VHA services than among female Veterans who did not use VHA services (Figures 30 and 31).

## Figure 30. VHA Veteran Suicide Deaths by Method and Sex, 2001–2014



**Main Finding: The percentage of all suicides resulting from suffocation and firearms increased among female Veterans who used VHA services.**

Figure 31. Non-VHA Veteran Suicide Deaths by Method and Sex in 2001 and 2014



**Main Finding: The percentage of suicides resulting from a firearm injury was similar among Veterans with and without the use of VHA services.**

42

## E.    Understanding the Burden of Veteran Suicide: Magnitude vs. Risk

When directing suicide prevention efforts, it's important to consider the distribution of suicides as well as differences in rates among key population subgroups. Figures 32 through 35 show important differences in the distribution of the number and rate of suicide across age groups and sexes compared to the characteristics of suicide among civilians. As shown in Figures 32 and 33, rates of suicide are highest among younger male Veterans and lowest among male Veterans ages 60–79. However, the greatest number of suicides among male Veterans was observed for those ages 50–69. In contrast, the greatest number of suicides among male civilians was observed for those ages 59 and younger. Similarly, while fewer differences in the distribution of counts of suicide between civilians and Veterans are observed for women, the greatest rates of suicide among female Veterans were among those ages 18–29.

Figure 32. Comparison of Suicide Counts and Rates by Age Group for Male Civilians, 2014



Figure 33. Comparison of Suicide Counts and Rates by Age Group for Male Veterans, 2014



**Main Finding: Among male civilians, the largest number of lives lost to suicide was among younger and middle-aged adults (ages 18–59), with the highest rates of suicide among older adults. Among male Veterans, the largest number of lives lost to suicide was among middle-aged men (ages 50–69), with the highest rates of suicide among the youngest men (ages 18–29).**

Figure 34. Comparison of Suicide Counts and Rates by Age Group for Female Civilians, 2014



Figure 35. Comparison of Suicide Counts and Rates by Age Group for Female Veterans, 2014



**Main Finding: Among female civilians, age-specific suicide rates correspond closely with the number of lives lost to suicide, with both peaking among women ages 40–59. Among female Veterans, the largest number of lives lost to suicide occurs in middle age (ages 40–59), but the highest rate occurs among female Veterans ages 18–29.**

46

# VII.   Summary and Discussion of Findings

This comprehensive analysis of Veteran suicide from 2001 to 2014 confirms that when compared to their non-Veteran peers, most Veterans are at an increased risk for suicide. However, important differences in rates of suicide among Veteran and civilian groups were observed when rates were stratified by sex and age group. While the average number of Veterans who died by suicide per day has remained relatively stable in recent years, the relative risk for suicide among Veterans compared to civilian adults has increased, as have age-specific suicide rates for Veterans ages 18–39, 50–69, and 80 and older. Increases in suicide rates are particularly evident among female Veterans and Veterans who do not use VHA services.

Despite evidence of increases in suicide rates among most civilian and Veteran groups, rates of suicide have remained stable among some Veteran subpopulations, such as men ages 40–49, and differences have diminished between Veterans who do and do not use VHA services.

The most common means for suicide among Veterans is firearms, with approximately 41 percent of female and 68 percent of male Veteran suicide deaths resulting from a firearm injury in 2014. Poison is the second-most common means of suicide for female Veterans: 32 percent of female Veterans who die by suicide use poison. Among male suicide decedents, suffocation is the second-most common cause of death (17 percent in 2014). The use of firearms as the method for suicide death decreased among civilians from 2001 to 2014, but it remained stable among Veterans. These results strongly suggest that firearms safety initiatives are likely an important component of an effective suicide prevention strategy for male and female Veterans.

Among male Veterans, suicide rates are highest in the younger and older years, and among female Veterans, suicide rates are highest in the younger years. However, because the age distribution of the living Veteran population is heavily weighted toward middle-aged adults, the resulting burden of suicide, in terms of the number of lives lost, is most evident among middle-aged Veterans, despite the lower rates of suicide observed for this subpopulation. Analysis of suicide risk among the Veteran population indicates that it is important to develop and direct Veteran suicide prevention initiatives that are tailored to reach Veterans of all ages.

Findings included in this report highlight the complex relationship between a history of U.S. military service and suicide risk and the need for additional assessments to understand factors such as changes in risk exposures, workforce composition and socio-economic factors, and rates of suicide across Veteran and civilian groups.

# VIII.   Ongoing Suicide Data Analysis

The findings presented in this report represent the first analysis of more than 50 million records. This epidemiologic overview of suicide risk among the Veteran population and how it compares to suicide risk among U.S. adult civilians sets the stage for continued analysis. Additional analysis of this data is ongoing and will include the following inquiries, at a minimum:

- Comparison of suicide risk and burden among OEF/OIF/OND Veterans who do and do not use VHA services
- Comparison of suicide rates among residents of urban and rural areas
- Suicide rates across branches of military service (i.e., Army, Navy, Air Force, Marines)
- Suicide rates by race/ethnicity
- Suicide risk during periods of transition

***References:***

\* Source: VA Benefits & Health Care Utilization Pocket Card, Updated 5/13/16; Veteran Population as of 09/30/15 (http://www.va.gov/vetdata/docs/pocketcards/fy2016q3.pdf)

\*\*Source: VA Benefits & Health Care Utilization Pocket Card, Updated 5/13/16; Produced by the National Center for Veterans Analysis and Statistics. (http://www.va.gov/vetdata/docs/pocketcards/fy2016q3.pdf). (pg 1)

Curtin SC, Warner M, Geedegaard H. Increase in suicide in the United States, 1999–2014. NCHS data brief, no, 241. Hyattsville, MD: National Center for Health Statistics. 2016. Details on priority group enrollment criteria can be found at: http://www.va.gov/HEALTHBENEFITS/resources/priority_groups.asp (pg 6)

Harris, E.C. & Barraclough, B. (1997) Suicide as an outcome for mental health disorders. A meta-analysis. Br J Psychiatry, 170, 205-228 (pg 8)

# EXHIBIT C

Journal of Trauma and Acute Care Surgery, Publish Ahead of Print
DOI: 10.1097/TA.0000000000002067

# Impact of Licensed Federal Firearm Suppliers on Firearm-Related Mortality

Stephanie D. Chao, MD[1], Zachary J. Kastenberg MD[2], Sriraman Madhavan, MS[3], Kristan L. Staudenmayer MD[2]

[1]Division of Pediatric Surgery, Department of Surgery, Stanford School of Medicine, Stanford, CA

[2]Division of General Surgery, Department of Surgery, Stanford School of Medicine, Stanford, CA

[3]Department of Statistics, Stanford University, Stanford, CA

**Email Addresses:**

Stephanie Chao: stephanie.chao@stanford.edu

Zachary Kastenberg: zacharykastenberg@gmail.com

Sriraman Madhavan: Division of Pediatric Surgery

Department of Surgery

Stanford School of Medicine

300 Pasteur Drive, M116

Stanford, CA 94305

Kristan Staudenmayer: kristans@stanford.edu

1

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**Corresponding Author:**

Stephanie D. Chao, MD

Division of Pediatric Surgery

Department of Surgery

Stanford School of Medicine

300 Pasteur Drive, M116

Mail code: 5733

Stanford, CA 94305

Tel: (650)723-6439

Fax: (650)725-5577

Email: Stephanie.chao@stanford.edu

**Conflict of Interest Disclosures:** None


**Funding/Support:** None


**Meeting Presentation**: 77th Annual Meeting of AAST and Clinical Congress of Acute Care Surgery and 4th World Trauma Congress. Quick Shot session September 29, 2018. Session XXVII, number 26.

2

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**ABSTRACT:**

**Background**: Legal firearm sales occur largely through suppliers that have Federal Firearm Licensees (FFLs). Since FFL density might reflect ease-of-access to firearm purchases, we hypothesized that the number of FFL dealers would be associated with firearm-related deaths. We further hypothesized that licensee-type subsets would be associated with differential risks for gun-related deaths.

**Methods**: We used data from the National Center for Health Statistics National Vital Statistics System (2008-2014) and national data on Federal Firearms Licensees for 2014. Correlation analysis and linear regression analysis were performed to determine the relationship between different licensee types and firearm-related deaths. We controlled for population, number of statewide registered firearms, and the density of other types of FFLs.

**Results**: We identified a total of 65,297 FFLs. There was a moderate correlation (R = 0.53, $\rho$ = 0.48) between total FFL density and firearm-related death rates. Further analysis by type of firearm-related death showed a strong correlation (R = 0.81, $\rho$ = 0.76) between total FFL density and firearm-related suicide rates. No correlation was found between total FFL density and firearm-related homicide rate. Among individual FFL types, FFL02 (firearm dealing pawnshop) density was the only FFL-type found to be correlated with firearm-related death rates. We found a strong correlation between FFL02 density and overall firearm-related death rate (R = 0.69, $\rho$ = 0.78) and firearm-related suicide rate (R = 0.72, $\rho$ = 0.78). Linear regression analysis showed that even while controlling for number of registered firearms and population, the number of firearm-dealing pawnshops remained significantly associated with overall firearm-related deaths and firearm-related suicides.

3

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**Conclusion**: Access to legally-distributed firearms is associated with firearm-related death rates, particularly firearm-related suicides. Specifically, firearm-dealing pawnshops were associated with suicide-related deaths. These findings suggest that deeper exploration of legal firearm access and firearm-related injuries would benefit discussion of preventative measures.

**LEVEL OF EVIDENCE:** IV

**TYPE OF STUDY:** Prognostic and Epidemiological

**KEYWORDS:**

Firearms; Federal firearm licensees; Firearm suicides; Pawnshops

4

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

## BACKGROUND

The intended use for firearms in non-law enforcement settings is generally for sport or self-protection. Unfortunately, the unintended consequences of the current state of firearm availability in the U.S. are significant and often contentious. The U.S. averages over 25 times the gun-related homicide rate and eight times the gun-related suicide rate compared to other high-income countries [1]. From 2008-2014, there were more than 220,000 gun-related deaths in the U.S., including approximately 80,000 homicides and 130,000 suicides. The financial burden generated from these injuries is estimated at $174 billion per year [2].

Commercial firearm sales are regulated in the United States by the Bureau of Alcohol, Tobacco, and Firearms through the issuance of federal firearms licenses (FFLs). There are 9 license types, including categories for pawnbrokers, manufacturers, and importers. Whether firearms from legal and regulated sellers transition to illegal use is important to understand if we are to attempt to reduce the burden of firearm-related injury. However, the U.S. has no system for firearm tracking. It has been suggested that firearms can make their way from legal sales to a crime through theft, the black market, or straw purchases [3]. In contrast to illegal use, firearm-related suicides are usually due to weapons owned by the victim. [4] These two scenarios raise the question of by what means guns used for illegal purposes or for self-harm transition from legal to illegal markets, or from legal dealers to individuals at risk for self-harm. Understanding these vulnerabilities are important to developing strategic prevention efforts.

To better understand the pathway from legal firearm sales to firearm-related deaths, we evaluated rates of firearm-related mortality and availability of guns by FFL type.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**METHODS**

*Data source*. Data on firearm-related mortality was obtained from the National Center for Health Statistics National Vital Statistics System (2008-2014) [5]. FFL license data and total registered firearms per state were obtained from through the Bureau of Alcohol, Tobacco, Firearms and Explosives website for 2014 [6-7]. The number of FFL licenses in 2014 was used, as this was the only year that overlapped with available Vital Statistics Data.

*Inclusion and exclusion criteria*. All license types with more than 200 licenses issued nationwide were included in analyses. FFL type 3, issued to collectors of curios and relics, was excluded because the firearms regulated by this license include those at least 50 years old, are rare in some capacity, or are of museum interest.

*Data analysis*. FFL density was determined by normalizing number of FFL licenses for each type by population (2014). Associations between the FFL density and firearm-related mortality rates were compared at the state level. Analyses were separately performed on firearm-related homicides versus suicides. Correlations were quantified using the Pearson correlation coefficient (R), as well as Spearman's rank correlation coefficient ($\rho$). To determine whether a specific licensee type had a statistically significant relationship with firearm-related homicides or suicides, linear regression analysis was performed, controlling for population, number of statewide registered firearms, and the density of other types of FFLs. The significance threshold was set at 0.01. Since multiple tests were performed to compare different licensee types and firearm-related deaths, the Bonferroni correction was used to reduce the chances of a Type 1 error.

6

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*Institutional review*. The Stanford University Human Subjects Review Board reviewed the study protocol and deemed this study exempt from review.

**RESULTS**

In 2014, six of the nine FFL types met inclusion criteria accounting for a total of 65,297 FFLs (Table 1). The most common form of FFL was Dealer in Firearms, which constituted 73% of licenses. Pawnbrokers and firearm manufacturers were the second two most common categories (11% each).

Overall state FFL density ranged from 4.4 FFL per 100,000 population (New Jersey) to as high as 123.3 FFLs per 100,000 population (Montana). Densities of different FFL subtypes similarly varied by states. Pawnbroker FFLs were more often located in Arkansas and Montana, whereas manufacturers were more often located in Idaho and West Virginia. Similarly, there was variation in firearm-related mortality, ranging from 3.23 per 100,000 population (Hawaii) to 18.76 per 100,000 population (Louisiana) over the study period. (Figure 1)

We identified a moderate correlation (R = 0.53, ρ = 0.48) between total FFL density by state and firearm-related death rate. Linear regression analysis showed that the relationship remained statistically significant even after controlling for number of registered firearms in each state.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

In subgroup analysis of intent (suicide versus homicide) for firearm related mortality and total FFL density, we found a strong correlation (R = 0.81, ρ = 0.76) between total FFL density and firearm-related suicides (Figure 2). However, no correlation was found between total FFL density and firearm-related homicide rate.

In subgroup analysis of mortality rates by type of death and license type, pawnshop (FFL02) density was the only FFL type found to correlate with statewide firearm-related death rates (R = 0.69, ρ = 0.78). Moreover, pawnshop density was strongly associated with firearm-related suicide rates (R = 0.72, ρ = 0.78) (Figure 3). There was no correlation between FFL density of any type and firearm-related homicide rate. We also did not find a correlation between firearm suicide rates in children (less than 18 years of age) and FFL density or firearm-dealing pawnshop density, when controlled for number of registered firearms.

Linear regression analysis showed that even while controlling for total registered firearms, population and all other FFL licensee counts, firearm-dealing pawnshops remained the only FFL type which is significantly associated with overall firearm-related deaths and firearm-related suicides. Linear regression results also show an incremental 4.23 gun-related deaths for each additional firearm-dealing pawnbroker per state over the study period. (Table 2)

### DISCUSSION

We have shown that the density of legal firearm licenses is associated with firearm-related death rates. When determining if this relationship differed between suicides versus homicides, we found that only suicide rates correlated with FFL density, and in particular, density of firearm-dealing pawnshops (FFL02). The fact that misuse of firearms in the form

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

of self-harm was associated with FFL density and not homicide makes sense, since self-harm related violence is often done with legally-purchased guns. What is interesting is the finding that self-harm with firearms was associated with a specific FFL type. This suggests that legal access to firearms in regions with high densities of pawnshops may either be an indicator of high risk, or a risk factor itself for those at risk for self-harm. This may be due, in part, to the association between pawnshops and lower socioeconomic status, a particular demographic that has been shown to be at increased risk of suicide [8]. Alternatively, pawnshops may offer reduced visibility compared with a larger firearm dealer, which may appeal to depressed purchasers who are looking for easy access.

As suicides account for the majority of firearm related mortality in the United States, this suggests an imperative for prevention efforts. In 2016, there were 22,938 suicide firearm deaths and 14,415 homicide firearm deaths [9]. Our findings suggest there may be opportunities to prevent firearm-related self-harm through identification of high-risk individuals at all dealers, with a focus on pawnshops.

Our findings are consistent with studies that associate legal ownership of firearms and suicide mortality rates in both case-control and ecological studies [10]. Miller et al demonstrated that states with the highest gun ownership rates had almost twice as many suicides when compared to the states with the lowest rates of gun ownership. This finding held true even when controlling for state-level population size, socio-demographic factors and mental illness [11]. Furthermore, increased accessibility offered by firearm-dealing pawnshops may increase the risk of death during a transient suicidal crisis. It has previously been suggested that higher rates of suicide may occur in areas of high gun availability, indicating interplay between impulsivity and ease of firearm attainment [12]. Wintermute et al found that suicide

9

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

was the leading cause of death among handgun purchases in the first year after the purchase of a handgun [13]. Vriniotis et al reported that nearly one in ten firearm suicides in the New Hampshire during a two-year period occurred using firearms purchased or rented within one week of the suicide, usually within hours [14]. Firearms can be purchased legally in a matter of minutes through licensed dealers [15]. Our data suggests a link between firearm dealing pawnshops (FFL02) and purchase of firearms with the intention of suicide, since the correlation between firearm suicide rates and FFL02 density persists even when controlling for other FFL-types.

Ecological studies on gun availability and suicides frequently demonstrate amplified effects on the adolescent population when compared with the adult population. Miller et al showed that a 10% decrease in household firearm ownership was associated with a 4.2% decrease in overall firearm suicide rate but an 8.3% decrease among adolescent suicide rates [16]. Lahti et al demonstrated increased gun ownership in North versus South Finland was associated with a 2.6-fold higher suicide rate among young adult males when compared with a 1.9-fold higher suicide rate among adult males [17]. Passage of new licensing requirements for gun ownership in New Zealand resulted in a 39% reduction in adult firearm suicide rates and a 66% reduction in adolescent suicide rates [18]. US federal law prohibits the sale of firearms to individuals under the age of 18 years. Our study did not find a correlation between adolescent firearm suicide rates and FFL density or FFL02 density, when controlled for number of registered firearms. This may suggest that the effect of increased FFL and FFL02 density on increased firearm suicide may represent a sizeable volume of legal sales of firearms to individuals purchasing a firearm for the intent of self-harm, rather than simply increasing gun availability in the household or overall gun ownership.

10

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Our findings validate the potential efficacy of suicide prevention campaigns through partnerships between firearm dealers and health professionals. In New Hampshire, the Department of Health and Human Services Projects developed a public-private partnership with licensed gun dealers in the state to educate gun retailers to avoid selling firearms to suicidal customers and to educate existing customers to be alert to signs of suicide and crisis in household members. Study investigators found 84% of storeowners approached were interested in learning more about how gun dealers can aid in suicide prevention. Half of all gun shops in New Hampshire actively participated in the suicide prevention campaign. Moreover, 22% had previously suspected a prospective buyer was suicidal and 31% could recall an incident where someone killed him/herself with a recently purchased firearm [14]. Programs, such as the New Hampshire Firearm Safety Coalition, that collaborate with gun shops to display suicide prevention materials aimed at gun shop customers are promising and in various stages of implementation in more than 20 states [14,19].

While we did not find an association between homicide and FFL license density, any point of access for firearm sales likely represent opportunities for the re-routing of firearms towards illegal activities. Although straw purchases happen at places of legal sale, our findings suggest that straw sales may not be the predominant mechanism by which firearms used for homicides are acquired. Analysis of how firearms are acquired for committing acts of violence against others is beyond the scope of his study.

This study is subject to several limitations. Given the nature of this ecological study, our generalizations remain broad and cannot infer causality. We are also limited in our evaluation of factors, such as concomitant alcohol and drug use, psychiatric disorders, and history of violence that may confound our findings [13]. Such factors which place an individual at

11

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

higher risk for suicide may also represent the demographic of those that patronize pawnshops, and may not be due to the firearm purchase itself. Our study also neither accounts for the variations in state gun control laws nor their local enforcement.

In conclusion, we found that total number of licensed gun dealers per state (FFL density) was directly correlated with overall death rates and strongly correlated with suicide death rates. The correlation between dealer density and firearm-related suicides was particularly strong for pawnshop dealers (FFL02), even when controlled for total registered firearms per state. We suggest this is an opportunity for targeted efforts to prevent suicides at the point of sale, particularly at firearm-dealing pawnshops.

**AUTHORSHIP STATEMENT**

All authors have contributed significantly to, and are willing to take responsibility for, the data presented in this study. All authors have reviewed the manuscript. All authors participated in study design, data acquisition, analysis and interpretation of data.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

## REFERENCES

1. Grinshteyn E., Hemenway D. Violent Death Rates: The US compared with other high-income OECD countries. *Am J Med*. 2016;129:266-273.

2. Lee J, Quraishi SA, Bhatnagar S, Zafonte RD, Masiakos PT. The economic cost of firearm-related injuries in the United States from 2006 to 2010. *Surgery*. 2014;155: 894–898.

3. US Department of Justice, Bureau of Justice Statistics. Guns used in crime. https://www.bjs.gov/content/pub/pdf/GUIC.PDF. Published July 1995. Accessed July 20, 2018.

4. Miller M, Azrael D, Hemenway D. Household firearm ownership and suicide rates in the United States. *Epidemiology*. 2002;13:517-524.

5. National Center for Health Statistics. National Vital Statistics System. Available at: https://www.cdc.gov/nchs/nvss/. Centers for Disease Control and Prevention. Atlanta, GA. Accessed January 29, 2018

6. Bureau of Alcohol, Tobacco, Firearms and Explosives. Listing of Federal Firearms Licensees (FFLs) – 2014. https://www.atf.gov/firearms/listing-federal-firearms-licensees-ffls-2014. Updated May 30, 2017. Accessed January 29, 2018

7. Bureau of Alcohol, Tobacco, Firearms and Explosives. Firearms commerce in the United States 2014. https://www.atf.gov/resource-center/docs/firearmscommerceannualstatisticalreport2014pdf/download. Accessed January 29, 2018

8. Denney JT, Rogers RG, Krueger PM, Wadsworth T. Adult suicide mortality in the United States: marital status, family size, socioeconomic status, and differences by sex. *Soc Sci Q*. 2002;90: 1167–1185.

13

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

9. Firearms homicides. Available at: https://webappa.cdc.gov/cgi-bin/broker.exe. Centers for Disease Control and Prevention. Atlanta, GA. Accessed Jan 29, 2018.

10. Mann JJ, Michel CA. Prevention of firearm suicide in the United States: what works and what is possible. *Am J Psychiatry*. 2016;173:969-979.

11. Miller M, Lippmann SJ, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. *J Trauma*. 2007;62:1029–1034.

12. Anglemyer A, Horvath T, Rutherford G. The Accessibility of firearms and risk for suicide and homicide victimization among household members: a systematic review and meta-analysis. *Ann Intern Med*. 2014;160:101–110.

13. Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. *N Engl J Med*. 1999;341(21):1583–9.

14. Vriniotis M, Barber C, Frank E, Demicco R, New Hampshire Firearm Safety Coalition. A suicide prevention campaign for firearm dealers in New Hampshire. *Suicide Life Threat Behav*. 2015;45:157–163.

15. Taylor K, Hanbury M. Here's how easy it is to legally buy a semiautomatic gun in the US. *Business Insider*. February 15, 2018. Available at: http://www.businessinsider.com/how-to-buy-a-gun-2017-10. Accessed February 20, 2018.

16. Miller M, Azrael D, Hepburn L, Hemenway D, Lippmann SJ. The association between changes in household firearm ownership and rates of suicide in the United States, 1981–2002. *Inj Prev*. 2006;12:178-182.

17. Lahti A, Keränen S, Hakko H, Riala K, Räsänen P. Northern excess in adolescent male firearm suicides: a register-based regional study from Finland, 1972-2009. *Eur Child Adolesc Psychiatry*. 2014 Jan;23(1):45-52.

14

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

18. Beautrais AL, Fergusson DM, Horwood LJ. Firearms Legislation and Reductions in Firearm-Related Suicide Deaths in New Zealand. *Aust N Z J Psychiatry*. 2006 Mar(40);3:253-259.

19. Barber C, Frank E, Demicco R. Reducing suicides through partnerships between health Professionals and Gun Owner Groups—Beyond Docs vs Glocks. *JAMA Intern Med*. 2017;177(1):5–6.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

FIGURES LEGEND

Figure 1. Firearm-related mortality and FFL density heat maps

Figure 2. Total FFL density vs. Firearm death rate and Firearm suicide rate

Figure 3: Firearm dealing pawnshop density vs. firearm death rate and firearm suicide rate

16

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**Figure 1**



Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**Figure 2**



18

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**Figure 3**



19

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**TABLES**:

Table 1: Number of FFLs of each type in 2014

| FFL Type | Description | N (%) |
|----------|-------------|-------|
| 1 | Dealer in firearms | 47,833 (73.2) |
| 2 | Pawnbroker in firearms | 7,220 (11.1) |
| 6 | Manufacturer of ammunition | 1,910 (2.9) |
| 7 | Manufacturer of firearms | 7,259 (11.1) |
| 8 | Importer of firearms | 818 (1.3) |
| 10 | Manufacturer of destructive devices | 257 (0.4) |
| Total | | 65,297 |

20

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Table 2: Multivariate analysis of FFL types and mortality rate

| FFL Type | Coefficient (Firearm Deaths) | Coefficient (Firearm Suicides) | Coefficient (Firearm Homicides) |
|---|---|---|---|
| FFL01 | 0.16 | -1.58 | -0.27 |
| FFL02 | **2.38*** | **4.23*** | 1.64 |
| FFL06 | 1.03 | 2.47 | 13.6 |
| FFL07 | 0.19 | -3.79 | -4.05 |
| FFL08 | 2.09 | 9.2 | -8.23 |
| FFL10 | 3.68 | 21.3 | 51.88 |

*$p < 0.01$

21

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

# EXHIBIT D



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

Mr. Avram D. Frey, Esq.
Gibbons P.C.
One Gateway Center               Re:    Appeal No. DOJ-AP-2017-004986
Newark, NJ  07102                       Request No. 2017-0208
afrey@gibbonslaw.com                    MWH:PJA

**VIA:  FOIAonline**

Dear Mr. Frey:

        You appealed on behalf of your client, Everytown for Gun Safety, from the action of the
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) on its Freedom of Information Act
request for access to records concerning the successful tracing of firearms used in suicides.

        After carefully considering your appeal, I am affirming ATF's action on your client's
request.  The FOIA provides for disclosure of many agency records.  At the same time, Congress
included in the FOIA nine exemptions from disclosure that provide protection for important
interests such as personal privacy, privileged communications, and certain law enforcement
activities.  ATF properly withheld this information in full because it is protected from disclosure
under the FOIA pursuant to 5 U.S.C. § 552(b)(3).  This provision concerns matters specifically
exempted from release by a statute other than the FOIA (in this instance, the Consolidated
Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, a permanent law, which
prohibits ATF from using appropriated funds to disclose firearms database information).  See
Abdeljabbar v. ATF, 74 F. Supp. 3d 158, 173-76 (D.D.C. Nov. 20, 2014).

        Please be advised that this Office's decision was made only after a full review of this
matter.  Your appeal was assigned to an attorney with this Office who thoroughly reviewed and
analyzed your appeal, your client's underlying request, and the action of ATF in response to your
client's request. If you have any questions regarding the action this Office has taken on your
appeal, you may contact this Office's FOIA Public Liaison for your appeal.  Specifically, you
may speak with the undersigned agency official by calling (202) 514-3642.

        If you are dissatisfied with my action on your appeal, the FOIA permits you to file a
lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

        For your information, the Office of Government Information Services (OGIS) offers
mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-

- 2 -

exclusive alternative to litigation.  Using OGIS services does not affect your right to pursue litigation.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

7/6/2017

X ~~Matt - M~~

Matthew Hurd, Associate Chief, for
Sean O'Neill, Chief, Administrative Appeals ...
Signed by: MATTHEW HURD

# EXHIBIT E

# STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS, 155 Cong Rec S 3164

March 17, 2009

**Reporter**
155 Cong Rec S 3164 *

*Congressional Record TOC  >  111th Congress, 1st Session  >  March 2009  >  March 17, 2009  >  Senate  >  STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS*

**Reference:** Vol. 155, No. 46

**Section:** Senate

**Speaker:** Mr. UDALL of Colorado; Mr. TESTER; Mr. KYL; Mr. LEAHY; Mrs. HUTCHISON; Ms. MIKULSKI; Ms. COLLINS; Mr. HARKIN; Ms. SNOWE; Mr. REID; Mr. DURBIN; Mrs. FEINSTEIN; Mr. ROCKEFELLER; Ms. LANDRIEU

## Text

[*3164]

By Mr. UDALL of Colorado:

S. 607. A bill to amend the National Forest Ski Area Permit Act of 1986 to clarify the authority of the Secretary of Agriculture regarding additional recreational uses of National Forest System land that are subject to ski area permits, and for other purposes; to the Committee on Energy and Natural Resources.

Mr. UDALL of Colorado. Mr. President, today I am introducing a bill to revise the 1986 law dealing with use of National Forests for ski areas in order to reflect current ways those areas are used and to provide clear authority for the Forest Service to allow additional recreational uses of those areas.

I have long thought it is in the national interest to encourage Americans to engage in outdoor recreational activities that can contribute to their health and well-being, and that National Forest lands, including ski areas, can play a role by providing opportunities for such activities.

My interest in the subject was heightened last year when representatives of the National Ski Areas Association brought to my attention the fact that the National Forest Ski Areas Permit Act of 1986. This law speaks only to "nordic and alpine skiing" and does not reflect the full spectrum of snowsports for which ski areas are now used. They described this problem as the absence of clear authority for the Forest Service to permit use of ski areas for other summer, seasonal, or year-round outdoor recreational activities and facilities in support of those activities.

To better understand the matter, I sent a letter asking the Under Secretary of Agriculture for Natural Resources and the Environment whether current law could be clearer on those points. Under Secretary Mark Rey replied that the 1986 legislation indeed did not address those matters and that, if requested, the USDA "would be happy to work with you to amend" the law to provide the Forest Service with clear authority regarding such activities and facilities.

I did request and receive technical suggestions from the Forest Service, and have considered their input as well as suggestions from the National Ski Areas Association and other interested parties in developing the bill that I introduced in the U.S. House of Representatives last year.

(3) Validity of patents.-For the purpose of determining the validity of a claim in any patent or the patentability of any claim in a nonprovisional application for patent that is made before the effective date of the amendments made by sections 2 and 3, other than in an action brought in a court before the date of the enactment of this Act-

(A) the provisions of subsections (c), (d), and (f) of *section 102 of title 35, United States Code*, that were in effect on the day prior to the date of enactment of this Act shall be deemed to be repealed;

(B) the amendments made by section 3 of this Act shall apply, except that a claim in a patent that is otherwise valid under the provisions of *section 102(f) of title 35, United States Code*, as such provision is in effect on the day prior to the date of enactment of this Act, shall not be invalidated by reason of this paragraph; and

(C) the term "in public use or on sale" as used in *section 102(b) of title 35, United States Code*, as such section was in effect on the day prior to the date of enactment of this Act shall be deemed to exclude the use, sale, or offer for sale of any subject matter that had not become available to the public.

(4) Continuity of intent under the create act.-The enactment of *section 102(b)(3) of title 35, United States Code*, under section (2)(b) of this Act is done with the same intent to promote joint research activities that was expressed, including in the legislative history, through the enactment of the Cooperative Research and Technology Enhancement Act of 2004 (*Public Law 108-453*; the "CREATE Act"), the amendments of which are stricken by section 2(c) of this Act. The United States Patent and Trademark Office shall administer *section 102(b)(3) of title 35, United States Code*, in a manner consistent with the legislative history of the CREATE Act that was relevant to its administration by the United States Patent and Trademark Office.

By Mr. LEAHY (for himself and Mr. Cornyn):

*S. 612*. A bill to amend *section 552(b)(3) of title 5, United States Code* (commonly referred to as the Freedom of Information Act) to provide that statutory exemptions to the disclosure requirements of that Act shall specifically cite to the provision of that Act authorizing such exemptions, to ensure an open and deliberative process in Congress by providing for related legislative proposals to explicitly state such required citations, and for other purposes; to the Committee on the Judiciary.

Mr. LEAHY. Mr. President, this week, our Nation celebrates Sunshine Week-a time to recognize and promote openness in our Government. At this important time of year, I am pleased to join with Senator Cornyn to reintroduce the OPEN FOIA Act-a bipartisan bill to promote more openness regarding statutory exemptions to the Freedom of Information Act, FOIA.

This bipartisan bill builds upon the work that Senator Cornyn and I began several years ago to reinvigorate and strengthen FOIA. Together, we introduced, and Congress ultimately enacted, the OPEN Government Act-the first major reforms to FOIA in more than a decade. I thank Senator Cornyn for his work and leadership on this important issue. I also thank President Obama-who was a cosponsor of the OPEN Government Act when he was in the Senate-for his deep commitment to FOIA. President Obama clearly demonstrated his commitment to open Government when he issued a new directive to strengthen FOIA during his first full day in office.

The OPEN FOIA Act simply requires that when Congress provides for a statutory exemption to FOIA in new legislation, Congress must state its intention to do so explicitly and clearly. This commonsense bill mirrors bipartisan legislation that the Judiciary Committee favorably reported, and the Senate unanimously passed, during the 109th Congress, *S. 1181*. While no one can fairly question the need to keep certain Government information secret to ensure the public good, excessive Government secrecy is a constant temptation and the enemy of a vibrant democracy.

For more than four decades, FOIA has served as perhaps the most important Federal law to ensure the public's right to know, and to balance the Government's power with the need for Government accountability. The Freedom of Information Act contains a number of exemptions to its disclosure requirements for national security, law enforcement, confidential business information, personal privacy and other circumstances. The FOIA exemption

commonly known as the "(b)(3) exemption," requires that Government records that are specifically exempted from FOIA by statute be withheld from the public. In recent years, we have witnessed an alarming number of FOIA (b)(3) exemptions being offered in legislation-often in very ambiguous terms-to the detriment of the American public's right to know.

The bedrock principles of open Government lead me to believe that (b)(3) statutory exemptions should be clear and unambiguous, and vigorously debated before they are enacted into law. Too often, legislative exemptions to FOIA are buried within a few lines of very complex and lengthy bills, and these new exemptions are never debated openly before becoming law. The consequence of this troubling practice is the erosion of the public's right to know, and the shirking of Congress' duty to fully consider these exemptions.

The OPEN FOIA Act will help stop this practice and shine more light on the process of creating legislative exemptions to FOIA. That will be the best antidote to the "exemption creep" that we have witnessed in recent years.

When he recently addressed a joint session of the Congress and the American people, President Obama said that "I know that we haven't agreed on every issue thus far, and there are surely times in the future when we will part ways. But, I also know that every American who is sitting here tonight loves this country and wants it to succeed. That must be the starting point for every debate we have in the coming months, and where we return after those debates are done."

Sunshine Week reminds all of us that open Government is not a Democratic issue, nor a Republican issue. It is an American issue and a virtue that all Americans can embrace. Democratic and Republican Senators alike have rightly supported and voted for this bill in the past. It is in this same bipartisan spirit that I urge all Members to support this bipartisan FOIA reform bill.

Mr. President, I ask unanimous consent that the text of the bill be printed in the Record.

There being no objection, the text of the bill was ordered to be placed in the Record, as follows:

### S. 612

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "OPEN FOIA Act of 2009".

**SEC. 2. SPECIFIC CITATIONS IN STATUTORY EXEMPTIONS.**

*Section 552(b) of title 5, United States Code*, is amended by striking paragraph (3) and inserting the following:

"(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute-
  **[*3176]**

"(A)

(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

"(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

"(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.".

By Mrs. HUTCHISON (for herself, Ms. Mikulski, Mrs. Feinstein, Ms. Landrieu, Ms. Stabenow, Mrs. Lincoln, Mrs. Murray, Ms. Collins, Ms. Snowe, Mrs. Boxer, Mrs. Gillibrand, Mrs. Shaheen, Ms. Murkowski, Ms. Klobuchar, Mrs. Hagan, Ms. Cantwell, and Mrs. McCaskill):

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RON PETERSON FIREARMS, LLC,

       Plaintiff,

  v.

B. TODD JONES, ACTING DIRECTOR,
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS & EXPLOSIVES,

       Defendant.

CIVIL NO. 11-CV-678 JC/LFG
(consolidated with 12-CV-167)

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS'
## MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

On February 27, 2012, Defendant filed the certified administrative record in this case.

See Doc. No. 36. This filing included an agency certification that the record filed with the Court

"constitute[s] a true and complete copy of all non-privileged materials that constitute the agency

administrative record." Certification of Admin. Record [Doc. No. 36-1]. Consistent with this

certification, Defendant redacted certain information that Congress has expressly prohibited from

disclosure, consisting of the names and identifying information of federal firearms licensees

("FFLs") from whom information was sought in the course of a firearms trace by law

enforcement officials. As explained below, Congress has expressly prohibited the disclosure of

such information in the course of civil litigation. Despite this prohibition, Plaintiffs Dale

Rutherford, doing business as The Cop Shop, and Tracy Rifle & Pistol, Inc. ("Plaintiffs") have

moved this Court to order Defendant to produce this privileged and confidential information that

has been redacted in the administrative record. However, Plaintiffs fail to demonstrate any need

for the redacted information or to overcome the presumption of regularity accorded to an

agency's designation of the administrative record.  Nor do Plaintiffs take any account of the

reasons that prompted Congress to preclude such information from disclosure, including the

privacy concerns of businesses licensed by the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF").  Moreover, the administrative record, as redacted, provides sufficient

information to inform both the Court and Plaintiffs of the relevant decision made by Defendant

and obviates the need for Plaintiffs to obtain additional information in order to litigate this case.

Accordingly, the Court should deny Plaintiffs' motion.

## ARGUMENT

### I.    Federal Law Expressly Prohibits the Disclosure of the Confidential Business Information Sought by Plaintiffs.

In cases involving review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

("APA"), information that is prohibited from disclosure in civil litigation does not constitute part

of the administrative record.[1]  Courts have repeatedly held that agencies may exclude or redact

from an administrative record confidential or sensitive information, particularly where, as here,

federal law expressly prohibits the redacted information from disclosure.  See, e.g., MD Pharm.,

Inc. v. DEA, 133 F.3d 8, 13-15 (D.C. Cir. 1998) (party challenging agency's decision to issue

---

[1] "A complete administrative record . . . does not include privileged materials, such as documents that fall within the deliberative process privilege, attorney-client privilege, and work product privilege."  Tafas v. Dudas, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008); see also Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 13 (D.D.C. 2001) ("[D]eliberative intra-agency memoranda and other such records are ordinarily privileged, and need not be included in the record."); Checkosky v. SEC, 23 F.3d 452, 489 (D.C. Cir. 1994) ("In passing on final agency action, we . . . have refused to consider transcripts of closed agency meetings or intra-agency memoranda and documents recording the deliberative process leading to the agency's decision.") (citations and quotations omitted), *superseded on other grounds as recognized by* Marrie v. SEC, 374 F.3d 1196 (D.C. Cir. 2004); Norris & Hirshberg, Inc. v. SEC, 163 F.2d 689, 693 (D.C. Cir. 1947) ("[I]nternal memoranda made during the decisional process . . . are never included in a record.").

license to another firm was not entitled to complete access to all information considered by the agency in light of regulations prohibiting disclosure of "[a]ny confidential or trade secret information disclosed in conjunction with [a licensing] application"); Nat'l Wildlife Fed. v. EPA, 286 F.3d 554, 574 (D.C. Cir. 2002) (disclosure in the administrative record of confidential business information ("CBI") collected by the agency was not required where the "CBI sought was the type of sensitive information and confidential or trade secret information that EPA can properly withhold from public view") (internal punctuation omitted).  Moreover, "designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity.  The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary."  Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1097 (10th Cir. 2007) (quoting Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993)).

Plaintiffs seek disclosure of the "identities of the federally-licensed retail sellers who sold rifles that were later recovered in Mexico from 2008 to 2010," based on "queries made by ATF of its Firearms Tracing System database."  Pl. Br. in Supp. of Mot. to Supplement Admin. Record ("Pl. Br.") at 3 [Doc. No. 41].  However, a federal statute prohibits the disclosure of ATF trace data, including the information sought by Plaintiffs in this case, except for narrowly-defined law enforcement or national security purposes.

Each year since 2003, Congress has included in annual appropriations legislation strict prohibitions on ATF's use of federal funds to disclose information contained in its trace databases.  The most recent enactment of this restriction provides:

*Provided further*, That, during the current fiscal year and in each fiscal year thereafter, **no funds appropriated under this or any other Act may be used to disclose part or all of the contents of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives or any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of such section**, except to: (1) a Federal, State, local, or tribal law enforcement agency, or a Federal, State, or local prosecutor; or (2) a foreign law enforcement agency solely in connection with or for use in a criminal investigation or prosecution; or (3) a Federal agency for a national security or intelligence purpose; unless such disclosure of such data to any of the entities described in (1), (2) or (3) of this proviso would compromise the identity of any undercover law enforcement officer or confidential informant, or interfere with any case under investigation; and no person or entity described in (1), (2) or (3) shall knowingly and publicly disclose such data; **and all such data shall be immune from legal process, shall not be subject to subpoena or other discovery, shall be inadmissible in evidence, and shall not be used, relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based on the data, in a civil action in any State (including the District of Columbia) or Federal court** or in an administrative proceeding other than a proceeding commenced by the Bureau of Alcohol, Tobacco, Firearms and Explosives to enforce the provisions of chapter 44 of such title, or a review of such an action or proceeding; **except that this proviso shall not be construed to prevent:** (A) the disclosure of statistical information concerning total production, importation, and exportation by each licensed importer (as defined in section 921(a)(9) of such title) and licensed manufacturer (as defined in section 921(a)(10) of such title); (B) the sharing or exchange of such information among and between Federal, State, local, or foreign law enforcement agencies, Federal, State, or local prosecutors, and Federal national security, intelligence, or counterterrorism officials; or (C) the publication of annual statistical reports on products regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, including total production, importation, and exportation by each licensed importer (as so defined) and licensed manufacturer (as so defined), or **statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations**:

Pub. L. No. 112-55, 125 Stat. 552, 609-10 (Nov. 18, 2011) (emphasis added).

The information sought by Plaintiffs – the identities of FFLs who sold firearms that were later recovered in Mexico and successfully traced – is clearly "part . . . of the contents of the Firearms Trace System database," the disclosure of which is expressly prohibited by this

-4-

legislation.[2]  Identifying information for the FFLs who sold firearms later recovered in Mexico

and successfully traced is information maintained by ATF in its trace database.  <u>See</u> Decl. of

Charles J. Houser ¶¶ 1-6 (attached as Ex. 1).  This information is used, along with other similar

data, to assist ATF in detecting patterns in the sources of firearms used in crimes.  <u>See id.</u> ¶ 8; <u>see</u>

<u>also generally</u> ATF National Tracing Center Division: Information for Law Enforcement

Agencies (explaining that tracing of firearms recovered by law enforcement officials is used,

among other purposes, to detect patterns in the sources and kinds of crime guns).[3]

     Revealing in a publicly-filed Administrative Record the identities of FFLs who sold

firearms later recovered in Mexico and successfully traced could implicate privacy concerns of

private businesses and jeopardize pending criminal investigations – some of the precise concerns

Congress sought to address.  <u>See</u> Houser Decl. ¶¶ 9-10.  As explained in the House Report for the

2005 Appropriations Act:

> In the last two fiscal years the Committee has expressed serious concern that,
> contrary to provisions of the Gun Control Act, as amended, and Congress' intent,
> *certain sensitive law enforcement information contained in databases maintained*
> *by the ATF* have been subject to release under the Freedom of Information Act
> and through court action to the public, including civil litigants, firearm
> manufacturers and distributors, public interest groups and governmental entities,
> for use other than in bona fide criminal investigations and prosecutions.  The
> Committee concern is not related to budgetary considerations.  The intent has
> been to enforce existing Federal law limiting disclosure of this sensitive law
> enforcement information solely to law enforcement, and, to the extent current
> Federal law does not already so restrict disclosure to so provide now.  It is of great
> concern that releases have occurred, and if repeated, may result in wide-spread

---

[2] By contrast, the unredacted information that was included in the Administrative Record
(indicating the number of firearms recovered from FFLs in particular states, without revealing the
identities of those FFLs) constitutes "statistical aggregate data regarding firearms traffickers and
trafficking channels," 125 Stat. at 610, the disclosure of which is permitted by the statute.

[3] *Available at* http://www.atf.gov/publications/download/p/atf-p-3312-7.pdf.

disclosure of this information to the public at large. This holds the potential of
endangering law enforcement officers and witnesses, jeopardizing on-going
criminal investigations and homeland security. The need to maintain these
sensitive law enforcement databases on a restricted, confidential basis in
accordance with the law and ATF disclosure practices in place for years derives
from the sensitive and long-term nature of criminal investigations. In addition,
such information, once released, might easily be disseminated through the
Internet. *This would endanger law enforcement and homeland security, and
violate the privacy of innocent citizens and businesses*.

H.R. Rep. 108-576, at 30 (2004) (emphasis added).

As the United States Court of Appeals for the Seventh Circuit has explained in construing

a previous iteration of this provision, this stringent disclosure restriction "deprives ATF of any

discretion to act on the matter." City of Chicago v. Dep't of Treasury, 423 F.3d 777, 781-82 (7th

Cir. 2005). "Congress' obvious intention . . . was to cut off access to the databases for any

reason not related to law enforcement." Id. at 780. "The public is now doubly restricted from

access to these databases: first, the funding restriction prevents the federal agency that collects

the data from acting on a request for disclosure; and second, the requesting party has no judicial

remedy as the information is immune from legal process and not subject to subpoena or

otherwise discoverable in a civil action." Id.

Accordingly, in preparing the Administrative Record, Defendant redacted the names and

identifying information of FFLs who sold firearms that were later recovered in Mexico and

successfully traced because it constitutes information "maintained by" ATF in its trace database,

which Congress has expressly prohibited from disclosure in civil litigation. Congress has made

clear that data such as the redacted information "shall be immune from legal process, shall not be

subject to subpoena or other discovery, shall be inadmissible in evidence, and shall not be used,

relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based

-6-

on the data, in a civil action in any State (including the District of Columbia) or Federal court."

125 Stat. at 610.  The redacted information at issue is thus exempt from disclosure.[4]

    In sum, Congress has expressly prohibited the release of the information sought by

Plaintiffs.  Therefore, and as explained below, Plaintiffs have failed to show that they are entitled

to supplementation of the Administrative Record.[5]

---

    [4] Additionally, the information is exempt from disclosure under Exemption 7 of the Freedom of Information Act, 5 U.S.C. § 552(b)(7).  That exemption permits an agency to withhold certain "information compiled for law enforcement purposes," including information the production of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  As noted above, Congress has stated that the trace information at issue "once released, might easily be disseminated through the Internet[, which] would endanger law enforcement and homeland security, and violate the privacy of innocent citizens and businesses." H.R. Rep. 108-576, at 30 (2004).  Moreover, because some FFLs are individuals rather than corporate entities, the disclosure of their names and identifying information in a system of records maintained by an agency may be protected by the Privacy Act, 5 U.S.C. § 552a.

    [5] Plaintiffs' brief states that "Defendant has not provided a basis for the redactions in a privilege log or otherwise."  Pl. Br. at 3.  Contrary to Plaintiffs' assumption, because documents exempted from disclosure are not part of the administrative record in the first instance, they need not be logged as "withheld" from an administrative record.  See Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Serv., 631 F. Supp. 2d 23, 27-28 (D.D.C. 2009) (denying motion to compel defendants to produce a privilege log of any privileged documents because such documents "are not part of the administrative record to begin with"); Blue Ocean Inst. v. Gutierrez, 503 F. Supp. 2d 366, 372 n.4 (D.D.C. 2007) ("[I]t is unfair [for plaintiff] to criticize [the agency] for not claiming a privilege and filing a privilege log as to documents that [the agency] claims should not be in the administrative record in the first place.").  Federal Rule of Civil Procedure 26(b)(5) is not to the contrary because it is a *discovery* rule that does not apply in APA record review cases like this one.  Under Rule 26(b)(5), "[w]hen a party withholds information *otherwise discoverable* by claiming that the information is privileged . . . the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed . . ."  Fed. R. Civ. P. 26(b)(5) (emphasis added).  The redacted information that Plaintiffs seek to compel Defendant to log is not "otherwise discoverable."  Indeed, no documents are "discoverable" in this case because the Federal Rules carve out from the mandatory requirement of initial disclosures "action[s] for review on an administrative record[.]"  Fed. R. Civ. P. 26(a)(1)(B)(i).

# EXHIBIT G

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **10 RING PRECISION, INC. et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 5:11-cv-00663-XR** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **B. TODD JONES, Acting Director,** | ) | |
| **Bureau of Alcohol, Tobacco, Firearms** | ) | |
| **& Explosives, in his official capacity,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S BRIEF IN OPPOSITION TO INTERVENOR PLAINTIFF'S
## MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

On March 8, 2012, Defendant filed the certified administrative record in this case.  See
ECF No. 35.  This filing included an agency certification that the record filed with the Court
"constitute[s] a true and complete copy of all non-privileged materials that constitute the agency
administrative record."  Certification of Admin. Record (attached as Ex. 1).  Consistent with this
certification, Defendant redacted certain information that Congress has expressly prohibited from
disclosure, consisting of the names and identifying information of federal firearms licensees
("FFLs") from whom information was sought in the course of a firearms trace by law
enforcement officials.  As explained below, Congress has expressly prohibited the disclosure of
such information in the course of civil litigation.  Despite this prohibition, Intervenor-Plaintiff
Golden State Tactical, Inc. ("Golden State") has moved this Court to order Defendant to produce
this privileged and confidential information that has been redacted in the administrative record.
However, Golden State fails to demonstrate any need for the redacted information or to
overcome the presumption of regularity accorded to an agency's designation of the administrative

record.  Nor does Golden State take any account of the reasons that prompted Congress to preclude such information from disclosure, including the privacy concerns of businesses licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  Moreover, the administrative record, as redacted, provides sufficient information to inform both the Court and Golden State of the relevant decision made by Defendant and obviates the need for Golden State to obtain additional information in order to litigate this case.  Accordingly, the Court should deny Golden State's motion.

## ARGUMENT

### I. Federal Law Expressly Prohibits the Disclosure of the Confidential Business Information Sought by Golden State.

In cases involving review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"), information that is prohibited from disclosure in civil litigation does not constitute part of the administrative record.[1]  Courts have repeatedly held that agencies may exclude or redact from an administrative record confidential or sensitive information, particularly where, as here, federal law expressly prohibits the redacted information from disclosure.  See, e.g., MD Pharm., Inc. v. DEA, 133 F.3d 8, 13-15 (D.C. Cir. 1998) (party challenging agency's decision to issue

---

[1] "A complete administrative record . . . does not include privileged materials, such as documents that fall within the deliberative process privilege, attorney-client privilege, and work product privilege."  Tafas v. Dudas, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008); see also Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 13 (D.D.C. 2001) ("[D]eliberative intra-agency memoranda and other such records are ordinarily privileged, and need not be included in the record."); Checkosky v. SEC, 23 F.3d 452, 489 (D.C. Cir. 1994) ("In passing on final agency action, we . . . have refused to consider transcripts of closed agency meetings or intra-agency memoranda and documents recording the deliberative process leading to the agency's decision.") (citations and quotations omitted), superseded on other grounds as recognized by Marrie v. SEC, 374 F.3d 1196 (D.C. Cir. 2004); Norris & Hirshberg, Inc. v. SEC, 163 F.2d 689, 693 (D.C. Cir. 1947) ("[I]nternal memoranda made during the decisional process . . . are never included in a record.").

license to another firm was not entitled to complete access to all information considered by the agency in light of regulations prohibiting disclosure of "[a]ny confidential or trade secret information disclosed in conjunction with [a licensing] application"); Nat'l Wildlife Fed. v. EPA, 286 F.3d 554, 574 (D.C. Cir. 2002) (disclosure in the administrative record of confidential business information ("CBI") collected by the agency was not required where the "CBI sought was the type of sensitive information and confidential or trade secret information that EPA can properly withhold from public view") (internal punctuation omitted). Moreover, it is well settled that, absent a "strong showing" to the contrary, courts presume "that the agency properly designated the Administrative Record." Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (citations and internal punctuation omitted); see also Malone Mortgage Co. Am., Ltd. v. Martinez, 2003 WL 23272381, at *5 (N.D. Tex. Jan. 6, 2003) ("An agency's designation of the administrative record is entitled to a presumption of administrative regularity.") (citing Wilson v. Hodel, 758 F.2d 1369, 1374 (10th Cir. 1985)).

Golden State seeks disclosure of the "identities of the federally-licensed retail sellers who sold rifles that were later recovered in Mexico from 2008 to 2010," based on "queries made by ATF of its Firearms Tracing System database." Intervenor Pl. Br. in Supp. of Mot. to Supplement Admin. Record ("Intervenor Br.") at 3 [ECF No. 37]. However, a federal statute prohibits the disclosure of ATF trace data, including the information sought by Golden State in this case, except for narrowly-defined law enforcement or national security purposes.

Each year since 2003, Congress has included in annual appropriations legislation strict prohibitions on ATF's use of federal funds to disclose information contained in its trace databases. The most recent enactment of this restriction provides:

*Provided further*, That, during the current fiscal year and in each fiscal year thereafter, **no funds appropriated under this or any other Act may be used to disclose part or all of the contents of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives or any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of such section**, except to: (1) a Federal, State, local, or tribal law enforcement agency, or a Federal, State, or local prosecutor; or (2) a foreign law enforcement agency solely in connection with or for use in a criminal investigation or prosecution; or (3) a Federal agency for a national security or intelligence purpose; unless such disclosure of such data to any of the entities described in (1), (2) or (3) of this proviso would compromise the identity of any undercover law enforcement officer or confidential informant, or interfere with any case under investigation; and no person or entity described in (1), (2) or (3) shall knowingly and publicly disclose such data; **and all such data shall be immune from legal process, shall not be subject to subpoena or other discovery, shall be inadmissible in evidence, and shall not be used, relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based on the data, in a civil action in any State (including the District of Columbia) or Federal court** or in an administrative proceeding other than a proceeding commenced by the Bureau of Alcohol, Tobacco, Firearms and Explosives to enforce the provisions of chapter 44 of such title, or a review of such an action or proceeding; **except that this proviso shall not be construed to prevent:** (A) the disclosure of statistical information concerning total production, importation, and exportation by each licensed importer (as defined in section 921(a)(9) of such title) and licensed manufacturer (as defined in section 921(a)(10) of such title); (B) the sharing or exchange of such information among and between Federal, State, local, or foreign law enforcement agencies, Federal, State, or local prosecutors, and Federal national security, intelligence, or counterterrorism officials; or (C) the publication of annual statistical reports on products regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, including total production, importation, and exportation by each licensed importer (as so defined) and licensed manufacturer (as so defined), or **statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations**:

Pub. L. No. 112-55, 125 Stat. 552, 609-10 (Nov. 18, 2011) (emphasis supplied).

The information sought by Golden State – the identities of FFLs who sold firearms that were later recovered in Mexico and successfully traced – is clearly "part . . . of the contents of the

-4-

Firearms Trace System database," the disclosure of which is expressly prohibited by this legislation.[2]  Identifying information for the FFLs who sold firearms later recovered in Mexico and successfully traced is information maintained by ATF in its trace database.  See Decl. of Charles J. Houser ¶¶ 1-6 (attached as Ex. 2).  This information is used, along with other similar data, to assist ATF in detecting patterns in the sources of firearms used in crimes.  See id. ¶ 8; see also generally ATF National Tracing Center Division: Information for Law Enforcement Agencies (explaining that tracing of firearms recovered by law enforcement officials is used, among other purposes, to detect patterns in the sources and kinds of crime guns).[3]

Revealing in a publicly-filed Administrative Record the identities of FFLs who sold firearms later recovered in Mexico and successfully traced could implicate privacy concerns of private businesses and jeopardize pending criminal investigations – some of the precise concerns Congress sought to address.  See Houser Decl. ¶¶ 9-10.  As explained in the House Report for the 2005 Appropriations Act:

> In the last two fiscal years the Committee has expressed serious concern that, contrary to provisions of the Gun Control Act, as amended, and Congress' intent, *certain sensitive law enforcement information contained in databases maintained by the ATF* have been subject to release under the Freedom of Information Act and through court action to the public, including civil litigants, firearm manufacturers and distributors, public interest groups and governmental entities, for use other than in bona fide criminal investigations and prosecutions.  The Committee concern is not related to budgetary considerations.  The intent has been to enforce existing Federal law limiting disclosure of this sensitive law enforcement information solely to law enforcement, and, to the extent current

---

[2] By contrast, the unredacted information that was included in the Administrative Record (indicating the number of firearms recovered from FFLs in particular states, without revealing the identities of those FFLs) constitutes "statistical aggregate data regarding firearms traffickers and trafficking channels," 125 Stat. at 610, the disclosure of which is permitted by the statute.

[3] *Available at* http://www.atf.gov/publications/download/p/atf-p-3312-7.pdf.

> Federal law does not already so restrict disclosure to so provide now.  It is of great
> concern that releases have occurred, and if repeated, may result in wide-spread
> disclosure of this information to the public at large.  This holds the potential of
> endangering law enforcement officers and witnesses, jeopardizing on-going
> criminal investigations and homeland security.  The need to maintain these
> sensitive law enforcement databases on a restricted, confidential basis in
> accordance with the law and ATF disclosure practices in place for years derives
> from the sensitive and long-term nature of criminal investigations.  In addition,
> such information, once released, might easily be disseminated through the
> Internet.  *This would endanger law enforcement and homeland security, and
> violate the privacy of innocent citizens and businesses.*

H.R. Rep. 108-576, at 30 (2004) (emphasis supplied).

As the United States Court of Appeals for the Seventh Circuit has explained in construing

a previous iteration of this provision, this stringent disclosure restriction "deprives ATF of any

discretion to act on the matter."  City of Chicago v. Dep't of Treasury, 423 F.3d 777, 781-82 (7th

Cir. 2005).  "Congress' obvious intention . . . was to cut off access to the databases for any

reason not related to law enforcement."  Id. at 780.  "The public is now doubly restricted from

access to these databases: first, the funding restriction prevents the federal agency that collects

the data from acting on a request for disclosure; and second, the requesting party has no judicial

remedy as the information is immune from legal process and not subject to subpoena or

otherwise discoverable in a civil action."  Id.

Accordingly, in preparing the Administrative Record, Defendant redacted the names and

identifying information of FFLs who sold firearms that were later recovered in Mexico and

successfully traced because it constitutes information "maintained by" ATF in its trace database,

which Congress has expressly prohibited from disclosure in civil litigation.  Congress has made

clear that data such as the redacted information "shall be immune from legal process, shall not be

subject to subpoena or other discovery, shall be inadmissible in evidence, and shall not be used,

relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based on the data, in a civil action in any State (including the District of Columbia) or Federal court." 125 Stat. at 610. The redacted information at issue is thus exempt from disclosure.[4]

In sum, Congress has expressly prohibited the release of the information sought by Golden State. Therefore, and as explained below, Golden State has failed to show that it is entitled to supplementation of the Administrative Record.[5]

---

[4] Additionally, the information is exempt from disclosure under Exemption 7 of the Freedom of Information Act, 5 U.S.C. § 552(b)(7). That exemption permits an agency to withhold certain "information compiled for law enforcement purposes," including information the production of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." As noted above, Congress has stated that the trace information at issue "once released, might easily be disseminated through the Internet[, which] would endanger law enforcement and homeland security, and violate the privacy of innocent citizens and businesses." H.R. Rep. 108-576, at 30 (2004). Moreover, because some FFLs are individuals rather than corporate entities, the disclosure of their names and identifying information in a system of records maintained by an agency may be protected by the Privacy Act, 5 U.S.C. § 552a.

[5] Golden State's motion states that "Defendant has not provided a basis for the redactions in a privilege log or otherwise." Intervenor Br. at 3. Contrary to Golden State's assumption, because documents exempted from disclosure are not part of the administrative record in the first instance, they need not be logged as "withheld" from an administrative record. See Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Serv., 631 F. Supp. 2d 23, 27-28 (D.D.C. 2009) (denying motion to compel defendants to produce a privilege log of any privileged documents because such documents "are not part of the administrative record to begin with"); Blue Ocean Inst. v. Gutierrez, 503 F. Supp. 2d 366, 372 n.4 (D.D.C. 2007) ("[I]t is unfair [for plaintiff] to criticize [the agency] for not claiming a privilege and filing a privilege log as to documents that [the agency] claims should not be in the administrative record in the first place."). Federal Rule of Civil Procedure 26(b)(5) is not to the contrary because it is a *discovery* rule that does not apply in APA record review cases like this one. Under Rule 26(b)(5), "[w]hen a party withholds information *otherwise discoverable* by claiming that the information is privileged . . . the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed . . ." Fed. R. Civ. P. 26(b)(5) (emphasis supplied). The redacted information that Golden State seeks to compel Defendant to log is not "otherwise discoverable." Indeed, no documents are "discoverable" in this case because the Federal Rules carve out from the mandatory requirement of initial disclosures "action[s] for review on an administrative record[.]" Fed. R. Civ. P. 26(a)(1)(B)(i).

# EXHIBIT H

The Washington Post

# Firearms Measure Surprises Some in GOP

By Juliet Eilperin

July 21, 2003

Rep. Todd Tiahrt (Kan.) surprised many of his fellow Republicans last week when he offered a lengthy amendment, blessed by the National Rifle Association, to the 2004 funding bill for the Commerce, Justice and State departments.

Tiahrt's eight-point amendment, which targets the Bureau of Alcohol, Tobacco and Firearms and was drafted with the NRA's help, would prohibit the use of federal funds for several bureau activities. It would prevent the bureau from requiring firearms dealers to conduct a physical inventory, from denying licenses to dealers whose sales fall below a certain level, and from demanding that certain dealers provide documentation for all used guns sold in a specific period.

Rep. Frank R. Wolf (R-Va.), who chairs the appropriations subcommittee on Commerce, Justice and State, objected to the amendment, saying he had not had time to review it. "They may all have been good amendments, they may not," Wolf said. "I just didn't have an opportunity to go through and look at them. I could not accept an amendment without knowing what all the provisions do."

Tiahrt refused to withdraw the amendment and won passage on a 31 to 30 vote. Before the vote, Tiahrt assured colleagues the NRA had reviewed the language, which won over some Democrats as well as several Republicans. "I wanted to make sure I was fulfilling the needs of my friends who are firearms dealers," Tiahrt said. NRA officials "were helpful in making sure I had my bases covered."

Wolf said House leaders would take a second look at the amendment when they enter talks with senators to resolve differences in the two chambers' appropriations bills. Tiahrt said he is confident his measure would survive the negotiations.

Making the Case for, Against Prescription Drug Benefit

With House-Senate conferees facing weeks or months of negotiations over proposals to add a prescription drug benefit to Medicare, Democratic and Republican lawmakers in the House are taking their arguments to constituents.

At least 75 House Democrats held town hall meetings on the subject this weekend to tell their side of the story. Most Democrats oppose the GOP-written House bill, which would subsidize the cost of private insurance plans that would compete for seniors' business once the bill is fully implemented in 2010. Under that scenario, seniors would choose between Medicare and private plans to obtain drug coverage

as well as insurance for doctor visits and hospital stays. The House adopted the measure by a single vote last month.

According to Stacy Farnen, spokeswoman for House Minority Whip Steny Hoyer (D-Md.), lawmakers from California to Maine spoke to elderly Americans about the flaws in the GOP bill.

"Democratic members are taking the prescription drug issue straight to seniors to explain what Democrats are fighting for, and the irresponsible plan that Republicans are trying to push through Congress," Farnen said.

Republicans have launched an aggressive outreach effort as well, according to GOP Conference spokesman Greg Crist. During the July 4th recess, he said, "several dozen" Republican lawmakers held "early birthday" celebrations for Medicare, made pharmacy visits and held town meetings to publicize their party's plan.

"We intend and plan to see those same events during August," Crist said.

Bill Aims to Curb Using Food as Bear Bait

Bear baiters, beware. Rep. Elton Gallegly (R-Calif.) has gotten fed up with hunters laying out extensive food traps for bears in national parks. While such baiting practices are legally permissible, Gallegly says they have created "a major safety issue" because the increased exposure to human food has made bears bolder about breaking into campsites and cabins.

Gallegly has a bill before the House Resources Committee, and he describes it as a reasonable curb on bear feeding. "I just say you can't put a truckload of Twinkies by the side of the road for the purpose of enticing a bear out to shoot it," Gallegly said in an interview. The bill has about 170 co-sponsors, and Gallegly said he is optimistic the measure will pass the House.

Drug Reimportation Divide

The proposal to allow U.S.-made prescription drugs to be reimported from foreign countries sparked a fierce debate among conservatives in Republican activist Grover Norquist's weekly meeting on Wednesday. Rep. Gil Gutknecht (R-Minn.) outlined his bill before representatives from several think tanks. The attendees -- including Steve Moore from the Club for Growth and Fred Smith from the Competitive Enterprise Institute -- blasted the proposal, according to participants. Pharmaceutical companies oppose the reimportation idea, but consumer groups support it.

At one point, Smith accused Gutknecht of trying to stifle pharmaceutical innovation. The bill, he said, would prevent U.S. companies from speeding lifesaving drugs to the commercial market. "Your bill's going to kill people," Smith said.

Gutknecht spokesman Bryan Anderson dismissed the criticism. "It's a scare tactic, and what the congressman wants to do is open up markets because he's a free trader," Anderson said.

The Week Ahead

The House will consider a mix of bills before leaving for the August recess, including pension law changes, the proposed reimportation of prescription drugs and several spending bills. The Senate will take up the homeland security appropriations bill as well as trade agreements with Chile and Singapore.

Staff writer Dan Morgan contributed to this report.

💬 0 Comments



### Juliet Eilperin

Juliet Eilperin is The Washington Post's senior national affairs correspondent, covering how the new administration is transforming a range of U.S. policies and the federal government itself. She is the author of two books — one on sharks and another on Congress, not to be confused with each other — and has worked for The Post since 1998.  Follow 🐦

## Your support helps our journalists report news that matters.

Try 1 month for ~~$10~~ $1

Send me this offer

### Inside 'Trump Revealed'

Read stories based on reporting for "Trump Revealed," a broad, comprehensive biography of the life of the 45th president.

- **Reporting archive: Trump's financial records, depositions and interview transcripts**

# EXHIBIT I

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco,
Firearms and Explosives
*Office of Enforcement Programs and Services*

# ATF
## NATIONAL TRACING CENTER DIVISION

**eTrace**
Internet-based
**Firearms Tracing and Analysis**

**ATF Publication 3312.9**
Revised December 2009

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue, NE
Washington, DC 20226
For more information about ATF visit:
www.atf.gov



## Contact the NTC eTrace Customer Service Group:

ATF National Tracing Center
Law Enforcement Support Branch
eTrace Customer Service Group
244 Needy Road
Martinsburg, WV 25405
Tel:  1-800-788-7133
Fax: 1-800-578-7223
Email: etraceadmin@atf.gov

## What Benefits Will eTrace Provide?

Benefits of eTrace include:

- *Significant reduction in the turnaround time required to process a trace request;*

- *Increase the overall number of crime guns traced by providing a user friendly interface for entering trace data;*

- *Improved data quality of trace related information by providing real-time data validation;*

- *Ability to monitor the status of traces;*

- *Ability to view/print/download completed trace results (all print functions are formatted for standard 8 ½" x 11" paper); and,*

- *Ability to perform on-line analytical research relative to your jurisdiction.*

## What is the National Tracing Center Division (NTC)?

The Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) National Tracing Center Division (NTC) is the only organization authorized to trace U.S. and foreign manufactured firearms for international, Federal, State, and local law enforcement agencies. Its purpose is to provide investigative leads in the fight against violent crime and terrorism and to enhance public safety.

## What is Firearms Tracing?

Firearms tracing is the systematic tracking of the movement of a firearm recovered by law enforcement officials from its first sale by the manufacturer or importer through the distribution chain (wholesaler/retailer) to the first retail purchaser.

## Why Trace Firearms?

• To link a suspect to a firearm in a criminal investigation;

• To identify potential traffickers, whether licensed or unlicensed sellers; and

• When sufficiently comprehensive tracing is undertaken by a given community, to detect in-state, interstate, and international patterns in the sources and kinds of crime guns.

## What is eTrace?

ATF extends its ongoing commitment to the law enforcement community by providing it with a paperless firearm trace submission system that is readily accessible through the Internet. This system, known as eTrace, provides the necessary utilities for submitting, retrieving, storing, and querying all firearms trace related information relative to your agency.

The eTrace application lets participating agencies electronically submit firearm trace requests. They can also monitor the progress of their traces and efficiently retrieve completed trace results in a real-time environment.

To access and utilize the eTrace application, the only infrastructure an agency needs is a secure computer and access to the Internet. Even agencies with limited personnel can comprehensively trace their firearms and analyze on-line data.

The focus of the eTrace application is to: enhance current trace protocols; efficiently function in a web-based environment; and, provide for the secure exchange of firearm trace related information between the user community and the ATF National Tracing Center.

eTrace also affords law enforcement agencies direct access to a historical database of its firearm trace related data, enabling a participating agency to analyze its trace related data through a broad search utility. A search for their traces can be initiated on virtually any data field or combination of data fields. This can include individual names, recovery location address, type of crime, date of recovery, etc.

eTrace also provides users with the ability to generate statistical reports regarding the number of traces submitted by their agency over time, the top firearms traced, time-to-crime rates, age of possessors, and more.

## What Functions are Available Through eTrace?

• Enter, validate, and submit comprehensive firearm trace request data;

• View a summary listing of recently submitted traces;

• View the status of a trace (In Progress, Completed, Delayed);

• View, print, and download detailed trace request and trace result information;

• Perform a "Quick Search" or a detailed multi-layer search for traces;

• Submit Urgent Trace Requests for processing;

• Update a trace (a user may only update a trace for which they were the original submitter);

• Re-open a trace to provide previously missing or invalid data;

• Online help and frequently asked questions bulletin board;

• Access to the Firearms Identification Guide (FIG); and,

• Ability to generate statistical reports (i.e., number of traces, top firearms traced, time-to-crime rates, age of possessors, etc.).

